# EXHIBIT A

**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

DOMINIC Y. JU
1311 Floral Street, NW
Washington, DC 20012

And

DANA JU
1311 Floral Street, NW
Washington, DC 20012

*Plaintiffs*,

v.

RANDOLPH CARTER
1224 N. Wolcott Avenue
Chicago, IL 60613
SERVE AT:
VERNON W. JOHNSON, III
Nixon Peabody LLP
401 9th Street, NW
Suite 900
Washington, DC 20004-2128

and

ELIZABETH DENEVI
1224 N. Wolcott Avenue
Chicago, IL 60613
SERVE AT:
VERNON W. JOHNSON, III
Nixon Peabody LLP
401 9th Street, NW
Suite 900
Washington, DC 20004-2128

and

ROBERT L. LEE JR. & ASSOCIATES
8723 Silent Court
Odenton, MD 21113

and

RECEIVED
Civil Clerk's Office
FEB 12 2014
Superior Court
of the District of Columbia
Washington, D.C.

14-0000007

Civil Action No. ________

ROBERT LOUIS LEE, JR. )
8723 Silent Court )
Odenton, MD 21113 )
)
*Defendants.* )

**COMPLAINT**
**ACTION INVOLVING REAL PROPERTY**

COMES NOW DOMINIC Y. JU AND DANA JU, Plaintiffs herein (hereinafter, "Plaintiffs") by and through their undersigned counsel, pursuant to the District of Columbia Rules of Civil Procedure, and for their Complaint ("Complaint") against Defendant Randolph Carter ("Defendant Carter"), Defendant Elizabeth Denevi ("Defendant Denevi"), Defendant Robert L. Lee Jr. & Associates, LLC, and Defendant Robert Louis Lee, Jr. ("Defendant Lee," and collectively with Defendant Carter, Defendant Denevi, and Defendant Robert L. Lee Jr. & Associates, LLC, the "Defendants"), state as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiffs are a married couple domiciled and residing in the District of Columbia. Plaintiffs are the purchasers and current owners of the residential real property located at 1311 Floral Street, NW, Washington, DC 20012 (hereinafter, the "Property").

2. Defendant Carter and Defendant Denevi are a married couple who, at the time of settlement on the Property with Plaintiffs herein, were domiciled in the District of Columbia. Defendants Carter and Denevi currently reside in Chicago, IL.

3. Defendant Carter and Defendant Denevi are the sellers of the Property to the Plaintiffs herein. A copy of the HUD-1 is attached hereto and incorporated herein as **Exhibit 1**.

4. Defendant Robert L. Lee Jr. & Associates was a business organized under the laws of the State of Maryland with a principal place of business located at 8723 Silent Court, Odenton, MD 21113. The online public records for the Maryland State Department of Assessments and

Taxation reflect that Defendant Robert L. Lee Jr. & Associates is "forfeited" as of 2009, for delinquency, and is therefore no longer considered to have a legal presence in the State of Maryland.

5.      A public online records search for the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") shows no record that Defendant Robert L. Lee Jr. & Associates was registered to do business in the District of Columbia as a foreign entity or otherwise.

6.      Defendant Robert L. Lee Jr. & Associates provided contractor services for home remodeling and renovation and, upon information and belief, was the contracting party with Defendant Carter for the Property that is the subject of this lawsuit.

7.      Defendant Lee is a natural person domiciled in the State of Maryland.  Defendant Lee is the sole proprietor of Robert L. Lee Jr. & Associates and, upon information and belief, the individual who executed the basement remodeling contract on behalf of Robert L. Lee Jr. & Associates with Defendant Carter to remodel the basement of the Property that is the subject of this lawsuit.

8.      Because Defendant Robert L. Lee Jr. & Associates is no longer in existence, for the purposes of this Complaint, the allegations set forth against "Defendant Lee" shall be construed to include both the natural person (Defendant Robert Louis Lee, Jr.) and the business (Defendant Robert L. Lee Jr. & Associates).

9.      The Property that is the subject of this suit is located in the District of Columbia; the contract that was breached was ratified in the District of Columbia; the Plaintiffs reside in the District of Columbia; and the Defendants conduct business is in the District of Columbia.  All acts giving rise to this claim occurred in the District of Columbia.

10. This Court has jurisdiction over this matter under D.C. Code § 11-921 and Rule 56 SCR-Civ.

11. Venue is proper pursuant to D.C. Code § 13-422 and 13-423 on the basis that the Defendants transact business, contract to supply services, caused tortious injury in the District of Columbia by acts and omissions in the District of Columbia, and have an interest in real property located in the District of Columbia, out of which this lawsuit arises.

**STATEMENT OF FACTS**

12. On or about June 24, 2004, Defendant Carter and Defendant Denevi purchased and made full settlement upon the Property for the purchase price of Five Hundred Twenty-Seven Thousand Dollars and No Cents ($527,000.000). A copy of the deed recorded in the District of Columbia land records reflecting the conveyance to Defendants Carter and Denevi is attached hereto and incorporated herein as **Exhibit 2**.

13. At the time Defendants Carter and Denevi made settlement and took possession of the Property, the basement was unfinished.

14. Upon information and belief, on or about August 2004, Defendant Carter executed a contracted with Defendant Lee to perform remodeling work to fully finish the Property's basement (the "Renovation Agreement"). Specifically, the Renovation Agreement provided in the Description of Work that Defendant Lee was to perform the following work: "*Basement area, bathroom, laundry room, and office addition to be remodeled, designed, build-out.*" A copy of the Renovation Agreement is attached hereto and incorporated herein as **Exhibit 3**.

15. Upon information and belief, Defendant Lee performed or caused subcontractors to perform the work described in the Renovation Agreement. This work included adding a new

bathroom, new laundry room, new plumbing fixtures, new electrical equipment, new structural

support and framing, and new flooring.

16.     Defendants Carter and Denevi resided in the Property at the time that the renovations

were made to the basement, and therefore saw the progress of the renovations.

17.     The D.C. Construction Codes (2008) and the District of Columbia Construction Codes

Supplement of 2008 (collectively, the "Construction Codes") require a Building Permit,

Demolition Permit and Supplement Plumbing, Mechanical and Electrical Permits, with

corresponding inspections, for the scope of work described in the Renovation Agreement.

18.     Pursuant to 12A DCMR 105.1.3, titled *Owner's Responsibility*, the owner, builder or

authorized representative is responsible for securing all required permits and work performed

without a required permit is deemed a violation of the Construction Codes.

19.     A search of the D.C. Department of Consumer and Regulatory Affairs ("DCRA") records

reflects that no permits, excepting supplemental mechanical and electrical permits, appear to

have been issued for the renovations made to the basement.  A list of the permit record from the

DCRA website is attached hereto and incorporated herein as **Exhibit 4**.

20.     Defendants did not obtain sufficient permits or inspections required by the Construction

Codes for the scope of the basement renovations performed.  These violations constitute illegal

construction under 12A DCMR 113A.

21.     In addition to finishing the basement, Defendants Carter and Denevi caused alterations to

be made to the exterior drainage system of the Property, that included re-grading the yard and

adding improperly sized gutters, both of which caused overflow that resulted in water leaking

into the Property.

22. On or about March 27, 2013, Defendants Carter and Denavi caused the Property to be listed for sale and marketed in the Metropolitan Regional Information Systems, Inc. as MLS listing #DC8039415 ("MLS Listing"), that described the Property as a 5 bedroom home and the basement as "*fully finished w/ BR, Half BA, + space for office*," indicating that the basement is habitable for use as a bedroom. A copy of the MLS Listing is attached hereto and incorporated herein as **Exhibit 5.**

23. Plaintiffs viewed the MLS Listing and relied on the information therein in deciding to purchase the Property.

24. On or about April 1, 2013, Plaintiffs entered into a standard GCAAR Regional Sales Contract (the "Sales Contract") to purchase the Property from Defendants Carter and Denevi for Eight Hundred Thousand Dollars and No Cents ($800,000.00). A copy of the Sales Contract is attached hereto and incorporated herein as **Exhibit 6**.

25. As required by the District of Columbia Residential Real Property Seller Disclosure Act (D.C. Code § 42-1302), Defendants Carter and Denevi prepared and ratified a "Seller's Property Condition Statement" (hereinafter, the "Disclosure Statement"), on February 22, 2013. Defendants Carter and Denevi delivered the Disclosure Statement to Plaintiffs on April 1, 2013 as part of the Sales Contract. See Exhibit 6. In the Disclosure Statement, Defendants Carter and Denevi certified, as required by statute, that the disclosures of the Property's condition were true and correct to the best of their actual knowledge.

26. The Disclosure Statement requires disclosure of "any structural defects in the walls or floors" (Exhibit 6, Disclosure Statement, ¶ A.4); and/or "any current leaks or evidence of moisture in the basement" (Exhibit 6, Disclosure Statement, ¶ A.3); and/or "any problem with drainage on the property" (Exhibit 6, Disclosure Statement, ¶ D.1); and/or "whether the property

has previously been damaged by flooding" (Exhibit 6, Disclosure Statement, ¶ D.2); and/or if there were "any substances, materials, or environmental hazards [including asbestos] on or affecting the property" (Exhibit 6, Disclosure Statement, ¶ D.4).

27.     In response to each of these required disclosures, Defendants Carter and Denevi explicitly answered "NO."

28.     In stating "NO" in response to the disclosure inquiries, Defendants Carter and Denevi declared to have no actual knowledge of the types of defects listed in the disclosure inquiries.

29.     Defendants Carter and Denevi did not amend the Disclosure Statement at any time prior to the settlement date for the sale of the Property and transfer of possession to Plaintiffs.

30.     On May 17, 2013, Plaintiffs and Defendants Carter and Denevi made full settlement on the Property and Plaintiffs took possession thereof.

31.     On July 12, 2013, Plaintiffs moved into the Property with their infant son.

32.     That evening, their first night living in the Property, Plaintiffs discovered wet carpet in the basement bedroom.  In an effort to locate the source of the dampness, my clients lifted a small section of the carpet.  Lifting merely a small section of the basement carpet revealed what appeared to be extensive water damage and disturbed asbestos tiles.  Plaintiffs then removed sections of the carpet throughout the basement to inspect the extent of the water damage and asbestos.  In doing so, Plaintiffs observed what appeared to be black mold, water damage, and fragments of fractured asbestos tiles throughout the basement beneath the carpeting.  Copies of photographs of the condition of the basement floorings are attached hereto and incorporated herein as **Exhibit 7**.

33. On July 13, 2013, Plaintiff Dana Ju emailed Defendant Denevi inquiring as to whether she was aware of prior instances of flooding in the Property's basement during the years 2004 to 2013 that they owned and occupied the Property.

34. That same day, Defendant Denevi responded in the 10:22 a.m. email, stating that "*[o]nce we fixed the drainage outside, we had no water in the basement*," and further stating that the source of the overflow is the "*back 'corner' just outside the guest bedroom window [which] is the juncture point for two big gutters*." A copy of the email communication is attached hereto and incorporated herein as **Exhibit 8**.

35. Following discovery of the water damage, Plaintiffs obtained assessments of the water damage from several repair companies and general contractors. Each told the Plaintiffs that improper drainage in the exterior spaces of the Property caused damage to the mortar and windows, thus allowing water penetration into the basement. Each also observed that the drainage issue and interior water damage had not only occurred in the past, but has continued to occur for a prolonged period of several years.

36. In the course of assessing the water damage, the water damage repair companies and general contractors informed Plaintiffs that there appeared to be asbestos flooring in the Property's basement.

37. On August 13, 2013, Plaintiffs retained Geller Environmental Services ("Geller") to analyze and investigate the asbestos.

38. On August 14, 2013, Geller delivered a report of its testing that confirmed the presence of asbestos in the Property, and further advised Plaintiffs to avoid the basement and to never expose their infant son to the asbestos hazard in the basement. A copy of the Geller Environmental Services report is attached hereto and incorporated herein as **Exhibit 9**.

39. On August 25, 2013, in an effort to learn the history of the water damage, the Plaintiffs met with Daniel and Ruth Jordan, who are the former owners of the Property that sold the Property to Defendants Carter and Denevi in 2004.

40. During their meeting that day, Daniel Jordan informed the Plaintiffs that he had experienced water leaks and moisture in the basement while he owned the Property.

41. In the same meeting, Daniel Jordan told Plaintiffs that he had installed the asbestos tile flooring in the then-unfinished basement when he and Ruth Jordan occupied the Property. Daniel Jordan also informed the Plaintiffs that when he and Ruth Jordan sold the Property to Defendants Carter and Denevi in 2004, that the asbestos tiles were exposed and fully intact.

42. On October 24, 2013, Ruth Jordan sent Plaintiffs the 4:34 p.m. email stating "*there were no broken tiles when we moved.*" A copy of the email communication is attached hereto and incorporated herein as **Exhibit 10**.

43. After Defendants Carter and Denevi purchased and took possession of the Property in 2004 from Daniel and Ruth Jordan, they retained Defendant Lee to fully remodel and finish the basement. The remodeling work was performed while Defendants Carter and Denevi owned and lived in the Property, and included installing new carpet, new windows, a new laundry room, a finished bathroom, and new structural framing.

44. During the basement remodeling, the asbestos tiles were partially removed, fractured and friable tiles were left throughout the flooring, and carpeting was then installed on top of the partially abated tiles. In addition, new drywall framing was constructed upon the tiles and secured with nails through the asbestos tiles.

45. The asbestos was further disturbed by the ongoing damage caused by Defendants Carter and Denevi's insufficient remedial repairs and defective alterations to the exterior drainage

system of the Property on or about August 10, 2004. The purported repairs and alterations involved installation of improperly sized gutters and improper grading that not only failed to abate the water leaking, but also caused water overflow and accumulation that leaked into the Property through the very corner of the Property Defendant Denevi discussed in her July 13, 2013 email as the source of the continuous leaking into the basement.

46. Defendants Carter and Denevi's improper repairs and alterations directly and proximately caused the extensive water damage and further disturbance of the asbestos tiles in the Property's basement. A copy of the contract for installation of the gutter system is attached hereto and incorporated herein as **Exhibit 11**.

47. But for Defendants' negligent repairs and reckless disregard for proper asbestos abatement procedures, the asbestos tiles would not have become hazardous.

48. All Defendants had actual knowledge of the presence of asbestos, water damage, and structural defects in the Property.

49. No Defendant disclosed the existence of these hazards, damage, and/or defects to Plaintiffs.

50. These hazards, damage, and defects were not discoverable during an ordinary and reasonable home inspection.

51. On November 4, 2013, Plaintiffs obtained an expert assessment of the condition of Property's basement from BJC ("BJC"), and an estimate for asbestos abatement and repair to bring the basement to a habitable condition. BJC estimated the total cost of repairs to correct the identified defects to be approximately $100,000.00. A copy of the BJC Report is attached hereto and incorporated herein as **Exhibit 12**.

52.     On November 11, 2013, Plaintiffs obtained a second expert assessment of the condition of Property's basement from City Renovations & Remodeling, LLC ("City"), and an estimate for repair to bring the basement to a habitable condition.  City estimated the total cost of repairs to correct the identified defects to be approximately $70,000.00.  The City Report does not account for asbestos abatement.  A copy of the City Report is attached hereto and incorporated herein as **Exhibit 13**.

53.     Due to the effects of the presence of asbestos, the water damage, and the defective renovations, Plaintiffs are required to demolish and fully renovate the entire basement.

54.     To abate the exterior drainage problems to prevent further water damage, Plaintiffs must perform extensive repair work to the gutters, windows, and grading of the yard.

55.     The asbestos tiles that Defendants disturbed and concealed continue to pose a significant health hazard to Plaintiffs and to their infant son.  Plaintiffs have been deprived of the full use and enjoyment of their home.

56.     Plaintiffs have spent significant sums to correct some of the defects and hazards, and anticipate spending extensive additional costs to make the Property safe, habitable, and in the promised condition.

57.     On September 12, 2013, Marty Stanton of KVS Title sent, on behalf of Plaintiffs, to Defendants Carter and Denevi written notice of the asbestos hazards, water damage, and structural defects in the Property, and an offer to amicably settle the dispute.  Defendants Carter and Denevi rejected this offer.  A copy of the written offer is attached hereto and incorporated herein as **Exhibit 14**.

58. On October 14, 2013, Plaintiffs sent Defendants Carter and Denevi via the 4:12 p.m. email a second offer to amicably settle the dispute. Defendants Carter and Denevi rejected this offer. A copy of the written offer is attached hereto and incorporated herein as **Exhibit 15.**

59. On January 10, 2014, Plaintiffs sent Defendants Carter and Denevi a letter offering the amicable settlement of the dispute. A copy of the letter is attached hereto and incorporated herein fully referenced as Plaintiff's **Exhibit 16**.

60. Defendants Carter and Denevi have declined the Plaintiffs' offer to settle these claims.

**COUNT I**
**BREACH OF CONTRACT**
**As to Defendants Carter and Denevi**
**(Addendum and Seller Disclosure Statement)**

61. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 60 above.

62. On April 1, 2013, Plaintiffs and Defendants Carter and Denevi entered into the Sale Contract for the Property. On May 17, 2013, Plaintiffs and Defendants Carter and Denevi made full settlement on the Property.

63. Under the material terms of the Sales Contract, Defendants Carter and Denevi agreed to deliver the Property to Plaintiffs with the basement in a habitable condition free from environmental hazards and water damage problems.

64. Under the material terms of the Sales Contract, which incorporated the Disclosure Statement, Defendants Carter and Denevi agreed to disclose in good faith all information required under D.C. Code § 42-1301 *et seq.*

65. Plaintiffs fully performed their obligations under the Sales Contract.

66. On April 1, 2013, Defendants Carter and Denevi delivered to the Plaintiffs the Property with an uninhabitable basement with substantial structural defects, asbestos hazards, and water damage.

67. Defendants Carter and Denevi materially breached the Sales Contract by failing to deliver the Property with the basement in a habitable condition free from structural defects, asbestos hazards, and water damage.

68. Defendants Carter and Denevi materially breached the Sales Contract by failing to disclose actually known asbestos hazards, water damage, and structural defects in the Property to Plaintiffs.

69. The Sales Contract provides that "the provisions not satisfied at Settlement will survive the delivery of the deed and will not be merged therein." See Exhibit 5, para. 31. Accordingly, the breached covenants under the terms of the contract survived the delivery of the deed.

70. Despite several demands by the Plaintiffs to Defendants Carter and Denevi to pay for repairs to restore the Property to the promised condition, Defendants Carter and Denevi have refused to pay for any repairs to the Property to fix the asbestos hazard and defects throughout the Property.

71. Defendants Carter and Denevi's material breach has caused Plaintiffs to incur a substantial pecuniary loss, including diminution in value of the Property, and additional costs in the future to restore the Property to the promised condition.

WHEREFORE, the Plaintiffs request rescission of the Sales Contract and setting aside the deed for transfer of the Property from Defendants Carter and Denevi to Plaintiffs herein; or, alternatively, judgment against Defendants Carter and Denevi, jointly and severally, in the

amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable costs and attorney's fees, and all other relief this Court deems just and proper.

**COUNT II**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**As to Defendant Carter and Defendant Denevi**

72. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 60 above.

73. On April 1, 2013, Plaintiffs and Defendants Carter and Denevi entered into the Sales Contract for the Property, which contains an implied duty of good faith and fair dealing.

74. Defendants Carter and Denevi materially breached this duty by failing to disclose the Property had been illegally renovated; falsely representating and failing to disclose known structural defects, environmental hazards, and water damage of the Property; and otherwise willfully rendering imperfect performance of the Sales Contract.

75. Defendants Carter and Denevi's material breach deceived Plaintiffs into believing that the Property was in a condition worth the value of the purchase price.

76. On May 17, 2013, believing Defendants Carter and Denevi was acting in good faith, Plaintiffs made full settlement on the Property and paid Defendants Carter and Denevi the purchase price of $800,000.00.

77. On May 17, 2013, Defendants Carter and Denevi delivered to Plaintiffs the Property with a basement rife with defects and environmental hazards, in a condition grossly deviating from the renovated and hazard-free condition in which Defendants Carter and Denevi represented it to be.

78. Defendants Carter and Denevi's material breach caused Plaintiffs to incur substantial expenses to date and must incur additional costs in the future to restore the Property's basement to the habitable condition it was represented to be by Defendants Carter and Denevi.

WHEREFORE, the Plaintiffs request rescission of the Sales Contract and setting aside the deed for transfer of the Property from Defendants Carter and Denevi to Plaintiffs herein; or, alternatively, judgment against Defendants Carter and Denevi, jointly and severally, in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable attorneys' fees and court costs and such further relief as relief this Court deems proper.

**COUNT III**
**BREACH OF WARRANTY**
**As to Defendant Carter and Defendant Denevi**

79. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 60 above.

80. On April 1, 2013, Plaintiffs and Defendants Carter and Denevi entered into the Sales Contract for the Property, which was a valid and enforceable contract.

81. Under the material terms of the contract, Defendants Carter and Denevi warranted that the existing basement was habitable and hazard-free as of the Possession Date.

82. On May 17, 2013, Defendants Carter and Denevi delivered to Plaintiffs the Property with a basement rife with defects and environmental hazards, in a condition grossly deviating from the renovated and hazard-free condition in which Defendants Carter and Denevi represented it to be.

83. Defendants Carter and Denevi materially breached this warranty by failing to delivery the Property with a habitable and hazard-free basement.

84. Defendants Carter and Denevi's material breach caused Plaintiffs to incur substantial expenses to date and must incur additional costs in the future to restore the Property's basement to the habitable and hazard-free condition it was warranted to be by Defendants Carter and Denevi.

WHEREFORE, the Plaintiffs request rescission of the Sales Contract and setting aside the deed for transfer of the Property from Defendants Carter and Denevi to Plaintiffs herein; or, alternatively, judgment against Defendants Carter and Denevi, jointly and severally, in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable attorneys' fees and court costs and such further relief as relief this Court deems proper.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**As to Defendant Carter and Defendant Denevi**

85. Plaintiffs incorporate herein by reference the allegations in Paragraphs 1 through 60 of the Complaint.

86. Defendants Carter and Denevi had a duty to exercise reasonable care in the marketing, selling, advertising and otherwise promoting of the Property to potential purchasers such as Plaintiffs, which included a duty to accurately describe the condition of the Property to Plaintiffs.

87. Defendants Carter and Denevi breached this duty and negligently misrepresented the property's suitability for occupancy and actual condition when they omitted material information from the Disclosure Statement contained in the Sales Contract in failing to disclose the previous instances of flooding, leaking, and/or drainage problems with the Property, and known asbestos hazard, that Defendants Carter and Denevi knew or should have known existed.

88. Defendants Carter and Denevi's statements as to the condition of the Property involved a material issue for the Plaintiffs, as their decision to purchase the Property was made on the belief

that they were purchasing a fully renovated and ready to move-in Property with a habitable basement and no defects or environmental hazards.

89. Plaintiffs, to their detriment, entered into the Sale Contract with Defendants Carter and Denevi in reasonable reliance upon their statements and omissions, and, as a direct and proximate result of these negligent misrepresentations, purchased a Property that contained nor as valuable as believed to be at the time of purchase.

WHEREFORE, the Plaintiffs request judgment against Defendant Carter and Defendant Denevi, jointly and severally, in the amount of One Hundred Fifty Dollars and No Cents ($150,000.00), punitive damages in the amount of Three Hundred Thousand Dollars and No Cents ($300,000), reasonable attorneys' fees and costs and such further relief as relief this Court deems proper.

**COUNT V**
**FRAUDULENT MISREPRESENTATION**
**As to Defendant Carter and Defendant Denevi**

90. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 60 above.

91. To facilitate the sale of the Property to Plaintiffs, Defendants Carter and Denevi made representations to the Plaintiffs as to the condition of the Property and the quality of their renovations to the Property that were false and known to be false by them when made.

92. Defendants Carter and Denevi made a false representation of material fact when they declared on the Disclosure Statement that the Property had no known defects, when they had actual knowledge of previous instances of flooding, leaking, and/or drainage problems with the Property, and had actual knowledge of the asbestos hazard, as follows:

(a)    Statement number A.3 of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge of any current leaks or evidence of moisture in the basement?" Defendants Carter and Denevi answered "No." However, Defendant Denevi's June 13, 2013, email response evidences actual knowledge of prior water damage.

(b)    Statement number A.4. of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge of any structural defects in walls or floors?" Defendants Carter and Denevi answered "No".  However, the renovations to the basement were made using slipshod methods resulting in significant defects to the walls and floors, including constructing drywall framing on top of and nailed to fragmented asbestos tiles.

(c)    Statement number D.1. of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge of any problem with drainage on the property?" Defendants Carter and Denevi answered "No".

(d)    Statement number D.2. of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge whether the property has previously been damaged by flooding?" Defendants Carter and Denevi answered "No." However, Defendant Denevi's June 13, 2013, email response evidences actual knowledge of prior water damage.

(e)    Statement number D.4. of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge of any substances, materials or environmental hazards [including asbestos] on or affecting the property?" Defendants Carter and Denevi answered "No."  However, Defendants Carter and Denevi

purchased the Property from Daniel and Ruth Jordan with the asbestos tiles intact and

exposed, then proceeded to cause the asbestos to be disturbed in the course of renovating

the basement, then concealed the hazardous condition by causing carpeting to be installed

on top of the disturbed asbestos tiles.

93.     When answering the above questions in the Disclosure Statement, Defendants Carter and

Denevi had actual knowledge that there were previous instances of flooding, leaking, and/or

drainage problems with the Property; had actual knowledge of structural defects in the walls and

flooring; and had actual knowledge of the asbestos hazard.  The statements in the Disclosure

Statement are completely false.

94.     Defendants Carter and Denevi made these false representations of material fact with the

intent to deceive the Plaintiffs into purchasing the Property at a price in excess of its actual value

in view of the existing defects and hazards, and for financial gain divesting Defendants Carter

and Denevi of the financial cost of remediation and repair.

95.     Defendants Carter and Denevi caused the carpet to be installed on top of the hazardous

asbestos tile, concealing the hazards and causing the asbestos to be undiscoverable by reasonable

inspection.

96.     The false representations affected the willingness of Plaintiffs to purchase the Property,

as the Plaintiffs reasonably relied on the false representations in making their decision to

purchase the Property, to their detriment.

97.     Plaintiffs would not have purchased the Property if the defects, in particular, the asbestos

hazard, had been disclosed to them.

98. Plaintiffs have suffered injury as a result of Defendant Carter and Defendant Denevi's false representation of material fact, including, but not limited to, remediation and abatement costs, professional fees and expenses, and diminution of Property value.

WHEREFORE, the Plaintiffs request judgment against Defendants Carter and Denevi, jointly and severally, in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), punitive damages in the amount of Three Hundred Thousand Dollars and No Cents ($300,000), reasonable attorneys' fees and costs and such further relief as relief this Court deems proper.

**COUNT VI**
**NEGLIGENCE PER SE**
**As to Defendant Carter and Defendant Denevi**
**(Violation of DC Code § 42-1305-06)**

99. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 60 above.

100. Sections 42-1305 and 42-1306 of the D.C. Code require sellers of real property to furnish a Disclosure Statement to prospective purchasers describing all known defects in the real property, including previous instances of flooding, current leaking and/or drainage problems, and environmental hazards.

101. Defendants Carter and Denevi, who were identified as the "sellers" of the Property when Plaintiffs made their offer to buy the Property, violated DC Code § 42-1305-06 when they affirmatively represented to Plaintiffs in the Disclosure Statement that he had no actual knowledge of previous instances of flooding, current leaking and/or drainage problems, and/or environmental hazards, all as described above.

102. Defendants Carter and Denevi breached his statutory duty when they failed to disclose in writing on the Disclosure Statement the Property's known defects, and falsely stated there were no such known defects.

103. Plaintiffs are the purchasers of the Property, and therefore individuals intended to be protected by D.C. Code § 42-1305 and § 42-1306.

104. Plaintiffs reasonably relied on the statements made in the statutorily mandated Disclosure Statement to their detriment.

105. As a direct and proximate result of the misstatements and omissions contained in the Disclosure Statement, Defendants Carter and Denevi induced Plaintiffs to purchase the Property and caused Plaintiffs to suffer injury because of extensive defects to the Property. But for Defendants Carter and Denevi's misstatements and omissions regarding the condition of the Property, Plaintiffs would not have purchased the Property at the agreed-upon price.

106. The failure of Defendants Carter and Denevi to disclose, in good faith, known defects and environmental hazards caused and continues to cause Plaintiffs significant damage, including but not limited to, remediation costs, professional fees and expenses, and diminution of Property value.

107. WHEREFORE, the Plaintiffs request judgment against Defendant Carter and Defendant Denevi, jointly and severally, in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable attorneys' fees and court costs, and such further relief as this Court deems proper.

**COUNT VII**
**NEGLIGENCE PER SE**
**As to Defendant Carter and Defendant Denevi**
**(Violation of D.C. Code § 6-1401, *et seq.* and DCMR 12)**

108.   Plaintiffs incorporate herein by reference the allegations in Paragraphs 1 through 60 of the Complaint.

109.   District of Columbia Municipal Regulations ("DCMR") 12A § 105.1 requires Property owners performing renovation, repair, and home improvement work to obtain permits for the work from the District of Columbia Department of Regulatory and Consumer Affairs ("DCRA"). (DCMR 12A §§ 105.1.4 and 105.1.13).

110.   Work started without a permit where a permit is determined to be required is a per se violation of the Construction Codes (DCMR 12A § 105.1.3).

111.   The duty to obtain requisite permits prior to performing construction, repairs, and home improvements imposed by DCMR 12A § 105.1 is intended to protect the safety of residential property owners and occupants by ensuring that the renovation and repair work is performed in accordance with applicable Construction Code standards.

112.   At the time the basement renovations were made to the Property, Defendants Carter and Denevi were the owners of the Property.

113.   For all of the renovations, repairs, and home improvements Defendants Carter and Denevi made to the Property, they obtained a total of four (4) permits:

   (a)   Supplemental Permit # M83363 issued September 13, 2004 for mechanical work;

   (b)   Supplemental Permit # E88341 issued December 8, 2004 for electrical work;

   (c)   Permit # F107828 issued June 8, 2007 for fence construction; and

   (d)   Supplemental Permit # E151521 issued September 17, 2007 electrical work.  See Exhibit 4.

114.   Defendants Carter and Denevi breached their duty of care by knowingly or negligently permitting the basement renovations, including installation of a new plumbing system and

structural support, to be built, installed, and repaired without obtaining permits for the work as required by DCMR 12A § 105.1.

115. If Defendants Carter and Denevi had complied with the permit and inspection requirements of the Construction Codes, the defects in the Property would have been avoided or cured.

WHEREFORE, the Plaintiffs request judgment against Defendant Carter and Defendant Denevi, jointly and severally, in the amount of One Hundred Thousand Fifty Dollars and No Cents ($150,000.00), reasonable attorneys' fees and costs and such further relief as relief this Court deems proper.

**COUNT VIII**
**NEGLIGENCE**
**As to Defendant Lee**

116. Plaintiffs incorporate herein by reference the allegations in Paragraphs 1 through 60 of the Complaint.

**Negligent Construction**
**(Violation of D.C. Code § 6-1401, *et seq*. and DCMR 12)**

117. Defendant Lee performed remodeling and renovation work to the Property's basement, and in conducting this activity, had a nondelegable duty to comply with the Construction Codes and in making the renovations, repairs, and home improvements to the Property.

118. The Construction Codes are intended to establish the minimum standards to safeguard the public health, safety, and general welfare.

119. Defendant Lee had a duty to use due care in the design, inspection, and construction that extends to persons foreseeably subjected to the risk of personal injury because of a latent and unreasonably dangerous condition resulting from that negligence.

120. Defendant Lee was negligent in failing to properly abate the asbestos from the Property that he discovered in the course of construction to the basement.

121. Defendant Lee was negligent in disturbing the tiles and concealing them beneath the carpeting he installed.

122. The post-settlement inspections identified dangerous latent conditions, the asbestos hazard in particular, that created risk of death or personal injury, particularly to the Plaintiff's infant son.

123. The asbestos hazards were a direct and proximate result of Defendant Lee's negligence in construction to the Property.

124. Defendant Lee exposed Plaintiffs to risks of personal injury through his negligence.

125. The threat to the safety and welfare of the Plaintiffs was significant to the degree that they were advised not to use the basement of the Property until it was repaired to a condition safe for habitability.

126. Defendant Lee, the party who performed the renovation work to the Property's basement, negligently created unsafe conditions that directly and proximately caused the Plaintiffs to suffer damages, including the cost of repair work necessary to correct the dangerous conditions to make the Property habitable.

**Negligence Arising Under the Renovation Agreement**

127. Defendant Lee contracted with Defendant Carter to perform remodeling work to the Property's basement.

128. At all relevant times, Defendant Lee was a licensed professional in DC.

129. Defendant Lee owed duty of care to Plaintiffs to remodel the Property's basement in a safe, skillful, careful, diligent, and worklike manner.

130. In performing the construction within the Renovation Agreement's scope of work, Defendant Lee should have known that protection of third parties either visiting Property or subsequent purchasers was important, and that his failure to exercise reasonable care in performing the work under the contract increases the risk of physical harm to third parties.

131. Defendant Lee breached his duty by recklessly and/or negligently creating, then concealing, hazardous asbestos conditions in the Property that created dangerous health hazards.

132. Defendant Lee's breach proximately caused Plaintiffs' injuries.

WHEREFORE, the Plaintiffs request judgment against Defendant Lee in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable attorneys' fees and costs and such further relief as relief this Court deems proper.

**COUNT IX (ALTERNATIVE)**
**UNLAWFUL TRADE PRACTICES**
**As to Defendant Lee**
**(Violation of DC Code § 28-3901, *et seq.*)**

133. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 60 above.

134. In the alternative, Defendant Lee committed unlawful trade practices in violation of the District of Columbia Consumer Protection Procedures Act, § 28-3901, *et seq.*

135. Defendant Lee is a "merchant" of "goods and services" as defined by the District of Columbia Consumer Protection Procedures Act, § 28-3901, *et seq.*

136. Specifically, Defendant Lee committed unlawful trade practices in violation of D.C. Code §§ 28-3904 (d), when he represented that his construction and remodeling services performed were of the quality of a licensed professional, and that he had fully renovated the basement so that it was of a habitable condition free from defects and hazards, when in fact the basement as

he renovated it was uninhabitable due to hazardous asbestos he had recklessly disturbed and concealed beneath carpeting.

137.    Specifically, Defendant Lee committed unlawful trade practices in violation of D.C. Code §§ 28-3904 (f), when he failed to disclose the Property's defects and asbestos hazards to Defendants Carter and Denevi that he discovered in the course of making the basement renovations, and proceeded to conceal the defects and asbestos hazards beneath carpeting.

138.    Plaintiffs have suffered injury as a result of Defendant Lee' unlawful trade practices, including, but not limited to, remediation costs, professional fees and expenses, diminution of Property value, and exposure to health hazards.

139.    Plaintiffs would not have been injured but for Defendant Lee' unlawful trade practices.

140.    Section 28-3905(k) of the D.C. Code permits a private right of action when an individual has been the victim of unlawful trade practices.  This section also permits the victim of unlawful trade practices to recover treble damages, attorneys' fees and expenses, and punitive damages.

        WHEREFORE, the Plaintiff demands judgment against Defendant Lee in the amount of treble damages of Four Hundred Fifty Thousand Dollars and No Cents ($450,000.00), reasonable attorneys' fees, costs and all other relief this Court deems proper.

*[signature page follows]*

Dated: 2/10/2014

Respectfully submitted,

By [signature]

Peter D. Antonoplos, Esq.
DC Bar # 485119
Antonoplos & Associates, Attorneys at Law
805 15th Street, NW
Suite 501
Washington, DC 20005
Telephone: (202) 803-5676
Fax: (202) 803-5677
Email: Peter@antonlegal.com

*Attorney for the Plaintiffs*

PLAINTIFF'S VERIFICATION

I, Dominic Y. Ju, Plaintiff herein, under penalty of perjury, state that I have read the foregoing Verified Compliant, and that the information stated therein as factual is true and correct, and those factual matters which are stated upon information and belief are believed to be true and correct. Executed on this 7th day of February, 2014.

Dominic Y. Ju

STATE OF ______________ )
) ss.
CITY OF THE DISTRICT OF COLUMBIA )

I, the undersigned, a Notary Public in and for the DISTRICT OF COLUMBIA, do hereby certify that DOMINIC Y. JU, party to the foregoing instrument bearing date on the 7th day of February, 2014, and hereto annexed, personally appeared before me, and the said DOMINIC Y. JU being personally well known to me as (or proved by the oath of credible witnesses to be) the person who executed the foregoing instrument, and acknowledged the same to be their act and deed.

Given under my hand and official seal, this 7th day of February, 2014.

NOTARY PUBLIC

My commission expires: Sept. 30, 2018

District of Columbia: SS
Subscribed and Sworn to before me this 7th day of February, 2014.
Elizabeth L. Gallacher, Notary Public, D.C.
My Commission Expires September 30, 2018

ELIZABETH L. GALLACHER NOTARY PUBLIC DISTRICT OF COLUMBIA COMMISSION EXPIRES SEPT. 30, 2018

PLAINTIFF'S VERIFICATION

I, Dominic Y. Ju, Plaintiff herein, under penalty of perjury, state that I have read the foregoing Verified Compliant, and that the information stated therein as factual is true and correct, and those factual matters which are stated upon information and belief are believed to be true and correct. Executed on this 7th day of February, 2014.

Dominic Y. Ju

STATE OF ______________________ )
) ss.
CITY OF THE DISTRICT OF COLUMBIA )

I, the undersigned, a Notary Public in and for the DISTRICT OF COLUMBIA, do hereby certify that DOMINIC Y. JU, party to the foregoing instrument bearing date on the 7th day of February, 2014, and hereto annexed, personally appeared before me, and the said DOMINIC Y. JU being personally well known to me as (or proved by the oath of credible witnesses to be) the person who executed the foregoing instrument, and acknowledged the same to be their act and deed.

Given under my hand and official seal, this 7th day of February, 2014.

NOTARY PUBLIC

My commission expires: Sept. 30, 2018

District of Columbia: SS
Subscribed and Sworn to before me
this 7th day of February, 2014.
Elizabeth L. Gallacher, Notary Public, D.C.
My Commission Expires September 30, 2018

ELIZABETH L. GALLACHER
NOTARY PUBLIC
DISTRICT OF COLUMBIA
COMMISSION EXPIRES SEPT 30 2018

# EXHIBIT 1



# A. Settlement Statement (HUD-1)

OMB Approval No. 2502-0265

**B. Type of Loan**

| 1. [ ] FHA 2. [ ] RHS 3. [X] Conv. Unins. 4. [ ] VA 5. [ ] Conv. Ins. | 6. File Number: 13-5646 | 7. Loan Number: 5002794424 | 8. Mortgage Insurance Case Number: |
|---|---|---|---|

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agents are shown. Items marked "(p.o.c)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name & Address of Seller: | F. Name & Address of Lender: |
|---|---|---|
| DOMINIC Y. JU, DANA L. JU<br>1928 10th St, NW, Washington, DC 20001 | RANDOLPH CARTER, ELIZABETH DENEVI<br>1224 N Wolcott Ave, Chicago, IL 60613 | TD Bank, N.A.<br>1 Portland Square, Portland, ME 04101 |
| G. Property Location:<br>1311 Floral Street, N.W.<br>Washington, DC 20012<br>Square 2777, Lot 0033 | H. Settlement Agent:<br>KVS Title, LLC<br>7200 Wisconsin Avenue, #903, Bethesda, MD 20814<br>Phone: 301-605-1420 / Fax: 301-605-1413 | I. Settlement Date: 05/17/2013<br>Disbursement Date: 05/17/2013 |
| | Place of Settlement:<br>7200 Wisconsin Avenue, #903, Bethesda, MD 20814 | TitleExpress<br>Printed 05/17/2013 at 12:32 pm<br>by EK |

**J. Summary of Borrower's Transaction**

| | | |
|---|---|---|
| 100. | Gross Amount Due from Borrower | |
| 101. | Contract sales price | 800,000.00 |
| 102. | Personal property | |
| 103. | Settlement charges to borrower (line 1400) | 23,671.17 |
| 104. | | |
| 105. | | |
| | Adjustments for items paid by seller in advance | |
| 106. | City/town taxes to | |
| 107. | County taxes to | |
| 108. | Assessments to | |
| 109. | Association Dues to | |
| 110. | | |
| 111. | | |
| 112. | | |
| 120. | Gross Amount Due from Borrower | 823,671.17 |
| 200. | Amounts Paid by or in Behalf of Borrower | |
| 201. | Deposit or earnest money | 80,000.00 |
| 202. | Principal amount of new loan(s) | 640,000.00 |
| 203. | Existing loan(s) taken subject to | |
| 204. | | |
| 205. | SUBORDINATE FINANCING | 79,840.00 |
| 206. | | |
| 207. | Lender Credit | 8.45 |
| 208. | | |
| 209. | | |
| | Adjustments for items unpaid by seller | |
| 210. | City/town taxes 04/01/2013 to 05/17/2013 | 460.76 |
| 211. | County taxes to | |
| 212. | Assessments to | |
| 213. | Association Dues to | |
| 214. | | |
| 215. | 52 Day Rent Back at No Charge | |
| 216. | | |
| 217. | | |
| 218. | | |
| 219. | | |
| 220. | Total Paid by/for Borrower | 800,309.21 |
| 300. | Cash at Settlement from/to Borrower | |
| 301. | Gross amount due from borrower (line 120) | 823,671.17 |
| 302. | Less amounts paid by/for borrower (line 220) | 800,309.21 |
| 303. | Cash [X] From [ ] To Borrower | 23,361.96 |

**K. Summary of Seller's Transaction**

| | | |
|---|---|---|
| 400. | Gross Amount Due to Seller | |
| 401. | Contract sales price | 800,000.00 |
| 402. | Personal property | |
| 403. | | |
| 404. | | |
| 405. | | |
| | Adjustments for items paid by seller in advance | |
| 406. | City/town taxes to | |
| 407. | County taxes to | |
| 408. | Assessments to | |
| 409. | Association Dues to | |
| 410. | | |
| 411. | | |
| 412. | | |
| 420. | Gross Amount Due to Seller | 800,000.00 |
| 500. | Reductions in Amount Due to Seller | |
| 501. | Excess deposit (see instructions) | |
| 502. | Settlement charges to seller (line 1400) | 52,345.00 |
| 503. | Existing loan(s) taken subject to | |
| 504. | Payoff of first mortgage loan #6006396151 to Morgan Stanley Private Bank, Nat'l Assoc. | 102,913.13 |
| 505. | Payoff of second mortgage loan #60137200121999 to Wells Fargo ** HeLoc Payoff Must Fax** | 30,461.04 |
| 506. | | |
| 507. | | |
| 508. | | |
| 509. | | |
| | Adjustments for items unpaid by seller | |
| 510. | City/town taxes 04/01/2013 to 05/17/2013 | 460.76 |
| 511. | County taxes to | |
| 512. | Assessments to | |
| 513. | Association Dues to | |
| 514. | | |
| 515. | 52 Day Rent Back at No Charge | |
| 516. | Rent Back Security Deposit | 2,000.00 |
| 517. | | |
| 518. | Water Escrow | 300.00 |
| 519. | Late Fee on DC WASA (Acct# 1703198) | 6.64 |
| 520. | Total Reduction Amount Due Seller | 188,486.57 |
| 600. | Cash at Settlement to/from Seller | |
| 601. | Gross amount due to seller (line 420) | 800,000.00 |
| 602. | Less reductions in amount due seller (line 520) | 188,486.57 |
| 603. | Cash [X] To [ ] From Seller | 611,513.43 |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

## L. Settlement Charges

| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. Total Real Estate Broker Fees | $40,000.00 | | | |
| Division of commission (line 700) as follows: | | | | |
| 701. $16,000.00 | to Lindsay Reishman Real Estate | | | |
| 702. $24,000.00 | to Urban Brokers, LLC | | | |
| 703. Commission paid at settlement | | | | -40,000.00 |
| 704. Earnest Money Deposit | to Urban Brokers, LLC | $80,000.00 P.O.C.(B*) | | 80,000.00 |
| 705. Administrative Fee | to $295 Pd by Jenn Smira of Lindsay Reishman | | | |
| 800. Items Payable in Connection with Loan | | | | |
| 801. Our origination charge (Includes Origination Point 0.000% or $0.00) | $668.45 | (from GFE #1) | | |
| 802. Your credit or charge (points) for the specific interest rate chosen | $ | (from GFE #2) | | |
| 803. Your adjusted origination charges | | (from GFE A) | 668.45 | |
| 804. Appraisal fee | to Gausman Appraisals | (from GFE #3) | 400.00 | |
| 805. Credit report | to CBC Innovis | (from GFE #3) | 10.96 | |
| 806. Tax service | to CoreLogic Tax Services | (from GFE #3) | 76.00 | |
| 807. Flood certification | to CoreLogic Flood Services | (from GFE #3) | 5.00 | |
| 808. Customer Auth Report | to CBC Innovis | (from GFE #3) | 1.70 | |
| 900. Items Required by Lender to be Paid in Advance | | | | |
| 901. Daily interest charges from | from 05/17/2013 to 06/01/2013 @ $61.3699/day | (from GFE #10) | 920.55 | |
| 902. Mortgage Ins. Premium | for months to | (from GFE #3) | | |
| 903. Homeowner's Insurance | for 12 months to USAA | (from GFE #11) | 1,787.17 | |
| 904. | months to | (from GFE #11) | | |
| 1000. Reserves Deposited with Lender | | | | |
| 1001. Initial deposit for your escrow account | | (from GFE #9) | 1,707.74 | |
| 1002. Homeowner's Insurance | 3 months @ $ 148.93/month $446.79 | to TD Bank, N.A. | | |
| 1003. Mortgage Insurance | months @ $ 0.00/month $ | to | | |
| 1004. City Property Tax | 5 months @ $ 371.33/month $1,856.65 | to TD Bank, N.A. | | |
| 1005. County Property Tax | months @ $ 0.00/month $ | to | | |
| 1006. Assessments | months @ $ 0.00/month $ | to | | |
| 1007. Aggregate Adjustment | $-595.70 | to TD Bank, N.A. | | |
| 1100. Title Charges | | | | |
| 1101. Title services and lender's title insurance | | (from GFE #4) | 3,662.00 | |
| 1102. Settlement or closing fee | to KVS Title, LLC $300.00 | | | 300.00 |
| 1103. Owner's title insurance - First American Title Insurance Corporation | | (from GFE #5) | 2,448.00 | |
| 1104. Lender's title insurance - First American Title Insurance Corporation | $2,562.00 | | | |
| 1105. Lender's title policy limit $640,000.00 Lender's Policy | | | | |
| 1106. Owner's title policy limit $800,000.00 Owner's Policy | | | | |
| 1107. Agent's portion of the total title insurance premium to KVS Title, LLC | $4,258.50 | | | |
| 1108. Underwriter's portion of the total title insurance premium to First American Title Insurance Corporation | $751.50 | | | |
| 1109. Title Abstract/Judgment Search | to CAPITAL ABSTRACTS, LP $220.00 | | | |
| 1110. Deed Preparation | to KVS Title, LLC | | | 125.00 |
| 1111. Release Service Fee ($125 per loan) | to KVS Title, LLC | | | 250.00 |
| 1112. Release Search & Tracking ($35 per lien) | to reQuire, LLC | | | 70.00 |
| 1113. Closing Protection Letter Services | to First American Title Insurance $50.00 | | | |
| 1114. Survey: Job# 13-1381 | to SNIDER & ASSOCIATES $200.00 | | | |
| 1200. Government Recording and Transfer Charges | | | | |
| 1201. Government recording charges | $ | (from GFE #7) | 344.50 | |
| 1202. Deed $31.50 | Mortgage $156.50 Release $ | to Recorder of Deeds | | |
| 1203. Transfer taxes | $ | (from GFE #8) | 11,600.00 | |
| 1204. City Transfer Tax | Deed $11,600.00 Mortgage $ | to Recorder of Deeds | | 11,600.00 |
| 1205. City Recordation Tax | Deed $11,600.00 Mortgage $ | to Recorder of Deeds | | |
| 1206. Construction Tax | Deed $ Mortgage $ | to Recorder of Deeds | | |
| 1207. Record DOT for 2nd Trust | $156.50 | to Recorder of Deeds | | |
| 1300. Additional Settlement Charges | | | | |
| 1301. Required services that you can shop for | | (from GFE #6) | | |
| 1302. Survey now in 1100 Section | to | | | |
| 1303. Pest Inspection: Invoice# 1736342 | to Pest Now/Superior Pest Management | | 37.10 | |
| 1304. Tax Service Fee | to | | | |
| 1305. Flood Certification | to | | | |
| 1306. Association Dues | to | | | |
| 1307. Transfer/New Owner Set-Up | to | | | |
| 1308. Tax Bill: 10/1/2012 - 3/31/2013 | to DC TREASURER (SSL: 2777/0033) | $1,833.02 P.O.C.(S*) | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | | 23,671.17 | 52,345.00 |

*Paid outside of closing by (B)orrower, (S)eller, (L)ender, (I)nvestor, Bro(K)er. **Credit by lender shown on page 1. ***Credit by seller shown on page 1.

Signature Page

# HUD CERTIFICATION OF BUYER AND SELLER

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the HUD-1 Settlement Statement.

Buyers

DOMINIC Y. JU

DANA L. JU

Sellers

RANDOLPH CARTER

ELIZABETH DENEVI

Settlement Agent

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds received and have been or will be disbursed by the undersigned as part of the settlement of this transaction. I have caused or will cause the funds to be disbursed in accordance with this statement.

SETTLEMENT AGENT

5-17-13

DATE

WARNING: IT IS A CRIME TO KNOWINGLY MAKE FALSE STATEMENTS TO THE UNITED STATES ON THIS OR ANY SIMILAR FORM. PENALTIES UPON CONVICTION CAN INCLUDE A FINE AND IMPRISONMENT. FOR DETAILS SEE TITLE 18: U.S. CODE SECTION 1001 AND SECTION 1010.

# EXHIBIT 2

Doc# 2004093228 1/3

AFTER RECORDING MAIL TO:
Stewart Title Group, LLC
11 Dupont Circle
Suite 750
Washington D.C. 20036

File No. DC-2046-04
DEED-SHORT FORM D.C.

***THIS DEED,*** made this 24th day of June, 2004, by and between **Daniel B. Jordan and Ruth Jordan, husband and wife,** party(ies) of the first part, and **Elizabeth Denevi and Randolph Carter, Joint Tenants,** party(ies) of the second part.

***WITNESSETH,*** that in consideration of the sum of **$527,000.00** the party(ies) of the first part do hereby grant unto the party(ies) of the second part, in fee simple, as **JOINT TENANTS,** all that piece or parcel of land, together with the improvements, rights, privileges and appurtenances to the same belonging, situate in the District of Columbia which has a Lot No. **0033** in Square **2777,** described as follows, to wit:

Lot numbered Thirty-three (33) in R. Claude Wright's combination of Lots numbered Six (6) and Seven (7) in Square numbered Twenty-seven Hundred Seventy-seven (2777), "Girl's Portion", as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 55 at folio 187.

Which has a mailing address of: 1311 Floral Street NW
Washington DC 20012

Title Insurer: Stewart Title Guaranty Company

AND the said party(ies) of the first part covenant that they will warrant specially the property hereby conveyed; and that they will execute such further assurances of said land as may be requisite.

WITNESS the hands and seals the day and year first hereinbefore written.

IN PRESENCE OF:

____________________ {SEAL}
Daniel B. Jordan

____________________ {SEAL}
Ruth Jordan

**District of Columbia, ss:**

I, R. Bradley Runyan a Notary Public, in and for the jurisdiction aforesaid, do hereby certify that Daniel B. Jordan and Ruth Jordan, husband and wife, who is/are known to me as the grantors in, and the persons who executed the aforegoing and annexed deed, bearing the date of June 24, 2004, personally appeared before me in the said District and acknowledged the said deed to be his/her act and deed.

**Given** under my hand and seal this 24th day of June, 2004

____________________
R. Bradley Runyan, Notary Public

My Commission Expires: October 14, 2008

File No. DC-2046-04

Doc# 2004093228
Book:
Pages:
Filed & Recorded
07/06/2004 11:02:47 AM
LARRY TODD
RECORDER OF DEEDS
WASHINGTON D.C. RECORDER OF DEEDS

| | | |
|---|---|---|
| RECORDING | $ | 20.00 |
| SURCHARGE | $ | 6.50 |
| RECORDATION TAX | $ | 7,905.00 |
| TRANSFER TAX 1. | $ | 7,905.00 |

# EXHIBIT 3

**Robert L. LeeJr. t/a Robert L. LeeJr. & Associates**
**8723 Silent Court, Odenton Maryland 21113**
**410-695-0160 (office/fax)**
**443-694-6215 (cell)**

**HOME IMPROVEMENT CONTRACT**

D.C. Permanent # 6138

The following is a CONTRACT for materials and labor to be supplied by the Contractor at the request and order of the homeowner.

HOMEOWNER'S NAME: RANDOLPH CARTER

ADDRESS: 1311 FLORAL St.

WASHINGTON D.C. 202 726-0721
CITY STATE ZIP CODE PHONE#

CONSTRUCTION ADDRESS (if different): ____

CITY STATE ZIP CODE

HOME PHONE: ( ) ____ ADDITIONAL #s: ____

DESCRIPTION OF WORK TO BE PERFORMED: BASEMENT AREA, BATHROOM, LAUNDRY ROOM AND OFFICE ADDITION TO BE REMODELED, DESIGNED, BUILD-OUT. THE SCOPE OF WORK IS WRITTEN ON THE PROPOSAL FORM WITH COST, AND PAYMENT ARRANGEMENT.

Work to be started on or before ____ 20 ____, and be substantially completed on or before ____ 20 ____.

OPTIONAL: If there is insufficient space to describe the full scope of the work in the space above, an addendum to this agreement describing the complete scope of work must be put in writing and signed by both parties. The addendum is made part of the this contract by this reference.

**BUYER'S RIGHT TO CANCEL**

If this agreement was solicited at or near your residence and you do not want the goods or services, you may cancel this agreement by mailing a notice to the seller. The notice must say that you do not want the goods or services and must be mailed before midnight of the third business day after you signed this contract. The notice must be mailed to: Robert L. LeeJr. t/a Robert L. LeeJr. & Associates, 8723 Silent Court, Odenton, Maryland, 21113. If you cancel, the seller may not keep any part of your cash down payment.

Total Amount $ 19,931.10 Deposit $ 6,643.70 Balance $ 13,287.40

Balance of payment to be made as follows: IN 2 PAYMENTS AS DISCRIBED ON THE PROPOSAL FORM (ADDENDUM - SCOPE OF WORK ORDER).

**DO NOT SIGN IN BLANK. HOMEOWNER IS ENTITILED TO COPY OF THE CONTRACT (INCLUDING ANY ADDENDA) AT THE TIME HE OR SHE SIGNS.**

The foregoing terms, specifications and conditions are satisfactory and hereby agreed to. You are authorized to work as specified and payment will be made as outlined above. Upon signing this agreement, the homeowner represents and warrants that he or she is the owner or the authorized agent of the aforesaid premises and that he or she has read this agreement.

Salesperson's Name: ROBERT L. LEE JR Liscense #: 6138 Date: ____

Homeowner(s): ____ Date: ____

This contract may be with drawn if not accepted by the Contractor within 3 days.

Contractor's Acceptance: ____ Date: ____

Homeowner(s) Acceptance: ____ Date: ____

# EXHIBIT 4

Mayor VINCENT C. GRAY

Search Search

Ask the Mayor | Subscribe to Emails | Agency Directory | 311 Online | Closures

311 Online | District Residents | Businesses | Visitors | Media | Online Services

DC Home > DCRA Home

## Property Information Verification System

**Property Information by Exact Address**

| | |
|---|---|
| **Address:** | 1311 FLORAL ST NW |
| **Zip Code:** | Zip Lookup |
| **SSL:** | 2777 0033 |
| **Cluster:** | Cluster 16 |
| **Ward:** | Ward 4 |
| **ANC:** | ANC 4A |
| **SMD:** | SMD 4A03 |
| **Census Tract:** | 001600 |
| **Zone:** | R-1-B * |

* Check the Zoning map for recent changes.

* Check the Zoning orders for recent changes.

**Find Property By:** Exact Address SSL

| St. No.* | St. Name* | St. Suffix | Quad |
|---|---|---|---|
| 2448 | 18TH | Street | NW |

St. No. Suffix: 1/2

Find

DEPARTMENT OF CONSUMER & REGULATORY AFFAIRS

Printer-friendly Reports »

Links » Google Street View Google Address Search Track Building Permit Status Real Property Data Bing Aerial View Gen'l Maps

Restrictions & Holds

Issued Permits

Maps

Photo

Owners

CAMA

Residential Cases

Commercial Inspections

Occupancy

BBL

**Issued Permits : No. of Records = 4**

**Show records per page :** 10

| Address | Unit | SSL | ID | Type | Date Issued | Status | Status Date | Detailed Description |
|---|---|---|---|---|---|---|---|---|
| 1311 FLORAL ST NW | | | E151521 | Supplemental/Electrical | 2007/09/17 | Permit Issued | | |
| 1311 FLORAL ST NW | | | E88341 | Supplemental/Electrical | 2004/12/08 | Permit Issued | | |
| 1311 FLORAL ST NW | | | F107828 | Construction/Fence | 2007/06/08 | Permit Issued | 2007/06/08 | REPLACE EXISTNG WOOD FENCE W/IRON FENCE 48" HIGH W/GATE |
| 1311 FLORAL ST NW | | | M83363 | Supplemental/Mechanical | 2004/09/13 | Permit Issued | | |

**Disclaimer:**
This application was created for DCRA from a variety of agency and non-agency data sources. It is not a legal document. Data may need to be cross-referenced to the original source system. Information provided by other agencies should be verified with them where appropriate.

**District News**
Subscribe to Email Lists

**Information Centers**
72 hours Emergency Planning
Consumer Protection
Education
Health
Social Services
Residents
Visitors

**Community**
DC Procurement
Green DC
DC One Card
Recovery.dc.gov

**DC Government**
Mayor's Office
DC Agencies
DC Council
Elected Officials
District Employees
Courts
DC Laws
DC Statehood

**Contact Us**
Call 311
Contact the Mayor
Contact Agency Directors
Send Feedback
Search Telephone Directory
Submit Service Requests
Make FOIA Requests

Accessibility | About DC Gov | DC Guide | Web Hotspots | Feedback | Privacy & Security | Terms & Conditions

# EXHIBIT 5



My Rating

Inquire About This Property
xactsite@mris.net

My Notes

---

---

---

Sold Price:

**$800,000**

Sold Date:

**1311 FLORAL ST NW**
**WASHINGTON,DC 20012**

**Subdivision:** SHEPHERD PARK
**County:** WASHINGTON
**Beds:** 5
**Bathrooms:** 2
**Sq ft:** 2,874 (approx)
**MLS #:** DC8039415
**Status:** Closed

Photo Coming Soon

OPEN SUN 3/31 1-4! Stunning 5BR/2 Full/2 Half BA fully detached Dutch Colonial in Shepherd Park. Large lot w/ outdoor yard + garage parking. Large LR w/ wood burning FP, formal DR, and gourmet eat-in kitchen. 4 spacious BRs upstairs w/ 2 full BA. MA BR has en suite BA + walk in closet. Basement is fully finished w/ BR, Half BA, + space for office. Fantastic fenced in yard.

**Description for 1311 FLORAL ST NW WASHINGTON, DC 20012**

OPEN SUN 3/31 1-4! Stunning 5BR/2 Full/2 Half BA fully detached Dutch Colonial in Shepherd Park. Large lot w/ outdoor yard + garage parking. Large LR w/ wood burning FP, formal DR, and gourmet eat-in kitchen. 4 spacious BRs upstairs w/ 2 full BA. MA BR has en suite BA + walk in closet. Basement is fully finished w/ BR, Half BA, + space for office. Fantastic fenced in yard.

## Listing Information

**Last Update:**

**Property Type:** Single Family-Detached

**Bedrooms:** 5
**Square Feet:** 2,874 (approx)
**Year Built:** 1917
**Stories:** 3
**Subdivision:** SHEPHERD PARK
**Water:** Public
**Sewer:** Public Septic, Public Sewer

**Lot Size:** 8,095 Sq. Ft.

**Garage:** Yes- 1 space

## Room Information

Main Floor

- **Dining Room**
- **Kitchen**
- **Living Room**
- **Sitting Room**
- **Foyer**

Lower Floor

- **Bedroom5**
- **Den/Study**

Upper Floor

- **Master Bedroom**
- **Bedroom2**
- **Bedroom3**
- **Bedroom4**

Bathrooms

**Full Baths:** 2

**1/2 Baths:** 2

**Additional Room Information**

**Dining:** Breakfast Room, Gourmet, Kit-Dining Combo, Sep Dining Rm, Eat-In Kitchen

## Interior Features

**Appliances:** Dishwasher, Disposal, Dryer, Icemaker, Microwave, Oven-Single, Oven/Range-Gas, Refrigerator, Washer, Water dispenser

**Heating:** Gas Heat, Forced Air

**Basement:** Connecting Stairway, Fully Finished, Outside Entrance, Space For Rooms, Walkout Stairs, Windows

**Fireplaces:** 1

**Additional Interior Features:** Floor Plan-Traditional, Attach Mstr Bath, Built-in Bookcases, Crown Molding, Granite Counters, MBA/Sep Shwr, MBR-BA Full, Master Walk-in Closet, Wood Floors

## Exterior / Lot Features

**Parking:** 1 Garage Spaces, Garage, Faces Rear

**Exterior:** Vinyl

**Pool:** None

**Structural Condition:** Renov/Remod, Shows Well

1311 FLORAL ST NW, WASHINGTON, DC 20012 | Listing Information | MRIShomes.com 1/8/14, 11:52 AM

## Financial Considerations

**Ownership Type:** Fee Simple

**Tax/Property ID:** 2777//0033

**Tax Amount:** $4,456

**Tax Year:** 2012

## Market Activity

**Market Activity | ZIP: 20012**

30
20
10
0
Jun
2013
Aug
2013
Oct
2013
Sold Listings
New Pendings
New Listings

© 2013 RealEstate Business Intelligence
Data Provided by MRIS as of Sep 5, 2013

## Listing Price History

**There is currently no listing history data available.**

http://www.mrishomes.com/homes-for-sale/DC/WASHINGTON/20012/1311-FLORAL-ST-NW-87740941/print Page 3 of 4

1311 FLORAL ST NW, WASHINGTON, DC 20012 | Listing Information | MRIShomes.com 1/8/14, 11:52 AM

**Driving Directions**

17th St NW
Jonquil St NW
Kalmia Rd NW
Jessup Blair Park
Blair Rd
New York A
Jonquil St NW
Shepherd Park
Georgia Ave NW
Eastern Ave NW
Fenton St
Iris St NW
Alaska Ave NW
Jequie Park
Hemlock St NW
Holly St NW
12th St NW
9th St NW
7th St NW
Takoma Ave
Holly St NW
Geranium St NW
13th St NW
Floral St NW
Fern Pl NW
8th St NW
Fern St NW
North Rd
Takoma
14th St NW
13th Pl NW
Service Rd
Elder St NW
Piney Branch Rd NW
Dahlia St NW
Dahlia St NW
9th St NW
Highland Ave NW
Takoma
Main Dr
600 yds
Aspen Dr
© 2014 Microsoft Corporation © 2010 NAVTEQ © AND

**Agent-Entered Driving Directions:** From 16th St NW- turn onto Alaska, right onto Floral.

Listing Provided Courtesy Of: Lindsay Reishman Real Estate, Inc.

Information is deemed reliable but is not guaranteed.

**Residential Real Estate:** Virginia Real Estate listings | Maryland Real Estate listings | West Virginia Real Estate listings | Washington, DC

Copyright © 2013 Metropolitan Regional Information Systems, Inc. | Privacy Policy | Terms of Use |

http://www.mrishomes.com/homes-for-sale/DC/WASHINGTON/20012/1311-FLORAL-ST-NW-87740941/print Page 4 of 4

# EXHIBIT 6

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001
DocuSign Envelope ID: 044DE23C-A6D5-4DE8-8B8D-947CE017F1C4
DocuSign Envelope ID: 9DDF5E9C-1489-4C18-8D7D-8B7CC6432A2C

# REGIONAL SALES CONTRACT

This SALES CONTRACT ("Contract") is made on April 1, 2013 ("Contract Date") between Dominic Ju, Dana Ju ("Purchaser") and Randolph Carter, Elizabeth Denevi ("Seller") who, among other things, hereby confirm and acknowledge by their initials and signatures herein that by prior disclosure in this real estate transaction Lindsay Reishman Real Estate, Inc. ("Listing Company") represents Seller, and Urban Brokers, LLC ("Selling Company") represents ☒ **Purchaser** OR ☐ **Seller.** The Listing Company and Selling Company are collectively referred to as "Broker". (If the brokerage firm is acting as a dual representative for both Seller and Purchaser, then the appropriate disclosure form is attached to and made a part of this Contract.) In consideration of the mutual promises and covenants set forth below, and other good and valuable consideration the receipt and sufficiency of which is acknowledged, the parties agree as follows:

1. REAL PROPERTY Purchaser will buy and Seller will sell for the sales price ("Sales Price"), Seller's entire interest in the real property (with all improvements, rights and appurtenances) described as follows ("Property"):
   TAX Map/ID # 2777//0033 Legal Description: Lot(s) 33 Block/Square ______
   Section ______ Subdivision or Condominium SHEPHERD PARK
   Parking Space(s) # ______ County/Municipality WASHINGTON
   Deed Book/Liber # ______ Page/Folio # ______
   Street Address 1311 FLORAL ST NW
   Unit # ______ City WASHINGTON State DC Zip Code 20012

2. JURISDICTIONAL ADDENDUM The following Jurisdictional Addendum, if ratified and attached, is made a part of this Contract. Jurisdictional Addendum for ☒ DC ☐ VA ☐ MD/County: ______
   ☐ **Other:** ______

3. PRICE AND FINANCING
   A. **Down Payment** $ 20%
   B. **Financing**
      1. First Trust (if applicable) $ 80%
      2. Second Trust (if applicable) $ ______
      3. Seller Held Trust Addendum attached (if applicable) $ ______

   **TOTAL FINANCING** $ 80.00

   **SALES PRICE** $ 800,000.00

   C. **First Deed of Trust** Purchaser will ☒ **Obtain** OR ☐ **Assume a** ☐ **Fixed** OR an ☐ **Adjustable** rate First Deed of Trust loan of the following type:
      ☐ **Conventional** See Addendum Attached ☐ **VA** See Addendum Attached
      ☐ **FHA** See Addendum Attached ☐ **Other:** ______
      ☒ **This contract is not contingent on Financing.**

   D. **Second Deed of Trust** Purchaser will ☐ **Obtain** OR ☐ **Assume a** ☐ **Fixed** OR an ☐ **Adjustable** rate Second Deed of Trust loan.

   E. **Assumption Only** Assumption fee, if any, and all charges related to the assumption will be paid by the Purchaser. If Purchaser assumes Seller's loan(s): (i) Purchaser and Seller ☐ **will**, OR ☐ **will not** obtain a release of Seller's liability to the U.S. Government for the repayment of the loan by Settlement, (ii) Purchaser and Seller ☐ **will**, OR ☐ **will not** obtain substitution of Seller's VA entitlement by Settlement. Balances of any assumed loans, secondary financing and cash down payments are approximate.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

DocuSign Envelope ID: 9DDF5E9C-1489-4C18-8D7D-8B7CC6432A2C

4. **DEPOSIT** Purchaser has delivered a deposit ("Deposit") to Urban Brokers, LLC ("Escrow Agent") of [X] $ 80,000.00 check and/or [ ] $ ______ by note due and payable on ______.

The Deposit will be placed in an escrow account of the Escrow Agent after Date of Ratification in conformance with the laws and regulations of the appropriate jurisdiction and/or, if VA financing applies, as required by Title 38 of the U.S. Code. This account may be interest bearing and all parties waive any claim to interest resulting from the Deposit. The Deposit will be held in escrow until: (i) Credited toward the Sales Price at Settlement; (ii) All parties have agreed in writing as to its disposition; (iii) A court of competent jurisdiction orders disbursement and all appeal periods have expired; or, (iv) Disposed of in any other manner authorized by the laws and regulations of the appropriate jurisdiction. Seller and Purchaser agree that Escrow Agent will have no liability to any party on account of disbursement of the Deposit or on account of failure to disburse the Deposit, except in the event of the Escrow Agent's gross negligence or willful misconduct.

5. **DOWN PAYMENT** The balance of the down payment will be paid on or before the Settlement Date by certified or cashier's check or by bank-wired funds. An assignment of funds shall not be used without prior written consent of Seller.

6. **SETTLEMENT** Seller and Purchaser will make full settlement in accordance with the terms of this Contract ("Settlement") on, or with mutual consent before, May 17 ("Settlement Date") except as otherwise provided in this Contract. Purchaser selects: KVS Title ("Settlement Agent") to conduct the Settlement. (For transactions in Virginia, use the Virginia Jurisdictional Addendum to select the Settlement Agent.) Either party may retain their own legal counsel. Purchaser agrees to contact the Settlement Agent within 10 Days after the Date of Ratification to schedule Settlement and to arrange for ordering the title exam and, if required, a survey.

7. **PROPERTY MAINTENANCE AND CONDITION** Except as otherwise specified herein, Seller will deliver the Property free and clear of trash and debris, broom clean and in substantially the same physical condition to be determined as of [X] Contract Date OR [ ] Date of home inspection OR [ ] Other: ______. Seller will have all utilities in service through Settlement or as otherwise agreed. Purchaser and Seller will not hold the Broker liable for any breach of this paragraph.

Purchaser acknowledges, subject to Seller acceptance, that this Contract may be contingent upon home inspection(s) and/or other inspections to ascertain the physical condition of the Property. If Purchaser desires one or more inspection contingencies, such contingencies must be included in an addendum to this Contract.

[ ] This Contract is contingent upon home inspection(s) and/or other inspections. (Addendum Attached)

OR

[X] Purchaser declines the opportunity to make this Contract contingent upon home inspection(s) and/or other inspections.

Purchaser acknowledges that except as otherwise specified in this Contract, the Property, including electrical, plumbing, existing appliances, heating, air conditioning, equipment and fixtures shall convey in its AS-IS condition as of the date specified above.

8. **ACCESS TO PROPERTY** Seller will provide the Broker, Purchaser, inspectors representing Purchaser and representatives of lending institutions for Appraisal purposes reasonable access to the Property to comply with this Contract. In addition, Purchaser and/or Purchaser's representative will have the right to make a final inspection within 5 days prior to Settlement and/or occupancy, unless otherwise agreed to by Purchaser and Seller.

9. **UTILITIES** - WATER, SEWAGE, HEATING AND CENTRAL AIR CONDITIONING (Check all that apply)

Water Supply: [X] Public [ ] Private Well [ ] Community Well
Sewage Disposal: [X] Public [ ] Septic for # BR ______ [ ] Community Septic [ ] Alternative Septic for # BR: ______
Hot Water: [ ] Oil [X] Gas [ ] Elec. [ ] Other ______

GCAAR Form # 1301 - Regional Sales Contract - Rev 01/12 Page 2 of 8 Initials: Seller: ______/______ Purchaser: ______/______
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1311 Floral St

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

DocuSign Envelope ID: 9DDF5E9C-1489-4C18-8D7D-8B7CC6432A2C

Air Conditioning: ☐ Oil ☐ Gas ☒ Elec. ☐ Heat Pump ☐ Other ________ ☐ Zones ________
Heating: ☐ Oil ☒ Gas ☐ Elec. ☐ Heat Pump ☐ Other ________ ☐ Zones ________

10. PERSONAL PROPERTY AND FIXTURES The Property includes the following personal property and fixtures, if existing: built-in heating and central air conditioning equipment, plumbing and lighting fixtures, sump pump, attic and exhaust fans, storm windows, storm doors, screens, installed wall-to-wall carpeting, window shades, blinds, window treatment hardware, smoke and heat detectors, TV antennas, exterior trees and shrubs. Unless otherwise agreed to in writing, all surface or wall mounted electronic components/devices **DO NOT** convey. If more than one of an item convey, the number of items is noted.

**The items marked YES below are currently installed or offered.**

| Yes | No | # | Items | Yes | No | # | Items | Yes | No | # | Items |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ | ☐ | | Alarm System | ☒ | ☒ | | Freezer | ☐ | ☒ | | Satellite Dish |
| ☒ | ☐ | | Built-in Microwave | ☐ | ☒ | | Furnace Humidifier | ☐ | ☒ | | Storage Shed |
| ☒ | ☐ | 4 | Ceiling Fan | ☐ | ☒ | | Garage Opener | ☒ | ☐ | | Stove or Range |
| ☐ | ☒ | | Central Vacuum | ☐ | ☒ | | w/ remote | ☒ | ☐ | | Trash Compactor |
| ☒ | ☐ | | Clothes Dryer | ☐ | ☒ | | Gas Log | ☒ | ☐ | | Wall Oven |
| ☒ | ☐ | | Clothes Washer | ☐ | ☒ | | Hot Tub, Equip. & Cover | ☒ | ☐ | | Water ~~Treatment~~ System |
| ☒ | ☐ | | Cooktop | ☐ | ☒ | | Intercom | ☐ | ☒ | | Window A/C Unit |
| ☒ | ☐ | | Dishwasher | ☒ | ☐ | | Playground Equipment | ☐ | ☒ | | Window Fan |
| ☒ | ☐ | | Disposer | ☐ | ☒ | | Pool, Equip. & Cover | ☒ | ☐ | | Window Treatments |
| ☒ | ☐ | | Electronic Air Filter | ☒ | ☐ | 2 | Refrigerator | ☐ | ☒ | | Wood Stove |
| ☒ | ☐ | | Fireplace Screen/Door | ☒ | ☐ | | w/ ice maker | | | | |

**OTHER** ____________________

**LEASED ITEMS** Any leased items, systems or service contracts (including, but not limited to, fuel tanks, water treatment systems, lawn contracts, security system monitoring, and satellite contracts) **DO NOT** convey absent an express written agreement by Purchaser and Seller. The following is a list of the leased items within the Property:

11. FINANCING APPLICATION If this Contract is contingent on financing, Purchaser will make written application for the Specified Financing and any lender required property insurance no later than 7 days after the Date of Ratification. Purchaser grants permission for the Selling Company and the lender to disclose to the Listing Company and the Seller general information available about the progress of the loan application and loan approval process. If Purchaser fails to settle except due to any Default by Seller, then the provisions of the DEFAULT paragraph shall apply. Seller agrees to comply with reasonable lender requirements, except as otherwise provided in the LENDER REQUIRED REPAIRS paragraph of the applicable financing contingency addendum.

12. ALTERNATE FINANCING Purchaser may substitute alternative financing and/or an alternative lender for Specified Financing provided: (a) Purchaser is qualified for alternative financing; (b) there is no additional expense to Seller; (c) the Settlement Date is not delayed; and (d) if Purchaser fails to settle except due to any Default by Seller, then the provisions of the DEFAULT paragraph shall apply.

13. PURCHASER'S REPRESENTATIONS Purchaser ☒ **will**, OR ☐ **will not** occupy the Property as Purchaser's principal residence. **Unless specified in a written contingency, neither this Contract nor the financing is dependent or contingent on the sale and settlement or lease of other real property.** The Selling Company ☒ **is**, OR ☐ **is not** authorized to disclose to the Listing Company, Seller and any lender the appropriate financial or credit information statement provided to the Selling Company by Purchaser. Purchaser acknowledges that Seller is relying upon all of Purchaser's representations, including without limitation, the accuracy of financial or credit information given to Seller, Broker or the lender by Purchaser.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

DocuSign Envelope ID: 9DDF5E9C-1489-4C18-8D7D-8B7CC6432A2C

14. ~~**TERMITE INSPECTION** The ☐ **Purchaser at Purchaser's expense** OR ☐ **Seller at Seller's expense**, will furnish a written report from a pest control firm dated not more than 30 days prior to Settlement showing that all dwelling(s) and/or garage(s) within the Property (excluding fences or shrubs not abutting garage(s) or dwelling(s)) are free of visible evidence of active termites and other wood-destroying insects, and free from visible insect damage. Any extermination and repairs for damage identified in the inspection report will be made at Seller's expense.~~

15. **DAMAGE OR LOSS** The risk of damage or loss to the Property by fire, act of God, or other casualty remains with Seller until the execution and delivery of the deed of conveyance to Purchaser at Settlement.

16. **TITLE** The title report and survey, if required, will be ordered promptly and, if not available on the Settlement Date, then Settlement may be delayed for up to 10 business days to obtain the title report and survey after which this Contract, at the option of Seller, may be terminated and the Deposit will be refunded in full to Purchaser according to the terms of the DEPOSIT paragraph. Fee simple title to the Property, and everything that conveys with it, will be sold free of liens except for any loans assumed by Purchaser. Title is to be good and marketable, and insurable by a licensed title insurance company with no additional risk premium. Title may be subject to commonly acceptable easements, covenants, conditions and restrictions of record, if any; otherwise, Purchaser may declare this Contract void, unless the defects are of such character that they may be remedied within 30 Days beyond the Settlement Date. In case action is required to perfect the title, such action must be taken promptly by Seller at Seller's expense. The Broker is hereby expressly released from all liability for damages by reason of any defect in the title. Seller will convey the Property by general warranty deed with English covenants of title (Virginia); general warranty deed (West Virginia); special warranty deed (D.C. and Maryland) ("Deed"). Seller will sign such affidavits, lien waivers, tax certifications, and other documents as may be required by the lender, title insurance company, Settlement Agent, or government authority, and authorizes the Settlement Agent to obtain pay-off or assumption information from any existing lenders. The manner of taking title may have significant legal and tax consequences. Purchaser is advised to seek the appropriate professional advice concerning the manner of taking title. Unless otherwise agreed to in writing, Seller will pay any special assessments and will comply with all orders or notices of violations of any county or local authority, condominium unit owners' association, homeowners' or property owners' association or actions in any court on account thereof, against or affecting the Property on the Settlement Date.

17. **POSSESSION DATE** Unless otherwise agreed to in writing between Seller and Purchaser, Seller will give possession of the Property at Settlement, including delivery of keys, if any. If Seller fails to do so and occupies the Property beyond Settlement, Seller will be a tenant at sufferance of Purchaser and hereby expressly waives all notice to quit as provided by law. Purchaser will have the right to proceed by any legal means available to obtain possession of the Property. Seller will pay any damages and costs incurred by Purchaser including reasonable attorney fees.

18. **FEES** Fees for the preparation of the Deed, that portion of the Settlement Agent's fee billed to Seller, costs of releasing existing encumbrances, Seller's legal fees and any other proper charges assessed to Seller will be paid by Seller. Fees for the title exam (except as otherwise provided), survey, recording (including those for any purchase money trusts) and that portion of the Settlement Agent's fee billed to Purchaser, Purchaser's legal fees and any other proper charges assessed to Purchaser will be paid by Purchaser. Fees to be charged will be reasonable and customary for the jurisdiction in which the Property is located. (Recording, Transfer and Grantor's Taxes are covered in the appropriate jurisdictional addenda).

19. **BROKER'S FEE** Seller irrevocably instructs the Settlement Agent to pay the Broker compensation ("Broker's Fee") at Settlement as set forth in the listing agreement and to disburse the compensation offered by the Listing Company to the Selling Company in writing as of the Contract Date, and the remaining amount of Broker's compensation to the Listing Company.

20. **ADJUSTMENTS** Rents, taxes, water and sewer charges, front foot benefit and house connection charges, condominium unit owners' association, homeowners' and/or property owners' association regular periodic assessments (if any) and any other operating charges, are to be adjusted to the day of Settlement. Any heating or cooking fuels remaining in supply tank(s) at Settlement will become the property of Purchaser, unless leased. Taxes, general and special, are to be adjusted according to the certificate of taxes issued by the collector of taxes, if any, except that

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

DocuSign Envelope ID: 9DDF5E9C-1489-4C18-8D7D-8B7CC6432A2C

recorded assessments for improvements completed prior to Settlement, whether assessments have been levied or not, will be paid by Seller or allowance made at Settlement. If a loan is assumed, interest will be adjusted to the Settlement Date and Purchaser will reimburse Seller for existing escrow accounts, if any.

21. **ATTORNEY'S FEES**

A. If any Party breaches this Agreement and a non-breaching Party retains legal counsel to enforce its rights hereunder, the non-breaching Party shall be entitled to recover against the breaching Party, in addition to any other damages recoverable against any breaching Party, all of its reasonable Legal Expenses incurred in enforcing its rights under this Agreement, whether or not suit is filed, and in obtaining, enforcing and/or defending any judgment related thereto. Should any tribunal of competent jurisdiction determine that more than one party to the dispute has breached this Agreement, then all such breaching Parties shall bear their own costs, unless the tribunal determines that one or more parties is a "Substantially Prevailing Party", in which case any such Substantially Prevailing Party shall be entitled to recover from any of the breaching parties, in addition to any other damages recoverable against any breaching Party, all of its reasonable Legal Expenses incurred in enforcing its rights under this Agreement, whether or not suit is filed, and in obtaining, enforcing and/or defending any judgment related thereto.

B. In the event a dispute arises resulting in the Broker (as used in this paragraph to include any agent, licensee, or employee of the Broker) being made a party to any litigation by the Purchaser or by the Seller, the Parties agree that the Party who brought the Broker into litigation shall indemnify the Broker for all of its reasonable Legal Expenses incurred, unless the litigation results in a judgment against the Broker.

22. **PERFORMANCE** Delivery of the required funds and executed documents to the Settlement Agent will constitute sufficient tender of performance. Funds from this transaction at Settlement may be used to pay off any existing liens and encumbrances, including interest, as required by lender(s) or lienholders.

23. **DEFAULT** If Purchaser fails to complete Settlement for any reason other than Default by Seller, at the option of Seller, the Deposit may be forfeited as liquidated damages (not as a penalty) in which event Purchaser will be relieved from further liability to Seller. If Seller does not elect to accept the Deposit as liquidated damages, the Deposit may not be the limit of Purchaser's liability in the event of a Default. If the Deposit is forfeited, or if there is an award of damages by a court or a compromise agreement between Seller and Purchaser, the Broker may accept and Seller agrees to pay the Broker one-half of the Deposit in lieu of the Broker's Fee, (provided Broker's share of any forfeited Deposit will not exceed the amount due under the listing agreement). If Seller fails to perform or comply with any of the terms and conditions of this Contract or fails to complete Settlement for any reason other than Default by Purchaser, Purchaser will have the right to pursue all legal or equitable remedies, including specific performance and/or damages. If either Seller or Purchaser refuses to execute a release of Deposit ("Release") when requested to do so in writing and a court finds that such party should have executed the Release, the party who so refused to execute the Release will pay the expenses, including, without limitation, reasonable attorney's fees, incurred by the other party in the litigation. Seller and Purchaser agree that no Escrow Agent will have any liability to any party on account of disbursement of the Deposit or on account of failure to disburse the Deposit, except only in the event of the Escrow Agent's gross negligence or willful misconduct. The parties further agree that the Escrow Agent will not be liable for the failure of any depository in which the Deposit is placed and that Seller and Purchaser each will indemnify, defend and save harmless the Escrow Agent from any loss or expense arising out of the holding, disbursement or failure to disburse the Deposit, except in the case of the Escrow Agent's gross negligence or willful misconduct. If either Purchaser or Seller is in default, then in addition to all other damages, the defaulting party will immediately pay the costs incurred for the title examination, Appraisal, survey and the Broker's Fee in full.

24. **OTHER DISCLOSURES** **Purchaser and Seller should carefully read this Contract to be sure that the terms accurately express their respective understanding as to their intentions and agreements. The Broker can counsel on real estate matters, but if legal advice is desired by either party, such party is advised to seek legal counsel. Purchaser and Seller are further advised to seek appropriate professional advice concerning the condition of the Property or tax and insurance matters.** The following provisions of this paragraph disclose some

GCAAR Form # 1301 – Regional Sales Contract – Rev 01/12 Page 5 of 8 Initials: Seller: [initials] Purchaser: [initials]

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1311 Floral St

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

DocuSign Envelope ID: 9DDF5E9C-1489-4C18-8D7D-8B7CC6432A2C

matters which the parties may investigate further. These disclosures are not intended to create a contingency. Any contingency must be specified by adding appropriate terms to this Contract. The parties acknowledge the following disclosures:

A. **PROPERTY CONDITION** Various inspection services and home warranty insurance programs are available. The Broker is not advising the parties as to certain other issues, including without limitation: water quality and quantity (including but not limited to, lead and other contaminants;) sewer or septic; soil condition; flood hazard areas; possible restrictions of the use of the Property due to restrictive covenants, zoning, subdivision, or environmental laws, easements or other documents; airport or aircraft noise; planned land use, roads or highways; and construction materials and/or hazardous materials, including but without limitation flame retardant treated plywood (FRT), radon, urea formaldehyde foam insulation (UFFI), mold, polybutylene pipes, synthetic stucco (EIFS), underground storage tanks, Defective Chinese drywall, asbestos and lead-based paint. Information relating to these issues may be available from appropriate government authorities.

B. **LEGAL REQUIREMENTS** All contracts for the sale of real property must be in writing to be enforceable. Upon ratification and Delivery, this Contract becomes a legally binding agreement. Any changes to this Contract must be made in writing for such changes to be enforceable.

C. **FINANCING** Mortgage rates and associated charges vary with financial institutions and the marketplace. Purchaser has the opportunity to select the lender and the right to negotiate terms and conditions of the financing subject to the terms of this Contract. The financing may require substantial lump sum (balloon) payments on the due dates. Purchaser has not relied upon any representations regarding the future availability of mortgage money or interest rates for the refinancing of any such lump sum payments.

D. **BROKER** Purchaser and Seller acknowledge that the Broker is being retained solely as a real estate agent and not as an attorney, tax advisor, lender, appraiser, surveyor, structural engineer, mold or air quality expert, home inspector or other professional service provider. The Broker may from time to time engage in the general insurance, title insurance, mortgage loan, real estate settlement, home warranty and other real estate-related businesses and services. Therefore, in addition to the Broker's Fee specified herein, the Broker may receive compensation related to other services provided in the course of this transaction pursuant to the terms of a separate agreement/disclosure.

E. **PROPERTY TAXES** Your property tax bill could substantially increase following settlement. For more information on property taxes contact the appropriate taxing authority in the jurisdiction where the Property is located.

F. **PROPERTY INSURANCE** Obtaining property insurance is typically a requirement of the lender in order to secure financing. Insurance rates and availability are determined in part by the number and nature of claims and inquiries made on a property's policy as well as the number and nature of claims made by a prospective Purchaser. Property insurance has become difficult to secure in some cases. Seller should consult an insurance professional regarding maintaining and/or terminating insurance coverage.

25. ASSIGNABILITY This Contract may not be assigned without the written consent of Purchaser and Seller. If Purchaser and Seller agree in writing to an assignment of this Contract, the original parties to this Contract remain obligated hereunder until Settlement.

26. DEFINITION

A. "Appraisal" means a written appraised valuation of the Property.

B. "Day(s)" or "day(s)" means calendar day(s) unless otherwise specified in this Contract.

C. All reference to time of day shall refer to the time of day in the Eastern Time Zone of the United States.

D. For the purpose of computing time periods, the first Day will be the Day following Delivery and the time period will end at 9 p.m. on the Day specified. If the Settlement Date falls on a Saturday, Sunday, or legal holiday, then the Settlement will be on the prior business day.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

DocuSign Envelope ID: 9DDF5E9C-1489-4C18-8D7D-8B7CC6432A2C

E. "Date of Ratification" means the date of final acceptance in writing by Purchaser and Seller, of all the terms of this Contract (not the date of expiration or removal of any contingencies).

F. For "Delivery" and "Notices" definitions, see appropriate Jurisdictional Addendum.

G. "Specified Financing" means the loan type(s) and amount(s), if any, specified in the PRICE AND FINANCING paragraph.

H. The masculine includes the feminine and the singular includes the plural.

I. "Possession Date" - See POSSESSION DATE paragraph.

J. "Legal Expenses" means attorney fees, court costs, and litigation expenses, if any, including, but not limited to, expert witness fees and court reporter fees.

27. **MISCELLANEOUS** This Contract may be signed in one or more counterparts, each of which is deemed to be an original, and all of which together constitute one and the same instrument. Documents obtained via facsimile machines will also be considered as originals. Typewritten or handwritten provisions included in this Contract will control all pre-printed provisions that are in conflict.

28. **VOID CONTRACT** If this Contract becomes void and of no further force and effect, without Default by either party, both parties will immediately execute a release directing that the Deposit be refunded in full to Purchaser according to the terms of the DEPOSIT paragraph.

29. **HOME WARRANTY** ☐ **Yes** OR ☒ **No**
Home Warranty Policy paid for and provided at Settlement by: ☐ **Purchaser** or ☐ **Seller.**
Cost not to exceed $ __________________ . Warranty provider to be ____________________________________.

30. **TIME IS OF THE ESSENCE AS TO ALL TERMS OF THIS CONTRACT.**

31. **ENTIRE AGREEMENT** This Contract will be binding upon the parties and each of their respective heirs, executors, administrators, successors and permitted assigns. The provisions not satisfied at Settlement will survive the delivery of the deed and will not be merged therein. This Contract, unless amended in writing, contains the final and entire agreement of the parties and the parties will not be bound by any terms, conditions, oral statements, warranties or representations not herein contained. The interpretation of this Contract will be governed by the laws of the jurisdiction where the Property is located.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001
DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84
DocuSign Envelope ID: 9DDF5E9C-1489-4C18-8D7D-8B7CC6432A2C

**32. ELECTRONIC SIGNATURES In accordance with the Uniform Electronic Transactions Act (UETA) and the Electronic Signatures in Global and National Commerce Act, or E-Sign (the Act), and other applicable local or state legislation regarding Electronic Signatures and Transactions, the parties do hereby expressly authorize and agree to the use of electronic signatures as an additional method of signing and/or initialing this Contract. The parties hereby agree that either party may sign electronically by utilizing a digital signature service.**

Seller: EO / [initials] Purchaser: [initials] / [initials]

**SELLER:**

4/3/13 / [signature]
Date Signature
Randolph Carter

4/3/13 / [signature]
Date Signature
Elizabeth Denevi

**PURCHASER:**

4/1/2013 [DocuSigned by: Dominic Ju]
Date Signature
Dominic Ju

4/2/2013 [DocuSigned by: Dana Ju]
Date Signature
Dana Ju

**Date of Ratification (see DEFINITIONS)**
4/4/2013 [initials]

************************************************************************************************************

**For information purposes only:**

Listing Company's Name and Address:

Lindsay Reishman Real Estate, Inc.
1506 19TH ST NW STE# 1
WASHINGTON, DC 20036

Office # (202)491-1275 FAX # (202)319-1786

MRIS Broker Code and Office ID LNRE1

Agent Name Jennifer S Smira

Real Estate License Number & Jurisdiction

Agent MRIS ID# 3014837

Team Leader/Agent

Agent Email Address Jenn@ReishmanRealEstate.com

Selling Company's Name and Address:

Urban Brokers, LLC
2007 Vermont Ave NW
Washington, DC 20001

Office # (202)319-1303 FAX # (202)318-2268

MRIS Broker Code and Office ID URBO1

Agent Name Mark Meyerdirk

PB98360195
Real Estate License Number & Jurisdiction

Agent MRIS ID# 8454

Team Leader/Agent Mark Meyerdirk

Agent Email Address mark@urbanbrokers.com

©2012. This is a suggested form owned by certain REALTOR® Associations ("Associations"). This form has been created and printed exclusively for the use of REALTORS® and members of the Associations, who may copy or otherwise reproduce this form in identical form with the addition of their company logo and with any other changes being set forth in a clearly marked separate addendum. Any other use of this form is prohibited without prior written authorized consent of the Associations.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

GCAAR
GREATER CAPITAL AREA ASSOCIATION OF REALTORS

REALTOR®

EQUAL HOUSING OPPORTUNITY

# Addendum of Clauses

*(For use with MAR and Regional Contract)*

The Contract of Sale dated April 1, 2013, Address 1311 FLORAL ST NW City WASHINGTON, State DC Zip 20012 between Seller Randolph Carter, Elizabeth Denevi and Buyer Dominic Ju, Dana Ju is hereby amended by the incorporation of this Addendum, which shall supersede any provisions to the contrary in the Contract.

**It is expressly provided that only the numbered paragraphs which are checked and initialed by all Parties shall be made a part of said contract.**

☐ 1. SELLER'S CREDIT(S) TO BUYER: In addition to any other amount(s) the Seller has agreed to pay under other provisions of this Contract, the Seller shall credit the Buyer at the time of Settlement with the sum of $ ____________ towards Purchaser's settlement costs. It is the Buyer's responsibility to confirm with his Lender, if applicable, that the entire credit provided for herein may be utilized. If Lender prohibits the Seller from payment of any portion of this credit, then said credit shall be reduced to the amount allowed by Lender.

☐ 2. HOME INSPECTION CONTINGENCY: This Contract is contingent until 9 p.m. on the ________ Day after the Date of Ratification ("Deadline") for inspections of the property, not including radon or lead-based paint inspections, which require separate contingencies, by the Buyer, a home inspection firm and/or other representative(s) at the Buyer's discretion and expense. The Seller will have all utilities in service at the time of inspection(s). This contingency will terminate at the Deadline unless by the Deadline the Buyer Delivers to the Seller either **A or B:**

A. A copy of the report(s) from the inspection(s) of the property together with a Home Inspection Notice (see recommended GCAAR Form #1344) listing home inspection conditions or items that the Buyer requires the Seller to repair, and/or stipulating a dollar credit, as allowed by the lender, to be paid at settlement by the Seller toward the Buyer's charges to buy the property.

If the Seller elects not to perform in accordance with the Home Inspection Notice or makes another offer, the Seller will Deliver Notice to the Buyer of such decision within 3 Days after Delivery of the Home Inspection Notice.

Within 3 Days after Delivery of a Notice from one party, the other party may:

a) Deliver Notice accepting the terms contained in the other party's Notice; or
b) Deliver Notice continuing negotiations by making another offer; or
c) Deliver Notice that this Contract will become void at 9 p.m. on the 3rd Day following Delivery, unless the recipient Delivers to the other party Notice of the acceptance of the last Delivered offer prior to that date and time, in which case this Contract will remain in full force and effect.

Failure of either party to respond within 3 Days after Delivery of Notice from the other party will result in acceptance by both parties of the terms of the most recent Notice.

B. Notice declaring this Contract void.

☐ 3. GENERAL INSPECTION CONTINGENCY (NO RIGHT TO NEGOTIATE): This Contract is contingent until 9 p.m. on the ____________ Day after the Date of Ratification ("Deadline") for satisfactory inspections of the property by the Buyer, a home inspection firm and/or other representative(s) at the Buyer's discretion and expense. **The inspection(s) provided for hereunder are for informational purposes only. Unless otherwise agreed to elsewhere in the Contract, this Contingency does not provide the right to request that the Seller make any repairs and/or provide a dollar credit.** The Seller will have all utilities in service at the time of inspection(s). In the event of an unsatisfactory inspection, as determined by Buyer in his sole discretion, Buyer may, by Notice to Seller, declare this contract void. In the event such Notice is not given by the Deadline, this Contingency will terminate, and this contract will remain in full force and effect.

☒ 4. "AS-IS" PROPERTY CONDITION: All clauses in this Contract pertaining to termites and wood destroying insects, private well and/or private sewage systems, and compliance with city, state or county regulations are hereby deleted from this Contract. Smoke detectors will be installed as required by the laws or regulations of the appropriate jurisdictions. The provisions of the Property Maintenance and Condition Paragraph will remain in full force and effect.

DS DJ DS DJ DS RC DS ED

©2012 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

GCAAR Form # 1332 - MC & DC -Addendum of Clauses 1 of 6 03/2012
Urban Brokers LLC 2007 Vermont St NW Washington, DC 20001
Phone: 202-489-6150 Fax: 202-318-2268 Mark Meyerdirk 1311 Floral Street
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

☐ 5. **RADON INSPECTION CONTINGENCY:** This Contract is contingent until 9 p.m. on the ________ Day after the Date of Ratification ("Deadline") to allow the Buyer, at the Buyer's discretion and expense, to have the property inspected for the presence of radon by a Testing Firm listed with the National Radon Safety Board ("NRSB") or the National Environmental Health Association ("NEHA") using a U.S. Environmental Protection Agency ("EPA") approved testing method. Testing and retesting devices, if applicable, to be placed and retrieved by an NRSB or NEHA listed technician or their authorized subcontractor. This contingency will terminate at the Deadline unless by the Deadline, the Buyer Delivers to the Seller a copy of the radon testing report which confirms the presence of radon that equals or exceeds the action level established by the EPA together with either A or B:

**A. Radon Testing Notice:** (see GCAAR recommended Form #1363) requiring the Seller at Seller's expense prior to settlement to remediate the radon condition; or stipulating a dollar credit, as allowed by the Lender, to be paid at settlement by the Seller towards the Buyer's charges to buy the Property. In the event that the Seller agrees to remediate the radon condition, such work shall be performed by a NRSB or NEHA listed remediation firm who will provide written verification that the required remediation has been performed, including test results demonstrating that the presence of Radon is below the action level established by EPA.

If the Seller elects not to perform in accordance with the Radon Testing Notice or makes another offer, the Seller will Deliver Notice to the Buyer of such decision within 3 Days after Delivery of the Radon Testing Notice.

Within 3 Days after Delivery of a Notice from one party, the other party may:

a) Deliver Notice accepting the terms contained in the other party's Notice; or
b) Deliver Notice continuing negotiations by making another offer; or
c) Deliver Notice that this Contract will become void at 9 p.m. on the 3rd Day following Delivery, unless the recipient Delivers to the other party Notice of the acceptance of the last Delivered offer prior to that date and time, in which case this Contract will remain in full force and effect.

Failure of either party to respond within 3 Days after Delivery of a Notice from the other party will result in acceptance by both parties of the terms of the most recent Notice.

**B.** Notice declaring this Contract void.

☐ 6. **LEAD-BASED PAINT INSPECTION CONTINGENCY:** This Contract is contingent until 9 p.m. on the ________ Day after the Date of Ratification (**must be 10 days or such other period as shall be mutually agreeable to the Buyer and Seller**) ("Deadline") to allow Buyer, at Buyer's discretion and expense, to have a risk assessment or inspection of the interior and exterior of the subject property for the presence of lead paint and/or lead-based paint hazards ("Inspection"). Such Inspection shall be performed by an individual certified by the Maryland Department of the Environment ("MDE"), for Maryland properties, or the DC Department of Health Lead Based Paint Program, for DC Properties, to conduct such assessment or inspection ("Certified Inspector"). This contingency will terminate at the Deadline unless by the Deadline, Buyer Delivers to Seller a copy of the risk assessment report or inspection report which reveals conditions for which the Certified Inspector recommends corrective action together with either A or B.

**A. Lead-Based Paint Testing Notice:** (see recommended GCAAR Form #1340) identifying specific lead based paint hazards and requiring Seller at Seller's expense prior to settlement to perform requisite corrective action to abate such lead based paint hazards, or stipulating a dollar credit, as allowed by the Lender, to be paid at Settlement by the Seller towards Buyer's charges to buy the Property. In the event Seller agrees to have the corrective action performed, Seller shall furnish, not later than the date of settlement, a written certification by a Certified Inspector demonstrating that the specified conditions have been remedied.

If Seller elects not to perform in accordance with the Lead Based Paint Notice or makes another offer, Seller will Deliver Notice to Buyer of such decision within 3 Days after Delivery of the Lead Based Paint Notice.

Within 3 Days after Delivery of a Notice from one party, the other party may:

a) Deliver Notice accepting the terms contained in the other party's Notice; or
b) Deliver Notice continuing negotiations by making another offer; or
c) Deliver Notice that this Contract will become void at 9 p.m. on the 3rd Day following Delivery, unless the recipient Delivers to the other party Notice of the acceptance of the last Delivered offer prior to that date and time, in which case this Contract will remain in full force and effect.

Failure of either party to respond within 3 Days after Delivery of a Notice from the other party will result in acceptance by both parties of the terms of the most recent Notice.

**B.** Notice declaring this Contract void.

☐ 7. **POST SETTLEMENT AIR CONDITIONING AND/OR SWIMMING POOL INSPECTION CONTINGENCY:**
These provisions shall apply to the following system(s) (the "System") (check appropriate system(s)):
☐ the **Air Conditioning System**; and/or ☐ the **Swimming Pool System** (defined as the swimming pool and related equipment, including the structural integrity of the swimming pool).

Buyer and Seller agree that the System will convey in normal working order ("Required Condition"). Due to weather conditions, the System located at the Property cannot be adequately tested to ensure that it is in the Required Condition. Buyer and Seller agree that Buyer shall, at his expense, make an inspection of the System at the earliest practicable date, consistent with the weather conditions, but in no event later than the May 31 following ratification (the "Final Inspection Date"). Seller's agreement that the System will convey in the Required Condition is hereby extended through the date of the inspection of the System, but in no event later than the Final Inspection Date.

©2012 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

Buyer shall give Notice to Seller of the date and time on which the inspection is to be made, and Seller shall have the option of being present or represented at said inspection. The inspection shall be conducted by a heating and air conditioning technician, or pool service company, as appropriate, licensed in the jurisdiction in which the Property is located. **Buyer agrees not to attempt to operate the System prior to the scheduled date for the inspection. In the event Buyer attempts to operate the System prior to said inspection, then any warranty hereunder, express or implied, by Seller, shall be deemed to be null and void.**

In the event that the aforesaid inspection shows the System to be in the Required Condition, then Seller's obligations hereunder with respect to the System shall be deemed fulfilled. In the event that the aforesaid inspection shows the System not to be in the Required Condition, Buyer shall provide Notice of same to Seller no later than the Final Inspection Date, in which event Seller shall be responsible for the actual cost necessary to place the System in the Required Condition. All remedial action taken hereunder shall be performed in a good and workmanlike manner by a heating and air conditioning contractor or pool service company, as appropriate, selected by Seller who is licensed in the jurisdiction in which the Property is located, and shall be completed within 10 days after Buyer's Notice to Seller ("Seller's Timeframe"). Buyer shall make the Property available at reasonable times for the completion of such work. In the event that the System is not in the Required Condition by the expiration of Seller's Timeframe, Buyer shall be irrevocably authorized to have the required remedial action performed by a contractor meeting the aforesaid qualifications. Upon completion of the remedial action, but no later than 10 days following the expiration of Seller's Timeframe ("Buyer's Timeframe"), Buyer shall provide a Notice to Seller including a copy of the contractor's invoice and instructions as to whether the amount shown in said invoice shall be paid directly to said contractor or to Buyer as a reimbursement for covered expenses. Upon receipt of said Notice, Seller shall immediately make payment as instructed in the Notice.

In the event that any Notice required to be given in this Addendum is not given within the timeframe specified, then Seller's obligations hereunder with respect to the System shall be deemed fulfilled.

☐ 8. **HOLDING DEPOSIT CHECK: WARNING: THIS CLAUSE MAY NOT BE USED FOR A MARYLAND TRANSACTION WHEN A REAL ESTATE BROKER IS THE ESCROW AGENT:** It is understood and agreed by all Parties that the Buyer has instructed the Escrow Agent to hold and not deposit the above described deposit check until _________ Days after Ratification at which time said check shall be deposited.

☐ 9. **INTEREST-BEARING ACCOUNT DEPOSIT:** The Parties hereto agree and authorize ______________________________, Escrow Agent, to place the deposit in an interest-bearing escrow account. Interest shall accrue and be payable to the Buyer at time of settlement. In order to establish an Interest Bearing Account, the Buyer understands that a completed W-9 form and a copy of a government issued photo ID must be given to the Escrow Agent. A Processing fee of $ ____________________ shall be charged to the party receiving the interest by the above Escrow Agent for this service. In the event of a forfeiture of deposit, and interest accrued shall be payable to the Seller.

☒ 10. **APPRAISAL CONTINGENCY: IF THIS CONTRACT IS CONTINGENT UPON FINANCING AND SUCH FINANCING IS DECLINED BASED UPON THE APPRAISAL, THE BUYER WILL NOT BE IN DEFAULT, EVEN IF THIS APPRAISAL CONTINGENCY HAS BEEN REMOVED.**

DS ED DS KC

This Contract IS CONTINGENT until 9:00 p.m. on the 15 day after the Date of Ratification ("Deadline") for Buyer to obtain a written appraised valuation of the property (hereinafter "Appraisal") certifying the value of the property to be no less than the sales price **(check with your lender, if applicable, to confirm that the Appraisal will be completed by the Deadline)**. If Buyer is obtaining financing, the Lender shall select the Appraiser. If this is a cash sale, the Buyer shall select the Appraiser. The Appraiser shall be licensed to perform appraisals in the jurisdiction in which the property is located. Seller shall make the property available for inspection by such Appraiser.

In the event that the Appraisal is lower than the Sales Price, Buyer has the option of proceeding with this Contract at the stated Sales Price without regard to the Appraisal. However, should Buyer decline to proceed with this Contract at the stated Sales Price (due to the Appraisal being lower than the stated Sales Price), Buyer shall Deliver to Seller, by the Deadline, a Notice (See GCAAR Buyer's Appraisal Notice), requesting that the Sales Price be reduced to a specified lower amount of not less than the appraised value, together with a copy of the written Appraisal ("Buyer's Appraisal Notice"). This Contingency will terminate at the Deadline, unless by the Deadline Buyer Delivers to Seller Buyer's Appraisal Notice. * See GENERAL ADDENDUM for additional language.

DS ED DS KC

All Notices Delivered under this Appraisal Contingency shall be treated as follows:

WITHIN 3 DAYS AFTER NOTICE DELIVERY FROM ONE PARTY, THE OTHER PARTY MAY:

a) Deliver Notice accepting the terms contained in the other party's Notice; OR
b) Deliver Notice continuing negotiations by making another offer; OR
c) Deliver Notice that this Contract will become void at 9:00 p.m. on the 3rd Day following Delivery, unless the recipient Delivers to the other party Notice of the acceptance of the last Delivered offer prior to that date and time, in which case, this Contract will remain in full force and effect.

**FAILURE OF EITHER PARTY TO RESPOND WITHIN 3 DAYS AFTER NOTICE DELIVERY WILL RESULT IN THE CONTRACT BECOMING VOID.**

©2012 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

☐ 11. **SALE OF THE BUYER'S PROPERTY CONTINGENCY WITH KICK-OUT:** This Contract is contingent until 9 p.m. on the ______ Day after the Date of Ratification ("Deadline") upon the sale of the Buyer's property located at ________________________________ ("Buyer's Property"). If the Buyer does not satisfy or remove this contingency by the Deadline pursuant to paragraph 11C below, then at any time after the Deadline, but prior to the Buyer satisfying or removing this contingency, either the Seller or the Buyer may declare this Contract void by providing Notice to the other party.

A. The Seller may continue to offer the Property for sale and accept bona fide back-up offers to this Contract. If during the term of this contingency, a back-up offer is accepted, the Seller will Deliver Notice to the Buyer requiring that this contingency be satisfied or removed pursuant to paragraph 11C below not later than 9 p.m. on the ____________________ Day after Delivery of the Notice, or this Contract will become void.

B. The Buyer's Property will be listed exclusively and actively marketed by a licensed real estate broker and entered into a multiple listing service within 3 Days after the Date of Ratification at a price not to exceed $ ____________________________.

C. The Buyer may:

a) satisfy this contingency by Delivering to the Seller a copy of the ratified contract for the sale of the Buyer's Property with evidence that all contingencies, other than financing, have been removed or waived, together with a letter from an institutional lender stating that the financing described in the Contract for the sale of Buyer's Home is available to the Buyer in that Contract and, based upon written loan application, a preliminary credit report, and the information provided by that Buyer, the financing should be committed subject to appropriate verification, approval and commitment, or

b) remove this contingency by Delivering to the Seller (a) the lender's letter stating that the financing is not contingent in any manner upon the sale and settlement of any real estate or obtaining a lease of any real estate and that the Buyer has sufficient funds available for the down payment and closing costs necessary to complete settlement; or (b) evidence of sufficient funds available to complete settlement without obtaining financing.

D. If the Buyer satisfies the requirements of Paragraph 11C (a) above, this Contract will remain contingent upon the settlement of the sale of the Buyer's Property. Settlement under this Contract may not be delayed more than __________ Days after the settlement date (specified in this contract) without the parties' written consent. If a further delay is required to obtain coinciding settlements and the parties do not agree, then this Contract will become void. If at any time after the Date of Ratification the contract for the sale of the Buyer's Property becomes void, the Buyer will immediately Deliver Notice to the Seller together with evidence of such voiding, at which time either the Seller or the Buyer may declare this Contract void by Delivering Notice to the other party. This paragraph will survive the satisfaction of the contingency for the sale of the Buyer's Property.

☐ 12. **BACK-UP CONTRACT OR OFFER:** This Contract is first back-up to another contract or offer dated ____________________ between the Seller and ________________________________ as the Buyer. This Contract shall become the primary contract immediately upon Delivery of Notice from the Seller that the other contract or offer is void along with a copy of the fully executed release. The Buyer may void this back-up contract at any time prior to its becoming primary by Delivering Notice to the Seller. If the contract dated ____________________ settles, this back-up contract will become void. The rights and obligations of the parties under the primary contract are superior to the rights and obligations of the parties to this back-up contract. All timeframes contained in this contract shall not commence until the date this contract becomes primary. Additionally, the date for Settlement will be ______________ days after the date this contract becomes primary.

☐ 13. **SETTLEMENT OF BUYER'S PROPERTY CONTINGENCY:** Settlement on this Contract is contingent upon the settlement on the contract for the sale of the Buyer's Property located at ________________________________ ("Buyer's Property".) A copy of said contract is attached evidencing that all contingencies, other than financing, have been removed or waived, together with a letter from an institutional lender stating that the financing described in the Contract for the sale of Buyers Property is available to the Buyer in that Contract and, based upon a written loan application, a preliminary credit report, and the information provided by that Buyer, the financing should be committed subject to appropriate verification, approval and commitment. Settlement under this Contract may not be delayed more than __________ Days after the settlement date (specified in this Contract) without the parties' written consent. If a further delay is required to obtain coinciding settlements and the parties do not agree, then this Contract will become void. If at any time after the Date of Ratification the contract for the sale of the Buyer's Property becomes void, the Buyer will immediately Deliver Notice to the Seller together with evidence of such voiding, at which time either the Seller or the **Buyer may declare this Contract void by Delivering Notice to the other party.**

☐ 14. **OPTION TO KEEP HOUSE ON MARKET WITH KICK-OUT:** The Seller may continue to offer this property for sale and accept bona fide back-up offers to this Contract. If during the contingency period(s) as set forth in paragraph #'s ____________________ of this Contract or paragraph #'s ____________________ of form # ________________________, a back-up offer is accepted, the Seller will Deliver Notice to the Buyer together with a copy of the back-up Contract requiring that said contingency(ies) be satisfied or removed no later than 9 p.m. on the ________ Day after Delivery of the Notice, or this Contract will become void.

©2012 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

☐ 15. CONTINGENT ON THE SELLER PURCHASING ANOTHER HOME: This Contract is contingent until 9 p.m. on the ______ Day after the Date of Ratification ("Deadline") to allow the Seller to obtain a ratified contract to purchase another home. This provision will terminate at the Deadline and this Contract will remain in full force and effect unless the Seller declares this Contract void by Delivering Notice to the Buyer by the Deadline.

☐ 16. THIRD PARTY APPROVAL: This Contract is contingent upon the approval of ______ by 9 p.m. on the ______ Day after the Date of Ratification ("Deadline"). If Notice of disapproval is not Delivered to the other party by the Deadline, this contingency will terminate and this Contract will remain in full force and effect. No Notice of approval is required. If Notice of disapproval is Delivered by the Deadline, this Contract will become void.

☐ 17. ITEMS TO BE REMOVED: Notwithstanding the provisions of this Contract, the following fixtures and/or items of personal property shall not convey and shall be removed from the subject property by the Seller prior to settlement and will not be replaced: ______

☒ 18. POST-SETTLEMENT OCCUPANCY AGREEMENT: The Parties agree that the Seller shall occupy the property for a period of 52 days commencing on the day of settlement at the rate of $ ZERO per day. Seller shall pay a security deposit of $ 2,000.00 at the time of settlement. The Seller and the Buyer acknowledge that they have read and executed, or will execute at settlement, the GCAAR Post-Settlement Occupancy Agreement and agree to be bound by its terms and provisions. **In the event that this is a Maryland transaction and any mortgage on the property is 60 days or more in default, Seller has the right to rescind this Contract within 5 days of all parties signing a Statement of Tenancy (see GCAAR Form #1364).**

DS EP DS KC

☐ 19. PRE-SETTLEMENT OCCUPANCY AGREEMENT: The Parties agree that Buyer shall occupy the property prior to settlement commencing on the ______ day of ______ at the rate of $ ______ per day. The Seller and the Buyer acknowledge that they have read and executed, or will execute prior to occupancy, the GCAAR Pre-Settlement Occupancy Agreement and agree to be bound by its terms and provisions.

☐ 20. LICENSEE RELATIONSHIP DISCLOSURE: The Parties acknowledge that ______ is a licensed real estate agent in ______ (MD/DC/VA) associated with ______ (Company) and is the ☐ **Buyer** ☐ **Seller or is** ☐ **related to one of the parties** hereto in the following way: ______ and may share in the brokerage fee to be paid.

☐ 21. BROKERAGE FEE PAID BY THE BUYER: It is understood and agreed by all parties that (company name) ______, (agent's name) ______, is acting as an agent solely representing the Buyer in this transaction ("Buyer's Broker"). The Seller has no obligation to the Buyer's Broker, and does not owe a brokerage fee or other consideration of any nature to said Buyer's Broker. The settlement office is directed to collect from the Buyer funds, at settlement, and to disburse said fee, as per the separate Buyer's Broker Agreement between the Buyer's Broker and the Buyer. This Buyer's Broker's fee is separate and apart from any brokerage fee owed to the Seller's Listing Broker pursuant to the agency paragraph of the contract. The parties acknowledge that the said Buyer's Broker relationship was disclosed to the Seller and/or the Seller's agent prior to showing the property to the Buyer.

☐ 22. AGREEMENT BETWEEN UNREPRESENTED SELLER (FSBO/BUILDER) AND BUYER CONCERNING BUYER BROKER FEE: Sellers acknowledge and agree that (company name) ______ and Agent ______, represent solely the Buyer in this transaction. The Seller agrees to pay the Buyer's Broker fee of ______ % of the sale price OR $ ______ as part of this transaction and hereby irrevocably instructs the settlement agent or attorney to deduct this amount from the Seller's proceeds at settlement and pay the Buyer's Broker's fee on behalf of the Buyer. This fee is separate and apart from any other obligation or brokerage fees unrelated to the Buyer and Buyer Broker that the Seller might owe any other party or Broker. The Parties acknowledge that the Buyer's Agency relationship was disclosed to the Seller prior to showing the property to the Buyer.

☐ 23. MASTER PLAN REVIEW FOR MONTGOMERY COUNTY PROPERTIES: (Except City of Rockville) Notwithstanding any provisions to the contrary, this Contract is contingent until 9:00 P.M. on the ______ Day after the Date of Ratification ("Deadline"), to allow the Buyer the opportunity to review the applicable County Master Plan and the municipal land use plan for the area in which the property is located as well as any amendment to either plan and any approved official map showing planned uses, roads and highways, parks and other public facilities affecting the property ("Master Plan"). In the event the Buyer is dissatisfied with anything contained in the applicable Master Plan or municipal land use plan, in the Buyer's sole discretion, the Buyer shall Deliver Notice of disapproval to the Seller on or before the Deadline specified in this paragraph, in which event this Contract shall be void. If such Notice is not Delivered by the Deadline, this contingency shall automatically expire and this contract will remain in full force and effect. (This clause may not be used for property within the corporate limits of the City of Rockville.)

©2012 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

☐ 24. **1031 EXCHANGE:** Parties wishing to participate in a tax deferred exchange under Section 1031 of the Internal Revenue Code ("Exchange") are advised to consult an exchange professional.

☐ **Buyer** may elect to treat this purchase as part of an Exchange. Seller agrees to cooperate with Buyer in the execution of documents necessary to facilitate the Exchange provided Seller incurs no additional liability, cost or expense. Seller grants permission to assign this Contract to an exchange intermediary.

☐ **Seller** may elect to treat this sale as part of an Exchange. Purchaser agrees to cooperate with Seller in the execution of documents necessary to facilitate the Exchange provided Purchaser incurs no additional liability, cost or expense. Purchaser grants permission to assign this Contract to an exchange intermediary.

☐ 25. **ADDITIONAL PROVISIONS:**

Except as modified by this Addendum, all of the terms and provisions of this Contract are hereby expressly ratified and confirmed and will remain in full force and effect. The captions and headings are for convenience or reference only.

| | | | |
|---|---|---|---|
| DocuSigned by: Randolph Carter | 4/4/2013 | DocuSigned by: Dominic Ju | 4/3/2013 |
| Seller Randolph Carter | Date | Buyer Dominic Ju | Date |
| DocuSigned by: Elizabeth Denevi | 4/4/2013 | DocuSigned by: Dana Ju | 4/3/2013 |
| Seller Elizabeth Denevi | Date | Buyer Dana Ju | Date |

©2012 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

# General Addendum

The Contract of Sale dated April 1st, 2013
Address 1311 Floral St NW
City Washington, State DC, Zip 20012
Between Seller Elizabeth Denevi, Randolph Carter
and Buyer Dominic Ju, Dana Ju
is hereby amended by the incorporation of this Addendum, which shall supersede any provisions to the contrary in the Contract.

In the event the appraised price is lower than the sales price, the purchasers agree to pay the difference between the appraised price and the sales price, up to $7,500. Furthermore in the event the difference between the appraised price and the sale price exceeds $7,500 the Buyer Broker will pay the difference up to $2,500 from the commission. In the event the difference between the appraised price and the sales price exceeds $10,000, all parties acknowledge that we return to * of subsection 2 of paragraph 10.

E47DC137DA4949E
Mark Meyerdirk
DocuSigned By: Mark Meyerdirk

| | | | |
|---|---|---|---|
| DocuSigned by: Elizabeth Denevi (AGE4F9762D8B40F...) | 4/4/2013 | DocuSigned by: Dominic Ju (1C113D8ED04E4B5...) | 4/3/2013 |
| Seller Elizabeth Denevi | Date | Buyer Dominic Ju | Date |
| DocuSigned by: Randolph Carter (DAFBFCB7CEB40F...) | 4/4/2013 | DocuSigned by: Dana Ju (G430F2E9A6E5440...) | 4/3/2013 |
| Seller Randolph Carter | Date | Buyer Dana Ju | Date |

© 2010 The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

# Post-Settlement Occupancy Agreement

**(This form may be used for post-settlement occupancies of not greater than sixty (60) days. If greater than sixty (60) days, use appropriate jurisdictional lease agreement.)**

The Contract of Sale dated April 1, 2013, Address 1311 FLORAL ST NW City WASHINGTON, State DC Zip 20012 between Seller Randolph Carter, Elizabeth Denevi and Buyer Dominic Ju, Dana Ju is hereby amended by the incorporation of this Addendum, which shall supersede any provisions to the contrary in the Contract.

WHEREAS, according to said Contract, Seller agreed to give possession and occupancy at the time of settlement; and

WHEREAS, on this date, the parties hereto are amending said contract to provide a license allowing the Seller the right to continue to occupy the Property after the date of settlement, subject to the hereinafter stated terms and conditions.

NOW, THEREFORE, notwithstanding anything to the contrary in said contract, in consideration of the mutual covenants and conditions herein contained and intending to be legally bound the parties hereto agree as follows:

1. **Occupancy:** The Seller shall remain in possession of the Property under this license from the date of settlement through 7/8/2013 ("Specified Date") upon payment of the amount of $ ZERO which shall be deducted from the Seller's proceeds at settlement. The amount paid for this license is based upon a daily license fee of $ ZERO and is non-refundable in the event Seller vacates the premises prior to the Specified Date.

   The license hereby created shall be a license from day to day. In no event shall the Seller remain in the Property after the Specified Date. In the event the Seller wrongfully holds over and fails to vacate on the Specified Date, the daily license fee shall be DOUBLED. If Buyer should be required to employ an attorney and/or to utilize legal proceedings to obtain possession of the Property, or to remedy a default by Seller under any other provision of this Agreement, Seller agrees to be liable for all attorney's fees and court costs incident thereto should Buyer prevail.

2. **Deposit:** $ 2,000.00 of the proceeds of sale shall be retained by KVS Title ("Escrow Agent") as collateral security and applied toward any unpaid amounts that may remain due and owing pursuant to this Agreement, any extension thereof or hold-over period or applied to any damages to the Property caused by the Seller, his family, guests, employees, trades people or pets, in excess of ordinary wear and tear, or other damages and expenses suffered by the Buyer as a result of a breach of any covenant or provision of this Agreement. The Escrow Agent shall hold the deposit in a non-interest bearing account in a federally insured banking or savings institution.

©2003, The Greater Capital Area Association of REALTORS®, Inc.
This recommended form is the property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this form should be destroyed.

Urban Brokers LLC 2007 Vermont St NW Washington, DC 20001
Phone: 202-489-6150 Fax: 202-318-2268 Mark Meyerdirk 1311 Floral Street
Produced with ZipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

3. **Property Condition:** The Seller hereby agrees to deliver the Property vacant, clear of trash and debris, broom clean and in the condition required under the Contract of Sale and this Agreement. All utilities shall remain in service and in the name of the Seller until the later of the Specified Date or the date the Seller vacates the Property ("Termination Date"). The Seller shall pay all charges for same accruing up to that date.

4. **Final Inspection:** Following the date Seller vacates the Property, the Buyer ("Buyer" shall include Buyer's Representative) shall inspect the Property to ensure compliance with this Agreement and the Contract ("Final Inspection"). Seller ("Seller" shall include Seller's Representative) has the right to be present at such inspection. The Final Inspection shall take place a 9 : [X] AM/[ ] PM on July 9, 2013 or such other date and time as the parties may specify by joint written notice to the Escrow Agent ("Final Inspection Date"). In the event that Buyer determines that all provisions of this Agreement and the Contract have not been complied with, Buyer shall provide to Seller or Seller's Representative (if either is present at the Final Inspection) and to Escrow Agent on or before 8:00 p.m. on the 3rd business day (Monday-Friday excluding Federal designated holidays) following the date of the Final Inspection above or such other Final Inspection Date a written list of claims against the security deposit ("Claims List"). **In the event such Claims List is not delivered to Escrow Agent within said timeframe, the Buyer shall be precluded from making any claims under this Agreement against the security deposit. In such case the Escrow Agent is authorized and directed to release any funds remaining in said Escrow to the Seller without any further agreement, notice by or to the parties, or duty to make further inquiry.** In the event a Claims List is delivered within said timeframe, and includes damage to the Property and/or repairs required to be made under the Contract or this Agreement, the Buyer shall be irrevocably authorized for a period of 14 calendar days after the Final Inspection Date to complete required repairs and to provide invoices for same to Escrow Agent, which invoices said Escrow Agent shall be irrevocably authorized and directed to pay, or reimburse Buyer out of the escrow fund. In the event that Escrow Agent receives written notice from Buyer within said 14 day timeframe that required repairs are so substantial or of such a nature that the work will not be completed within said 14 day timeframe, the period for completion of repairs under this Agreement may be extended for a period deemed reasonable, as determined by Escrow Agent in their sole discretion. Following payment of all covered claims pursuant to the provisions of this Agreement, the balance of funds in said Escrow, if any, shall be disbursed to Seller. The Escrow Agent is also authorized to release all funds in Escrow at any time pursuant to either (a) a written notice from Buyer to the Escrow Agent directing a release of all funds to Seller or (b) a joint written notice from Buyer and Seller to Escrow Agent specifying any other disposition of such funds. Notwithstanding the release of funds held in escrow, the parties agree that the rights and obligations of the parties with respect to the condition of the property as may be specified in this Agreement or the Contract shall survive and remain in full force and effect.

5. **Disbursement of Deposit:** Any dispute relative to the disposition of the security deposit shall be decided by Escrow Agent and such decision shall be conclusive and binding upon Buyer and Seller. In the event that any amounts due to Buyer under this Agreement are in excess of the security deposit, it is understood and agreed that Seller shall be responsible to immediately reimburse Buyer all excess amounts due. In no event shall the Escrow Agent incur any liability for any decisions made pursuant to this Agreement or in the event the security deposit proves insufficient to pay all covered claims.

   It is intended by all parties that the Escrow Agent's sole responsibilities under this Agreement shall be the receipt of claims and the disbursement of funds in accordance with Paragraphs 4 and 5 hereof. In the event that the Escrow Agent must participate in negotiations with or between the parties, or in any legal or equitable proceedings in any capacity, the Buyer and Seller agree to be jointly and severally liable for Escrow Agent's time spent at Escrow Agent's standard billing rate, and all reasonable attorney's fees, expenses and costs incurred by the Escrow Agent. Prior to incurring any expenses or charges for which

©2003, The Greater Capital Area Association of REALTORS®, Inc.
This recommended form is the property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this form should be destroyed.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001

DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84

the Buyer and/or Seller shall be responsible under this Paragraph, Escrow Agent shall give notice to each of the parties of same.

6. **Risk of Loss:** Except for claims arising out of the Buyer's negligence, it is understood and agreed that the Seller specifically releases the Buyer from any and all claims that the Seller might have for injury to himself or members of his family or guests, and for loss or damage to his personal property during the period after settlement until the Termination Date. From the date of settlement the Buyer shall obtain and maintain insurance on the Property with the Buyer's policy being primary in the event of other available insurance. The Seller shall obtain and maintain a tenant's policy to protect the Seller's personal property and liability insurance for the Seller's period of occupancy, which policy shall remain in effect until the Termination Date. It is agreed that in the event of duplicate coverage to the dwelling, the Buyer's policy shall be primary and the Seller's policy shall be excess. In the event of a covered loss, Seller shall be responsible for the payment of any deductibles under both the Seller's and Buyer's insurance policies.

7. **Access:** It is further understood and agreed that the Buyer may enter the Property to examine, maintain, repair or protect the Property from damage, at reasonable hours of the day and upon prior notice to Seller, or a reasonable effort to give such notice, except in an emergency in which event no such notice shall be required. At time of settlement Seller shall provide Buyer with a set of keys to the Property.

8. **No Landlord Tenant Relationship Created:** Nothing in this Agreement shall constitute a Landlord/Tenant relationship between Buyer and Seller. Seller hereby warrants that no such tenancy shall arise under this Agreement or under applicable law. Further, Seller shall have no rights afforded to tenants in this jurisdiction by reason of the license hereunder granted from Buyer to Seller.

9. **General Provisions:** It is understood and agreed that wherever used herein, the singular shall include the plural and the plural shall include the singular. Except as otherwise provided for in this Agreement, Buyer and Seller agree that the terms and conditions of the Contract of Sale not modified herein shall remain in full force and effect.

10. **Headings:** The Paragraph headings of this Agreement are for convenience and reference only, and in no way define or limit the intent, rights or obligations of the parties.

11. **TIME IS OF THE ESSENCE. TIME IS OF THE ESSENCE WITH RESPECT TO ALL PROVISIONS OF THIS POST-SETTLEMENT OCCUPANCY AGREEMENT.**

DocuSigned by: Randolph Carter 4/4/2013
Seller Date
Randolph Carter

DocuSigned by: Elizabeth Denevi 4/4/2013
Seller Date
Elizabeth Denevi

DocuSigned by: Dominic Ju 4/3/2013
Buyer Date
Dominic Ju

DocuSigned by: Dana Ju 4/3/2013
Buyer Date
Dana Ju

The undersigned Escrow Agent hereby acknowledges receipt of the deposit herein provided.

Escrow Agent
KVS Title

©2003, The Greater Capital Area Association of REALTORS®, Inc.
This recommended form is the property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this form should be destroyed.

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001
DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84
DocuSign Envelope ID: 9DDF5E9C-1489-4C18-8D7D-8B7CC6432A2C

REALTOR®

**THIS NOTICE IS REQUIRED BY LAW AND IS NOT A CONTRACT.**

**THIS DISCLOSURE DOES NOT CREATE A BROKERAGE RELATIONSHIP.**

# Disclosure of Brokerage Relationship
# District of Columbia

Prior to providing specific real estate assistance, District of Columbia law requires that a licensee disclose to any party who the licensee does **NOT** represent the identity of the party to the proposed transaction which the licensee does represent. Even though a licensee may not represent you, that licensee must still treat you honestly in the transaction.

We, the undersigned ☐ Buyer(s)/Tenant(s) or ☒ Seller(s)/Landlord(s) acknowledge receipt of this Disclosure, and understand we are **NOT** represented by the licensee identified below.

Mark Meyerdirk, PB98360195 (Licensee & License #) and Urban Brokers, LLC (Brokerage Firm)

The licensee and brokerage firm named above represent the following party in the real estate transaction:

☐ **Seller(s)/Landlord(s)** (The licensee has entered into a written listing agreement with the seller(s) or landlord(s) or is acting as a sub-agent of the listing broker.)

☒ **Buyer(s)/Tenant(s)** (The licensee has entered into a written agency agreement with the buyer/tenant.)

☐ **Designated Agent of the** ☐ **Buyer(s)/Tenant(s) or** ☐ **Seller(s)/Landlord(s)**
(Both the buyers and sellers have previously consented to "Designated Agency", and the licensee listed above is indicating the parties represented.

DocuSigned by: Randolph Carter
EDAFBFCB7CE84CF...
Acknowledged — Date: 4/4/2013

DocuSigned by: Elizabeth Denevi
ACE4F9752D8840F...
Acknowledged — Date: 4/4/2013

Name of Person(s): ______________________

I certify on this date that I, the real estate agent, have delivered a copy of this disclosure to the person(s) identified above.

Mark Meyerdirk
Signed (Licensee) — Date: 4/1/2013

©2005, The Greater Capital Area Association of REALTORS®, Inc.
This recommended form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this form should be destroyed.

GCAAR Form #1002- DC - Disclosure of Brokerage Relationship (formerly form #143) — Page 1 of 1 — 07/2005
Urban Brokers LLC 2007 Vermont St NW Washington, DC 20001
Phone: 202-489-6150 Fax: 202-318-2268 Mark Meyerdirk 1311 Floral St
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

info@ReishmanRealEstate.com
202-491-1275

## INFORMATION NECESSARY FOR MAKING AN OFFER

**Owner:** Elizabeth Denevi + Randolph Carter
**Address:** 1311 Floral St NW, Washington, DC 20012
**Tax ID#:** 2777//0033
**Disclosures:** Inclusions/Exclusions Disclosure
Seller's Disclosure Statement
Lead-Based Paint Disclosure

**Preferred Terms:**

*Settlement Company*: KVS Law Group will provide a $500 Buyer credit at settlement.

*Financing*: Please include a full approval letter from a reputable lender.

*Contingencies*: Offers with limited or no contingencies considered favorably.

*Contract Type*: Please use the Regional Sales Contract for offers

**Please register your offer by calling Jennifer Smira at 202.340.7675**

**Broker Info:**
Lindsay Reishman Real Estate
1506 19th Street NW Suite 1
Washington, DC 20036
Phone: 202.491.1275

**Agent Info:**
Jennifer Smira
Cell: 202-340-7675
Email: Jenn@Reishmanrealestate.com
MRIS ID: 3014837

DocuSign Envelope ID: 862C690F-6FFE-4F3E-AF4D-AA0185B8B001
DocuSign Envelope ID: 4DAF44E2-11BB-4368-89E4-8AAE04603A84
DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

LR
LINDSAY REISHMAN
REAL ESTATE
A Different Experience. Better Results.

# LRRE Affiliated Business Disclosure

This document is to Inform you that Lindsay Reishman Real Estate ("LRRE") has a business relationship with Caliber Funding, LLC, KVS Title, LLC, and HMS National Warranty.

Each of these parties is a separate company that has a joint marketing and advertising agreement with LRRE, and there is no common or joint ownership. Under these agreements, LRRE performs certain marketing and advertising services for, and provides certain marketing opportunities to, Caliber Funding, LLC, KVS Title, LLC, and HMS National Warranty, that may provide LRRE a financial or other benefit.

You are NOT required to use either of the above noted service providers as a condition for purchase or sale of a property.

THERE ARE FREQUENTLY OTHER SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND RATE FOR THESE SERVICES.

**ACKNOWLEDGEMENT**

I/We have read this disclosure form and understand that LRRE is referring me/us to the above service providers. I also understand that LRRE does not receive a referral fee, but LRRE does perform certain marketing and advertising services on behalf of the listed providers that may provide LRRE with a financial or other benefit.

DocuSigned by:
Dominic Ju
1C1308ED94E4B5...
Client Signature — 4/1/2013
Date

DocuSigned by:
Dana Ju
Client Signature — 4/2/2013
Date

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

KANSTOROOM
VITALE +
STANTON PLLC

kvslawgroup.com + P 301.605.1420 + F 800.707.8667
4733 Bethesda Avenue, Suite 410 + Bethesda, MD 20814

KVS Law is offering the Buyer a **<u>$500 credit</u>** toward their title charges if the settlement is conducted by our firm. The following is a complete list of title fees paid by the Buyer:

| | |
|---|---|
| Settlement Fee | $250 |
| Title Search | $205 |
| Title Exam | $180 |
| Title Commitment | $95 |
| Courier Fee | $20 |
| Total Cost | $750 |
| **LESS DISCOUNT** | **$500** |
| <u>Net Cost</u> | <u>$250</u> |

**Owner's Title Insurance costs vary with the sales price.

**Survey required by lender ($210), unless it is a condo.

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

# Jurisdictional Disclosure and Addendum to the Sales Contract for Washington, DC

*(Recommended for the Listing Agreement and required for the Regional Contract)*

Address 1311 Floral St NW
City Washington, State DC Zip 20012 Lot: 33
Block/Square: 2777 Unit: ______ Section: ______ Tax ID # 2777//0033
Parking Space(s) # 1 Storage Unit(s) # ______ Subdivision/Project: ______

PART I. SELLER DISCLOSURE - at time of listing:

1. SELLER'S ACKNOWLEDGMENT: **ALL INFORMATION HEREIN WAS COMPLETED BY THE SELLER.** The information contained in this Disclosure is based on the Seller's actual knowledge and belief and is current as of the date hereof.

2. SELLER DISCLOSURE: Pursuant to D.C. Code §42-1301, the Seller is exempt from property condition disclosure.

   ☐ **Yes** ☑ **No**

3. PROPERTY TAXES: Future property taxes may change. See https://www.taxpayerservicecenter.com/RP_Search.jsp?search_type=Assessment to determine the applicable rate. Additional information regarding property tax relief and tax credit information (tax reductions for seniors, homestead exemptions, property tax abatements and others) can be found at: http://otr.cfo.dc.gov/otr/cwp/view,a,1330,q,594338.asp .

4. D.C. SOIL DISCLOSURE REQUIREMENTS: The characteristic of the soil on the subject Property as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia published in 1976 and as shown on the Soil Maps of the District of Columbia at the back of that publication is USC

   For further information, the Buyer can contact a soil testing laboratory, the District of Columbia Department of Environmental Services, or the Soil Conservation Service of the Department of Agriculture.

5. TENANCY: Seller represents that property ☐ **is OR** ☑ **is not** subject to an existing residential lease or tenancy. If property is tenant occupied form #1314 is hereby provided.

6. CONDOMINIUM/COOPERATIVE/HOME OWNERS ASSOCIATION: Seller represents that this property ☐ **is OR** ☑ **is not** subject to a condominium, cooperative or home owners association. If applicable, the following required addendum is attached:

   ☐ Condominium Disclosure/Addendum (GCAAR form #921),

   ☐ Cooperative Disclosure/Addendum (GCAAR form #924) or

   ☐ Home Owners Association Disclosure/Addendum (GCAAR form #923)

©2012, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

7. **UNDERGROUND STORAGE TANK DISCLOSURE: (Applicable to single family home sales only.)** In accordance with the requirements of the District of Columbia Underground Storage Tank Management Act of 1990 [D.C. Code Section 8-113.02(g)], as amended by the District of Columbia Underground Storage Tank Management Act of 1990 Amendment Act of 1992 (the "Act") and the regulations adopted there under by the District of Columbia (the "Regulations"), Seller hereby informs Buyer that Seller has no knowledge of the existence or removal during Seller's ownership of the Property of any underground storage tanks as that term is defined in the Act and the Regulations, except as follows: no exceptions.

Seller [signature] 2/22/13 Date Seller [signature] 2/22/13 Date

**PART II. RESALE ADDENDUM:**

**The Contract of Sale dated** 4/1/2013 **, between Seller** ______ **and Buyer** Dominic Ju Dana Ju **is hereby amended by the incorporation of Parts I and II herein, which shall supersede any provisions to the contrary in the Contract.**

1. **LEAD-BASED PAINT REGULATIONS:**

A. **Lead-Based Paint Hazard:** A Seller who fails to give the required Lead Paint - Federal Disclosure ("Federal Lead Disclosure" See GCAAR Form 907) and EPA Pamphlet "Information and Disclosure of Lead-Based Paint and Lead-Based Paint Hazards" (pre 1978 properties) may be liable under Federal law for three times the amount of damages. A Seller who fails to give the required District of Columbia Lead Disclosure ("DC Lead Disclosure" See GCAAR Form 917) (pre 1978 properties) may be liable under District of Columbia law for civil and criminal penalties, and for damages. The foregoing Federal Lead Disclosure, EPA Pamphlet and DC Lead Disclosure are hereinafter collectively referred to as the "Required Lead Paint Information". The Seller represents that this residential Property [X] **was built prior to 1978 OR** [ ] **was not built prior to 1978 OR** [ ] building date is **uncertain.** If the dwelling(s) was built prior to 1978 or if the building date is uncertain, this Contract is not complete and not ratified unless, prior to ratification, the Buyer acknowledges receipt of the Required Lead Paint Information and has either taken the opportunity to incorporate a Lead-Based Paint Inspection contingency or waived such right. The Seller and any agent involved in the transaction are required to retain a copy of the completed Lead Paint Disclosure forms for a period of 3 years following the date of settlement. The Seller and Buyer acknowledge by their respective initials below that they have read and understand the provisions of this paragraph.

EO / RC Seller's Initials DJ / DJ Buyer's Initials

B. **Renovation, Repair and Painting Of Property:** In accordance with the Lead Renovation, Repair and Painting Rule ("RRP") as adopted by the Environmental Protection Agency ("the EPA"), effective April 22, 2010, if the improvements on the Property were built before 1978, contractor(s) engaged by Seller to renovate, repair or paint the Property must be certified by the EPA where such work will disturb more than six square feet of lead-based paint per room for interior projects; more than 20 square feet of lead-based paint for any exterior project; or includes window replacement or demolition ("Covered Work"). Before and during any Covered Work project, contractor(s) must comply with all requirements of the RRP.

A Seller who personally performs any Covered Work on a rental property is required to be certified by the EPA prior to performing such Covered Work. No certification is required for a Seller who personally performs Covered Work on a Seller's principal residence. However, Seller has the ultimate responsibility for the safety of Seller's family or children while performing such Covered Work. For detailed information regarding the RRP, Seller should visit www.epa.gov/lead/pubs/renovation.htm. The Seller and Buyer acknowledge that they have read and understand the provisions of this Section.

EO / RC Seller's Initials DJ / DJ Buyer's Initials

©2012, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

2. **SELLER DISCLOSURE:** Pursuant to D.C. Code §42-1302, prior to the submission of the offer the Buyer is entitled to a Seller's Disclosure Statement (if the Seller is not exempt), and hereby acknowledges receipt of same
[X] **Yes** [ ] **No** [ ] **Not applicable**

3. **RECORDATION AND TRANSFER TAXES:** Rates vary with the sales price and based on property type. See http://otr.cfo.dc.gov/otr/site/default.asp . Unless otherwise negotiated, the following will apply:

A. **Real Property:** The Recordation Tax will be paid by the Buyer and the Transfer Tax will be paid by the Seller
B. **Cooperatives:** The Economic Interest Deed Recordation Tax will be split equally between the Buyer and the Seller. There is no Transfer Tax for Cooperatives.

4. **FOREIGN INVESTMENT TAXES - FIRPTA:** Section 1445 of the United States Internal Revenue Code of 1986 provides that a Buyer of a residential real property located in the United States must withhold federal income taxes from the payment of the purchase price if (a) the purchase price exceeds Three Hundred Thousand Dollars ($300,000.00) or the purchase price is less than or equal to Three Hundred Thousand Dollars ($300,000.00) and the property will not be owner occupied, and (b) Seller is a foreign person for purposes of U.S. income taxation. A foreign person includes, but is not limited to, a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined by the Internal Revenue Code and applicable regulations). In the event the Seller is a foreign person (as described above); the Seller will be subject to the withholding provisions of FIRPTA. If the Seller is not a foreign person, the Seller agrees to execute an affidavit to this effect at the time of Settlement.

5. **NOTICES:** All notices under the contract shall be in writing. Notices to the Seller shall be effective when delivered to the Seller or an Agent of the Seller named in the contract (including a Dual Representative, or a Designated Representative assigned to the Seller, as applicable, or alternatively, to the Agent's Supervising Manager). Notices to the Buyer shall be effective when delivered to the Buyer or an Agent of the Buyer named in the contract (including a Dual Representative, or Designated Representative assigned to the Buyer, as applicable, or alternatively, to the Agent's Supervising Manager). "Purchaser" means "Buyer" and vice versa. "Delivery" means hand carried, sent by overnight delivery service, sent by wired or electronic medium which produces a tangible record of the transmission (such as telegram, mailgram, telecopier or "Fax", email which includes an attachment with an actual copy of the executed instruments being transmitted, or U.S. Postal mailing). In the event of overnight delivery service, Delivery will be deemed to have been made on the next business Day following the sending, unless earlier receipt is acknowledged in writing. In the event of U.S. Postal mailing, Delivery will be deemed to have been made on the third business Day following the mailing, unless earlier receipt is acknowledged in writing. The provisions of this paragraph regarding delivery of notices shall also be applicable to delivery of resale packages for condominiums, cooperatives and/or homeowners associations as may be required in a separate addendum.

6. **DEFINITIONS:**

A. **Days:** "Day" or "Days" means calendar days unless otherwise specified.
B. **Business Days:** "Business Days", whenever used, means Monday through Friday, excluding federal holidays.
C. **Computation of Time Periods:** For the purpose of computing time periods, the first Day will be the Day following Delivery, and the time period will end at 9 p.m. on the Day specified.
D. **Date of Ratification:** This Contract shall be deemed ratified when the contract, all addenda and any modifications thereto have been signed and initialed, where required by all parties, and Delivered to the other party pursuant to the Notices paragraph.
E. **As-Is:** Except as otherwise specified herein, the Seller will deliver the Property free and clear of trash and debris, broom clean and in substantially the same physical condition to be determined as of the latter of the Contract Date or date of Home Inspection.

| | | | |
|---|---|---|---|
| [signature] | 2/22/13 | DocuSigned by: Dominic Ju | 4/1/2013 |
| Seller | Date | Buyer | Date |
| [signature] | 2/22/13 | DocuSigned by: Dana Ju | 4/2/2013 |
| Seller | Date | Buyer | Date |

©2012, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this Form should be destroyed.

DocuSign Envelope ID: 9D253CE9-9EC8-4E88-A74A-9D254F9FDAFF
DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

LINDSAY REISHMAN
REAL ESTATE

GCAAR

REALTOR®

EQUAL HOUSING OPPORTUNITY

# Lead Paint - Federal Disclosure
## Disclosure of Information on Lead-Based Paint and Lead-Based Paint Hazards

RE: 1311 Floral St NW, Washington, DC 20012
Property Address

**LEAD WARNING STATEMENT**

Every purchaser/tenant of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller/landlord of any interest in residential real property is required to provide the buyer/tenant with any information on lead-based paint hazards from risk assessments or inspections in the seller's/landlord's possession and notify the buyer/tenant of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase/lease.

**SELLER'S/LANDLORD'S DISCLOSURE (initial)**

_____ (a) **Presence of lead-based paint and/or lead-based paint hazards (check one below):**

☐ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain):

☒ Seller/Landlord has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

_____ (b) **Records and reports available to the seller/landlord (check one below):**

☐ Seller/Landlord has provided the purchaser/tenant with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below):

☒ Seller/Landlord has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**PURCHASER'S/TENANT'S ACKNOWLEDGMENT (initial)**

_____ (c) Purchaser/Tenant has read the Lead Warning Statement above

_____ (d) Purchaser/Tenant has received copies of all information listed above. ☐ Yes ☐ No ☒ None listed

_____ (e) Purchaser/Tenant has received the pamphlet Protect Your Family From Lead in Your Home. ☒ Yes ☐ No

_____ (f) Purchaser has (check one below):

☐ Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or

☒ Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**AGENT'S ACKNOWLEDGMENT (initial)**

_____ (g) Agent has informed the seller/landlord of the seller's/landlord's obligations Under 42 U.S.C. 4582(d) and is aware of his/her responsibility to ensure compliance.

**CERTIFICATION OF ACCURACY**

The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

| | | | |
|---|---|---|---|
| Seller/Landlord Elizabeth Denevi | Date 2/24/13 | Buyer/Tenant (DocuSigned by) | Date 4/1/2013 |
| Seller/Landlord Randolph Carter | Date 2/24/13 | Buyer/Tenant (DocuSigned by) | Date 4/2/2013 |
| Agent Jenn Smira/ SP600505 | Date 2/24/2013 | Agent (DocuSigned By: Mark Meyerdirk, E47DC137DA4949E) | Date 4/1/2013 |

© 2001, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by REALTOR® members only.
Previous editions of this Form should be destroyed.

GCAAR FORM # 907 Federal Lead Disclosure — MC & DC (Previously form # 500) Page 1 of 1 07/01

Lindsay Reishman Real Estate 1506 19th Street NW Suite 1 Washington DC, DC 20036 Phone: 202-491-1275 Fax: 1311 Floral St NW
Jennifer Smira Produced with ZipForm™ by RE FormsNet, LLC 18025 Fifteen Mile Road, Clinton Township, Michigan 48035 www.zipform.com

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

LINDSAY REISHMAN
REAL ESTATE

GCAAR

REALTOR®

# Inclusions/Exclusions Attachment to Listing Agreement Disclosure and/or Addendum

Property Address: 1311 Floral St NW, Washington, DC 20012

## PART I. INCLUSIONS/EXCLUSIONS DISCLOSURE:

**Personal Property and Fixtures:** The Property includes the following personal property and fixtures, if existing: built-in heating and central air conditioning equipment, plumbing and lighting fixtures, sump pump, attic and exhaust fans, storm windows, storm doors, screens, installed wall-to-wall carpeting, window shades, blinds, window treatment hardware, smoke and heat detectors, TV antennas, exterior trees and shrubs. Unless otherwise agreed to in writing, all surface or wall mounted electronic components/devices **DO NOT** convey. If more than one of an item convey, the number of items is noted. **The items marked YES below are currently installed or offered.**

| Yes | No | # | Items | Yes | No | # | Items | Yes | No | # | Items |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☒ | ☐ | 1 | Alarm System | ☒ | ☐ | | Freezer | ☐ | ☒ | | Satellite Dish |
| ☒ | ☐ | 1 | Built-in Microwave | ☐ | ☒ | | Furnace Humidifier | ☐ | ☒ | | Storage Shed |
| ☒ | ☐ | 4 | Ceiling Fan | ☐ | ☒ | | Garage Opener | ☒ | ☐ | | Stove or Range |
| ☐ | ☒ | | Central Vacuum | ☐ | ☒ | | w/ remote | ☒ | ☐ | | Trash Compactor |
| ☒ | ☐ | | Clothes Dryer | ☐ | ☒ | | Gas Log | ☒ | ☐ | | Wall Oven |
| ☒ | ☐ | | Clothes Washer | ☐ | ☒ | | Hot Tub, Equip, & Cover | ☒ | ☐ | | Water ~~Treatment~~ Filter System |
| ☒ | ☐ | | Cooktop | ☐ | ☒ | | Intercom | ☐ | ☒ | | Window A/C Unit |
| ☒ | ☐ | | Dishwasher | ☒ | ☐ | | Playground Equipment | ☐ | ☒ | | Window Fan |
| ☒ | ☐ | | Disposer | ☐ | ☒ | | Pool, Equip, & Cover | ☒ | ☐ | | Window Treatments |
| ☐ | ☐ | | Electronic Air Filter | ☒ | ☐ | 2 | Refrigerator | ☐ | ☒ | | Wood Stove |
| ☒ | ☐ | | Fireplace Screen/Door | ☒ | ☐ | | w/ ice maker | | | | |

OTHER ______

**LEASED ITEMS**

Any leased items, systems or service contracts (including, but not limited to, fuel tanks, water treatment systems, lawn contracts, security system monitoring, and satellite contracts) DO NOT CONVEY absent an express written agreement by Purchaser and Seller. The following is a list of the leased items within the Property: ______

Seller certifies that Seller has completed this checklist disclosing what conveys with the property and gives permission to make this information available to prospective buyers.

DocuSigned by: Elizabeth Denevi 3/20/2013
ACE4F9752D8B40F...
Seller Elizabeth Denevi Date

[signature] 2/24/13
Seller Randolph Carter Date

## PART II. INCLUSIONS/EXCLUSIONS ADDENDUM:

The Contract of Sale dated 4/2/2013 between Seller Elizabeth Denevi, Randolph Carter and Buyer Dominic Ju Dana Ju is hereby amended by the incorporation of Part I and II herein, which shall supersede any provisions to the contrary in the Contract.

The parties agree that Part I herein shall replace and supersede the provisions of the Inclusions/Exclusions paragraph of the MAR Residential Contract of Sale or the Personal Property and Fixtures paragraph of the Regional Sales Contract as applicable.

Seller ______ Date ______

DocuSigned by: Dominic Ju 4/1/2013
Buyer Date

Seller ______ Date ______

DocuSigned by: Dana Ju 4/2/2013
Buyer Date

©2013, The Greater Capital Area Association of REALTORS®, Inc.
This Recommended Form is the property of the Greater Capital Area Association of REALTORS®, Inc. and is for use by REALTOR® members only.
Previous editions of this form should be destroyed.

GCAAR # 911 - Inclusions/Exclusions – MC & DC Page 1 of 1 2/2013
Lindsay Reishman Real Estate 1506 19th Street NW Suite 1 Washington DC, DC 20036 Phone: 202-491-1275 Fax: 1311 Floral St NW
Jennifer Smira Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

# SELLER'S PROPERTY CONDITION STATEMENT

## For Washington, DC

**Property Address:** 1311 Floral St NW Washington, DC 20012

Is the property included in a:

condominium association? ☐ Yes ☒ No
cooperative? ☐ Yes ☒ No
homeowners association with mandatory participation and fee? ☐ Yes ☒ No

If this is a sale of a condominium unit or cooperative unit, or in a homeowners association, this disclosure form provides information only as to the unit (as defined in the governing documents of the association) or lot (as defined in the covenants applicable to the lot), and not as to any common elements, common areas or other areas outside of the unit or lot.

**Purpose of Statement:** This Statement is a disclosure by the Seller of the defects or information actually known by the Seller concerning the property, in compliance with the District of Columbia Residential Real Property Seller Disclosure Act. Unless otherwise advised, the Seller does not possess an expertise in construction, architecture, engineering, or any other specific area related to the construction of the improvements on the property or the land. Also, unless otherwise advised, the Seller has not conducted any inspection of generally inaccessible areas such as the foundation or roof. THIS STATEMENT IS NOT A WARRANTY OF ANY KIND BY THE SELLER OR BY ANY AGENT REPRESENTING THE SELLER IN THIS TRANSACTION, AND IS NOT A SUBSTITUTE FOR ANY INSPECTIONS OR WARRANTIES THE BUYER MAY WISH TO OBTAIN.

**Seller Disclosure:** The Seller discloses the following information with the knowledge that, even though this is not a warranty, the Seller specifically makes the following statements based on the seller's actual knowledge at the signing of this document. Upon receiving this statement from the Seller, the Seller's agent is required to provide a copy to the Buyer or the agent of the Buyer. The Seller authorizes its agent (s) to provide a copy of this statement to any prospective buyer or agent of such prospective buyer in connection with any actual or anticipated sale of property. The following are statements made solely by the Seller and are not the statements of the Seller's agent (s), if any. This information is a disclosure only and is not intended to be a part of any contract between Buyer and Seller.

**The seller(s) completing this disclosure statement have owned the property from** 2004 **to** 2013.
**The seller(s) completing this disclosure have occupied the residence from** 2004 **to** 20013.

## A. Structural Conditions

1. **Roof** ☐ roof is a common element maintained by condominium or cooperative (no further roof disclosure required).

   Age of Roof ☐ 0-5 years ☐ 5-10 years ☒ 10-15 years ☐ 15+ years ☐ Unknown

   Does the seller have actual knowledge of any current leaks or evidence of moisture from roof?
   ☐ Yes ☒ No If yes, comments: ______

   Does the seller have actual knowledge of any existing fire retardant treated plywood?
   ☐ Yes ☒ No If yes, comments: ______

2. **Fireplace/Chimney(s)**

   Does the seller have actual knowledge of any defects in the working order of the fireplaces?
   ☐ Yes ☒ No ☐ No Fireplace(s)
   If yes, comments: ______

   Does the seller know when the chimney(s) and/or flue were last inspected and/or serviced?
   ☒ Yes ☐ No ☐ No chimneys or flues
   If yes, when were they last serviced or inspected? 1-2011

This is the required Seller's Disclosure Statement approved by the Washington, DC Board of Real Estate.

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

3. **Basement**
   Does the seller have actual knowledge of any current leaks or evidence of moisture in the basement?
   ☐ Yes ☒ No ☐ Not Applicable
   If yes, comments: ______
   Does the seller have actual knowledge of any structural defects in the foundation?
   ☐ Yes ☐ No
   If yes, comments: ______
4. **Walls and floors**
   Does the seller have actual knowledge of any structural defects in walls or floors?
   ☐ Yes ☒ No
   If yes, comments: ______
5. **Insulation**
   Does the seller have actual knowledge of presence of urea formaldehyde foam insulation?
   ☐ Yes ☒ No
   If yes, comments: ______
6. **Windows**
   Does the seller have actual knowledge of any windows not in normal working order?
   ☐ Yes ☒ No
   If yes, comments: ______

## B. Operating Condition of Property Systems

1. **Heating System** ☐ heating system is a common element maintained by condominium or cooperative (no further disclosure on heating system required).
   Type of system ☐ Forced Air ☒ Radiator ☐ Heat Pump ☐ Electric baseboard ☐ Other
   Heating Fuel ☒ Natural Gas ☐ Electric ☐ Oil ☐ Other
   Age of system ☐ 0-5 years ☒ 5-10 years ☐ 10-15 years ☐ Unknown
   Does the seller have actual knowledge that heat is not supplied to any finished rooms?
   ☐ Yes ☒ No
   If yes, comments: ______
   Does the seller have actual knowledge of any defects in the heating system?
   ☐ Yes ☒ No
   If yes, comments: ______
   Does the heating system include:
   Humidifier ☒ Yes ☐ No ☐ Unknown
   Electronic air filter ☐ Yes ☐ No ☒ Unknown
   If installed, does the seller have actual knowledge of any defects with the humidifier and electronic filter?
   ☐ Yes ☒ No ☐ Not Applicable
   If yes, comments: ______

2. **Air Conditioning System** ☐ air conditioning is a common element maintained by condominium or cooperative (no further disclosure on air conditioning system required).
   Type of system: ☒ Central AC ☐ Heat Pump ☐ Window/wall units ☐ Other ☐ Not Applicable
   Air Conditioning Fuel ☐ Natural Gas ☒ Electric ☐ Oil ☐ Other
   Age of system ☐ 0-5 years ☒ 5-10 years ☐ 10-15 years ☐ Unknown

This is the required Seller's Disclosure Statement approved by the Washington, DC Board of Real Estate.
GCAAR Form #919 – DC Seller's Disclosure Page 4 of 7 Revised March 2007
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1311 Floral St NW

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

If central AC, does the seller have actual knowledge that cooling is not supplied to any finished rooms? ☐ Yes ☒ No ☐ Not Applicable
If yes, comments: ______

Does the seller have actual knowledge of any problems or defects in the cooling system?
☐ Yes ☒ No ☐ Not Applicable
If yes, comments: ______

3. **Plumbing System**

Type of system ☒ Copper ☐ Galvanized ☒ Plastic Polybutelene ☐ Unknown
Water Supply ☒ Public ☐ Well
Sewage Disposal ☒ Public ☐ Well
Water Heater Fuel ☒ Natural Gas ☐ Electric ☐ Oil ☐ Other

Does the seller have actual knowledge of any defects with the plumbing system?
☐ Yes ☒ No
If yes, comments: ______

4. **Electrical System**

Does the seller have actual knowledge of any defects in the electrical system, including the electrical fuses, circuit breakers, outlets, or wiring?
☐ Yes ☒ No
If yes, comments: ______

## C. Appliances

Does the seller have actual knowledge of any defects with the following appliances?

| | | | |
|---|---|---|---|
| Range/Oven | ☐ Yes | ☒ No | ☐ Not Applicable |
| Dishwasher | ☐ Yes | ☒ No | ☐ Not Applicable |
| Refrigerator | ☐ Yes | ☒ No | ☐ Not Applicable |
| Range hood/fan | ☐ Yes | ☒ No | ☐ Not Applicable |
| Microwave oven | ☐ Yes | ☒ No | ☐ Not Applicable |
| Garbage Disposal | ☐ Yes | ☒ No | ☐ Not Applicable |
| Sump Pump | ☐ Yes | ☐ No | ☒ Not Applicable |
| Trash compactor | ☐ Yes | ☐ No | ☒ Not Applicable |
| TV antenna/controls | ☐ Yes | ☐ No | ☒ Not Applicable |
| Central vacuum | ☐ Yes | ☐ No | ☒ Not Applicable |
| Ceiling fan | ☐ Yes | ☒ No | ☐ Not Applicable |
| Attic fan | ☐ Yes | ☒ No | ☐ Not Applicable |
| Sauna/Hot tub | ☐ Yes | ☐ No | ☒ Not Applicable |
| Pool heater & equip. | ☐ Yes | ☐ No | ☒ Not Applicable |
| Security System | ☐ Yes | ☒ No | ☐ Not Applicable |
| Intercom System | ☐ Yes | ☐ No | ☒ Not Applicable |
| Garage door opener | ☐ Yes | ☐ No | ☒ Not Applicable |
| & remote controls | ☐ Yes | ☐ No | ☒ Not Applicable |
| Lawn sprinkler system | ☐ Yes | ☐ No | ☒ Not Applicable |
| Water treatment system | ☐ Yes | ☒ No | ☐ Not Applicable |
| Smoke Detectors | ☐ Yes | ☒ No | ☐ Not Applicable |
| Carbon Monoxide Detectors | ☐ Yes | ☒ No | ☐ Not Applicable |
| Other Fixtures | ☐ Yes | ☒ No | ☐ Not Applicable |
| Or Appliances | ☐ Yes | ☒ No | ☐ Not Applicable |

If yes to any of the above, described defects: ______

DocuSign Envelope ID: 9D253CE9-9ECB-4E88-A74A-9D354F0FDAEE
DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

## D. Exterior/Environmental Issues

1. **Exterior Drainage**
   Does the seller have actual knowledge of any problem with drainage on the property?
   ☐ Yes ☒ No
   If yes, comments: ______________________

2. **Damage to property**
   Does the seller have actual knowledge whether the property has previously been damaged by:
   Fire ☐ Yes ☒ No
   Wind ☐ Yes ☒ No
   Flooding ☐ Yes ☒ No
   If yes, comments: ______________________

3. **Wood destroying insects or rodents?**
   Does the seller have actual knowledge of any infestation or treatment for infestation?
   ☐ Yes ☒ No
   If yes, comments: ______________________

   Does the seller have actual knowledge of any prior damage or repairs due to a previous infestation?
   ☐ Yes ☒ No
   If yes, comments: ______________________

4. **Does the seller have actual knowledge of any substances, materials or environmental hazards (including but not limited to asbestos, radon gas, lead based paint, underground storage tanks, formaldehyde, contaminated soil, or other contamination) on or affecting the property?**
   ☐ Yes ☒ No
   If yes, comments: ______________________

5. **Does the seller have actual knowledge of any zoning violations, nonconforming uses, violation of building restrictions or setback requirements, or any recorded or unrecorded easement, except for utilities, on or affecting the property?**
   ☐ Yes ☒ No
   If yes, comments: ______________________

6. **Does the seller have actual knowledge that this property is a D.C. Landmark included in a designated historic district or is designated a historic property?**
   ☐ Yes ☒ No
   If yes, comments: ______________________

7. **Has the property been cited for a violation of any historic preservation law or regulation during your ownership?**
   ☐ Yes ☒ No
   If yes, comments: ______________________

This is the required Seller's Disclosure Statement approved by the Washington, DC Board of Real Estate.
GCAAR Form #919 – DC Seller's Disclosure Page 6 of 7 Revised March 2007
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1311 Floral St NW

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

8. **Does the seller have actual knowledge if an façade easement or a conservation easement has been placed on the property?**

☐ Yes ☒ No

If yes, comments: ______

The seller(s) certifies that the information in this statement is true and correct to the best of their knowledge as known on the date of signature.

Seller ______ Date 2/24/13
Elizabeth Denevi

Seller ______ Date 2/24/2013
Randolph Carter

Buyer(s) have read and acknowledge receipt of this statement and acknowledge that this statement is made based upon the seller's actual knowledge as of the above date. This disclosure is not a substitute for any inspections or warranties which the buyer(s) may wish to obtain. This disclosure is NOT a statement, representation, or warranty by any of the seller's agents or any sub-agents as to the presence or absence of any condition, defect or malfunction or as to the nature of any condition, defect or malfunction.

DocuSigned by ______ Date 4/1/2013
Buyer

DocuSigned by ______ Date 4/2/2013
Buyer

This is the required Seller's Disclosure Statement approved by the Washington, DC Board of Real Estate.
GCAAR Form #919 – DC Seller's Disclosure Page 7 of 7 Revised March 2007
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1311 Floral St NW

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

LINDSAY REISHMAN
REAL ESTATE

REALTOR®

EQUAL HOUSING OPPORTUNITY

# SELLER'S DISCLOSURE STATEMENT

## Instructions to the Seller for Seller's Disclosure Statement

These Instructions are to assist the Seller in completing the required Seller's Disclosure Statement in order to comply with the District of Columbia Residential Real Property Seller Disclosure Act.

1. **Who must complete the Seller's Disclosure Statement?** The Seller, not the broker and not the management company, condominium association, cooperative association or homeowners association.

2. **In what types of transactions must the Seller provide the Seller's Disclosure Statement to the Purchaser?** The Act applies to the following types of transfers or sales of District of Columbia real estate:
   (a) where the property consists of one to four residential dwelling units, and,
   (b) the transaction's a sale, exchange, installment land contract, lease with an option to purchase, or any other option to purchase, and,
   (c) the purchaser expresses, in writing, an interest to reside in the property to be transferred.

   **However, the Act does not apply to:**
   (a) court ordered transfers;
   (b) transfers to a mortgagee by a mortgagor in default;
   (c) transfers by sale under a power of sale in a deed of trust or mortgage or any foreclosure sale under a decree of foreclosure or deed in lieu of foreclosures;
   (d) transfers by a non-occupant fiduciary administering a decedent's estate, guardianship, conservatorship or trust;
   (e) transfers between co-tenants;
   (f) transfers made to the transferor's spouse, parent, grandparent, child, grandchild or sibling(or any combinations of the foregoing);
   (g) transfer between spouses under a divorce judgment incidental to such a judgment;
   (h) transfers or exchanges to or from any governmental entity; and
   (i) transfers made by a person of newly constructed residential property that has not been inhabited.

3. **When does the Seller's Disclosure Statement have to be provided to the Purchaser?** In a sale, before or at the time the prospective transferee executes a purchase agreement with the transferor. In an installment sales contract (where a binding purchase contract has not been executed), or in the case of a lease with no option to purchase, before or at the time the prospective transferee executes the installment sales contract or lease with the transferor.

4. **What information must the Seller disclose?** Answer ALL questions on the Seller's Disclosure Statement. If some items do not apply to your property, check "N/A" (not applicable). If you do not know the facts, check "UNKNOWN". Report actually known conditions referred to in the questions. Each disclosure must be made in "good faith" (honesty in fact in the making of the disclosure). Attach additional pages with your signature if additional space is required.

**The Seller of a condominium unit, cooperative unit, or a lot in a homeowners association, is to provide information only as to the Seller's unit or lot, and not as to any common elements, common areas or other areas outside of the unit or lot.**

This is the required Seller's Disclosure Statement approved by the Washington, DC Board of Real Estate.
GCAAR Form #919 – DC Seller's Disclosure Page 1 of 7 Revised March 2007

Lindsay Reishman Real Estate 1506 19th Street NW Suite 1 Washington DC, DC 20036
Phone: 202-491-1275 Fax: Jennifer Smira 1311 Floral St NW
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

REAL ESTATE

GCAAR

wdcar

REALTOR®

EQUAL HOUSING OPPORTUNITY

## SELLER'S DISCLOSURE STATEMENT

Instructions to the Seller for Seller's Disclosure Statement

5. **What is the remedy if the Seller does not provide the Seller's Disclosure Statement to the Transferee?** If the Seller's Disclosure Statement is delivered after the purchaser executes the purchase agreement, installment sales contract or lease with an option to purchase, the purchaser may terminate the transaction by written notice to the seller not more than five (5) calendar days after receipt of the Seller's Disclosure Statement by the purchaser, and the deposit must be returned to the purchaser. The right to terminate is waived if not exercised before the earliest of:
   (a) the making of an application for a mortgage loan (if the lender discloses that the right to rescind terminates on submission of the application); or
   (b) settlement or date of occupancy in the case of a sale; or
   (c) occupancy in the case of a lease with an option to purchase.

6. **If the Seller finds out different information after providing the Seller's Disclosure Statement to the Purchaser, how does this impact a ratified contract?** If information becomes inaccurate after delivery of the disclosure form, the inaccuracy shall not be grounds for terminating the transaction.

7. **How must a Seller deliver the Seller's Disclosure Statement to the Transferee?** The Seller's Disclosure Statement must be delivered by personal delivery, facsimile delivery, or by registered mail to the transferee. Execution by the transferor of a facsimile is considered execution of the original.

This is the required Seller's Disclosure Statement approved by the Washington, DC Board of Real Estate.
GCAAR Form #919 – DC Seller's Disclosure Page 2 of 7 Revised March 2007

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1311 Floral St NW

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

# LEAD DISCLOSURE FORM

**Federal Lead Warning Statement:** Housing built before 1978 may contain lead-based paint. Lead from paint, paint chips, and dust can pose health hazards if not managed properly. Lead exposure is especially harmful to young children and pregnant women. Before renting pre-1978 housing, lessors must disclose the presence of known lead-based paint and/or lead-based paint hazards in the dwelling. Lessees must also receive a federally approved pamphlet on lead poisoning prevention.

ADDRESS OF PROPERTY, INCLUDING UNIT NUMBER IF ANY:
1311 Floral St NW
Washington, DC 20012

The District of Columbia "Lead-Hazard Prevention and Elimination Act of 2008," as amended (the "Act"), D.C. Official Code § 8-231.01 *et seq.*, requires an owner of a residential property constructed before 1978 to disclose the information contained in this Lead Disclosure Form to prospective tenants or prospective property purchasers, before any change in occupancy or contract for possession is executed. Owners are required to disclose specific information which they know or reasonably should know about the property related to the presence of lead-based paint and/or lead-based paint hazards, and any pending actions ordered under the Act. To meet the requirements of this law, you must complete this Lead Disclosure Form.

I am the owner or authorized owner's agent of (*Insert Full Address of Property*) 1311 Floral St NW, Washington, DC 20012
and affirm that the following answers state what I reasonably know about my property.

CHECK ONE BOX UNDER A, B, AND C, BELOW.

**A. Check one of the following 3 statements that accurately describes what you know about the presence of lead-based paint on your property:**

☐ Lead-based paint is known or reasonably known to be present on the interior or on the exterior of the property (including common areas, if applicable), at the following locations (specify components, rooms, and any other relevant details, and **provide access to any available record or report** about the presence of lead-based paint at this property):

________________________________________

________________________________________

________________________________________

☐ To my knowledge, lead-based paint is not known or reasonably known to be present on the interior or on the exterior of the property, including common areas. I will provide access to any record or report I have about the absence of lead-based paint at this property.

☒ While lead-based paint is not known by me to be present in the dwelling unit, it is presumed to be there, because the dwelling unit was constructed prior to 1978.

**B. Check one of the following 2 statements that accurately describes what you know or reasonably should know about the condition of your property:**

NOTE: The following definitions must be followed to comply with District law.

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

GOVERNMENT OF THE
DISTRICT OF COLUMBIA

# INSTRUCTIONS FOR LEAD DISCLOSURE IN THE DISTRICT OF COLUMBIA

This disclosure form is intended to satisfy Federal disclosure requirements under 42 U.S.C. 4852d, as well as the District of Columbia's locally required disclosure requirements under D.C. Official Code § 8-231.01 and § 8-231.04. Under both Federal and District law, lead disclosure must occur before a tenant or purchaser of a pre-1978 residential property is obligated to lease or buy the property.

NOTE: There are some important differences between the Federal disclosure requirements and the District's disclosure requirements. Not all of these differences can be reconciled in the District's Lead Disclosure Form. Accordingly, it is vitally important that you read these instructions carefully, so that you remain in compliance with both Federal and District law pertaining to lead disclosure.

## I. WHAT THE DISTRICT'S LEAD DISCLOSURE FORM PROVIDES

The District's Lead Disclosure Form provides:

- The Lead Warning Statement that Federal law requires;
- Notice that any lead-related records or reports must be made available to the prospective tenant or purchaser, as required by both Federal and District law;
- Room for the owner to list relevant details about the location of any known lead-based paint;
- Room for the owner to list relevant details about the location of lead-based paint hazards that the owner reasonably should know about; and
- Room for the owner to list any pending actions related to the property that have been ordered by a District agency.

## II. KEY DIFFERENCES BETWEEN THE DISTRICT LAW AND FEDERAL LAW

- The District's lead law's definition of a "lead-based paint hazard" is different from the Federal definition of the same term. The District's definition of the term includes additional conditions that constitute a lead-based paint hazard, meaning it is stricter than the Federal definition. **Owners who use the District's Lead Disclosure Form to meet the District's requirement for disclosure must use the District law's definition of "lead-based paint hazard" when completing the form.** To help owners complete the form correctly, that definition is included on the form itself, as is the District's definition of the term "presumed lead-based paint," another key term to understand when completing the form. *Illustration: If an owner knows that there is peeling paint on their pre-1978 residential property, that paint is presumed by District law to be*

Lindsay Reishman Real Estate 1506 19th Street NW Suite 1 Washington DC, DC 20036
Phone: 202-491-1275 Fax: Jennifer Smira 1311 Floral St NW
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

*lead-based paint, and because the paint is in deteriorated condition, it is a lead-based paint hazard under District law and must be listed as such on the District's Lead Disclosure Form.*

- District law requires the owner to disclose information related to the property about the presence of lead-based paint, lead-based paint hazards, and any pending actions ordered by a District agency, whenever such information is "reasonably known to the owner." In contrast, Federal law only requires information about the presence of "known" lead-based paint and/or lead-based paint hazards to be disclosed. In other words, the District's requirements are stricter than the Federal requirements, regarding what the owner must disclose. **To satisfy District law, an owner must not only disclose what they actually know about the presence of lead-based paint and/or lead-based paint hazards on their property, but they must also disclose what it is reasonable for them to know about such presence.** *Illustration: If an owner has not given his or her pre-1978 property a new coat of paint in the past twenty years, it is reasonable for the owner to know that the paint is no longer in intact condition. Therefore, the owner must disclose that lead-based paint hazards are present on the interior and/or the exterior of the property, in the form of deteriorated presumed lead-based paint.*

- The Federal disclosure requirements apply to "target housing," a smaller category of housing than District law applies to. "Target housing" is a term that means pre-1978 residential properties, but that excludes "housing for the elderly or persons with disabilities (unless any child who is less than 6 years of age resides or is expected to reside in such housing) or any 0-bedroom dwelling [which are dwellings in which the living area is not separated from the sleeping area, such as efficiencies, studio apartments, dormitories, military barracks, and rentals of individual rooms in residential dwellings]." In contrast, the District's disclosure requirements apply to pre-1978 "dwelling units," which is a term that means "a room or a group of rooms that form a single independent habitable unit for permanent occupation by one or more individuals, that has living facilities with permanent provisions for living, sleeping, eating, and sanitation."

  The District has the same exception as the Federal exception, with respect to housing for the elderly or designated exclusively for persons with disabilities that does not contain a child under 6 years of age, and the following additional 3 exceptions: "[1] A unit within a hotel, motel, or seasonal or transient facility, unless such unit is or will be occupied by a person at risk for a period exceeding 30 days; [2] an area within the dwelling unit that is secured and accessible only to authorized personnel; [and 3] an unoccupied dwelling unit that is to be demolished, provided that the dwelling unit will remain unoccupied until demolition." Note that the Federal exception for "0-bedroom dwelling" is not an exception under District law. **Key point: if you are submitting the District's Lead Disclosure Form with the intent to satisfy <u>both</u> Federal and District disclosure requirements, an initial exemption from the requirement of submitting the form in cases involving pre-1978 residential housing is the one having to do with housing designated for the elderly or for the disabled.**

- Both Federal and District law require the owner to submit a completed Lead Disclosure Form prior to the purchaser or tenant being obligated under a contract to purchase or lease the dwelling unit. However, **Federal law and District law have different exceptions that apply, in addition**

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

**to the above-mentioned initial exemption, and they can also exempt the owner from having to submit a completed disclosure form:**

Exceptions under Federal law

- ✓ Sales of pre-1978 residential housing at foreclosure;
- ✓ Leases of pre-1978 residential housing that have been found to be lead-based paint free by a certified lead inspector;
- ✓ Short-term leases of 100 days or less, where no lease renewal or extension can occur; and
- ✓ Renewals of existing leases in pre-1978 residential housing in which the lessor has previously disclosed all information required by the Federal disclosure requirements related to the presence of known lead-based paint and/or lead-based paint hazards.

Exceptions under District law

- ✓ When the owner has a report from a risk assessor or an inspector certifying that a dwelling unit is a lead-free unit, the owner may provide that report instead of a completed disclosure form; and
- ✓ When the owner has three clearance reports issued at least twelve months apart and within the previous seven years, and the property was not and is not subject to any housing code violations that occurred during the past five years or any that are outstanding, the owner may provide those clearance reports instead of a completed disclosure form.

If one of the above exception scenarios exists, the owner must make sure the exception applies to the disclosure situation. For example, if District law requires that the Lead Disclosure Form be completed and submitted, an owner cannot use one of the exceptions provided by Federal law to avoid submitting the completed form. Conversely, an owner who is required by Federal law to disclose the known presence of lead-based paint and/or lead-based paint hazards cannot use an exception created by District law to avoid submitting the federally required information.

- If an owner learns of the presence of lead-based paint in a dwelling unit, District law requires the owner to:

- ✓ Notify the tenant of the presence of lead-based paint within 10 days after discovering its presence; and
- ✓ Provide the tenant with (1) the Federal Lead Warning Statement that is currently printed at the top of the District's Lead Disclosure Form, and with (2) the lead hazard information pamphlet entitled *Protect Your Family From Lead in Your Home* (EPA-747-K-94-001). However, if the tenant has already received the Warning Statement and the pamphlet within the prior 12 month period, then the owner does not have to provide them again during this same time period.

3

GCAAR Form 917 6/2012

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1311 Floral St NW

## III. ADDITIONAL DISCLOSURE REQUIREMENTS UNDER FEDERAL LAW

Providing the Lead Disclosure Form does not conclude an owner's obligations under related Federal law. Federal law requires that the following additional disclosure-related requirements also be met:

- The seller or lessor must provide the purchaser or lessee with an EPA-approved lead hazard information pamphlet, such as the EPA pamphlet entitled *Protect Your Family From Lead in Your Home* (EPA-747-K-94-001).

- The seller or lessor must disclose information about the presence of any known lead-based paint and/or lead-based paint hazards, as well as the existence of any available records or reports pertaining to such presence, not just to the purchaser or lessee, but also to each agent involved in the process. The term "agent" is defined as "any party who enters into a contract with a seller or lessor, including any party who enters into a contract with a representative of the seller or lessor, for the purpose of selling or leasing target housing [except for] purchasers or any purchaser's representative who receives all compensation from the purchaser."

- The Federal disclosure law requires owners to give prospective purchasers and tenants a 10-day opportunity to conduct a risk assessment or inspection to determine whether lead-based paint and/or lead-based paint hazards are present, prior to a purchase and sale agreement or a lease being executed. Owners of residential property in the District of Columbia must also follow this additional requirement imposed by Federal law.

- The Federal disclosure law requires lessors to provide lessees with available records or reports pertaining to lead-based paint and/or lead-based paint hazards, but permits owners to submit report summaries under certain circumstances.[i] Lengthy court documents and construction documents may be excerpted, provided that all information regarding lead-based paint and lead-based paint hazards is included along with sufficient background information, so that the context of the excerpt is clear. For paint inspection and risk assessment reports, EPA and HUD have determined that lessors may provide lessees with a summary of all paint inspection and risk assessment reports, provided that the summary is prepared by a certified paint inspector or risk assessor. Where information about specific units is inconsistent with the conclusions as a whole, this information must be included along with the summary of general conclusions. In situations where documents are excerpted or summarized, they must be accompanied by a list of all complete records and reports available to the lessee. If the lessor chooses to provide excerpts or summaries and document lists in lieu of complete copies, the lessor must provide the lessee with the opportunity to review the complete documents in a central location on the premises, if feasible, and the opportunity to receive copies of any documents not provided, upon request, and at no cost to the lessee.

- The Federal disclosure law requires owners to attach its required disclosure materials, including the Federal Lead Warning Statement, to the sales or leasing contract before a purchaser or lessee is obligated under a contract to purchase or lease pre-1978 residential housing. District law does not require that this information be attached to sales or leasing contracts, only that it be provided before the buyer or renter is obligated. But whenever Federal law is more stringent than local

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

law, Federal law applies, and therefore owners of residential property in the District of Columbia who want to submit only one disclosure form to satisfy both Federal and District requirements must follow the additional requirement imposed by Federal law, of attaching the Lead Disclosure Form to the sales or leasing contract.

[1] Interpretative Guidance for the Real Estate Community on the Requirements for Disclosure of Information Concerning Lead-based Paint in Housing, August 20, 1996, page 6, answer to question 13.

5

GCAAR Form 917 6/2012

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com 1311 Floral St NW

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

**DISTRICT OF COLUMBIA DEFINITION OF LEAD-BASED PAINT HAZARD:** "Lead-based paint hazard" means any condition that causes exposure to lead from lead- contaminated dust, lead-contaminated soil, deteriorated lead-based paint or presumed lead-based paint, or lead-based paint or presumed lead-based paint that is disturbed without containment. *See* D.C. Official Code § 8-231.01(22).

**DEFINITION OF PRESUMED LEAD-BASED PAINT:** "Presumed lead-based paint" means paint or other surface coating affixed to a component in or on a dwelling unit or child-occupied facility, constructed prior to 1978. *See* D.C. Official Code § 8-231.01(32).

☐ I have reason to believe a lead-based paint hazard is present on the interior or on the exterior of the property (including common areas, if applicable), at the following locations (specify components, rooms, and any other relevant details, and **provide access to any available record or report** about the presence of lead-based paint hazards at this property):

________________________________________

________________________________________

________________________________________

☐ To my knowledge, lead-based paint hazards are not present nor likely to be present on the interior or on the exterior of the property, including common areas, if applicable. I will provide access to any record or report I have about the absence of lead-based paint hazards at this property.

**C. Check one of the following 2 statements that accurately describes whether any government action is currently pending, with respect to your property or unit:**

☒ There are currently no pending actions ordered by a District Government agency with respect to the property listed above.

☐ There are currently pending actions that have been ordered by a District Government agency with respect to this property, as follows:

________________________________________

________________________________________

**By my signature below, I agree that this Lead Disclosure Form states information about my property or unit listed above, which is reasonably known to me, and that I have answered the questions in this form truthfully. I also agree to comply with the Act's requirement that I provide this information to my prospective tenants, as well as to any prospective purchasers, before they are under any contract to purchase or lease a dwelling unit. I understand that falsification of any information provided or required in this document may subject me to civil or criminal penalties. D.C. Official Code § 8-231.15(b) and § 8-231.16(b).**

[signature] 2/22/13

NAME OF OWNER/OWNER'S AUTHORIZED AGENT DATE

GOVERNMENT OF THE DISTRICT OF COLUMBIA

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

# ACKNOWLEDGEMENT FORM

**Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards and/or Pending Government Actions**

ADDRESS OF PROPERTY, INCLUDING UNIT # IF ANY:
1311 Floral St NW
Washington, DC 20012

**Lessee's Acknowledgement**

☐ I confirm that I have received a completed Lead Disclosure Form for the property address specified above, and that I received it on (insert date): ________________.

☐ I confirm that I have received the pamphlet, *Protect Your Family From Lead in Your Home*, and that I received it on (insert date): ________________.

Lessee's Signature ________________ Date ________________

**Prospective Purchaser's Acknowledgement**

☒ I confirm that I have received a completed Lead Disclosure Form for the property address specified above, and that I received it on (insert date): 4/2/2013.

☒ I confirm that I have received the pamphlet, *Protect Your Family From Lead in Your Home*, and that I received it on (insert date): 4/2/2013.

DocuSigned by [signature] — 4/1/2013

Prospective Purchaser's Signature — Date

DocuSigned by [signature] — 4/2/2013

**Agent's Acknowledgement**

☑ I have informed the property owner of the property owner's obligations under 42 U.S.C. 4852d, and I am aware of my responsibility to ensure compliance.

[signature] 3/11/2013

Agent's Signature — Date

John Smira SP600505

GCAAR Form 917 — 6/2012

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com — 1311 Floral St NW

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

LINDSAY REISHMAN
REAL ESTATE

REALTOR®

EQUAL HOUSING OPPORTUNITY

**THIS NOTICE IS REQUIRED BY LAW AND IS NOT A CONTRACT.**

**THIS DISCLOSURE DOES NOT CREATE A BROKERAGE RELATIONSHIP.**

# Disclosure of Brokerage Relationship
# District of Columbia

Prior to providing specific real estate assistance, District of Columbia law requires that a licensee disclose to any party who the licensee does **NOT** represent the identity of the party to the proposed transaction which the licensee does represent. Even though a licensee may not represent you, that licensee must still treat you honestly in the transaction.

We, the undersigned ☒ Buyer(s)/Tenant(s) or ☐ Seller(s)/Landlord(s) acknowledge receipt of this Disclosure, and understand we are **NOT** represented by the licensee identified below.

Jenn Smira SP600505 (Licensee & License #) and Lindsay Reishman Real Estate (Brokerage Firm)

The licensee and brokerage firm named above represent the following party in the real estate transaction:

☒ **Seller(s)/Landlord(s)** (The licensee has entered into a written listing agreement with the seller(s) or landlord(s) or is acting as a sub-agent of the listing broker.)

☐ **Buyer(s)/Tenant(s)** (The licensee has entered into a written agency agreement with the buyer/tenant.)

☐ **Designated Agent of the ☐ Buyer(s)/Tenant(s) or ☐ Seller(s)/Landlord(s)**
(Both the buyers and sellers have previously consented to "Designated Agency", and the licensee listed above is indicating the parties represented.

[signature] Acknowledged — 2/22/13 Date

[signature] Acknowledged — 2/22/13 Date

Name of Person(s): ______________________

I certify on this date that I, the real estate agent, have delivered a copy of this disclosure to the person(s) identified above.

Signed (Licensee) ______________________ Date ______________

©2005, The Greater Capital Area Association of REALTORS®, Inc.
This recommended form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this form should be destroyed.

GCAAR Form #1002- DC - Disclosure of Brokerage Relationship (formerly form #143) Page 1 of 1 07/2005
Lindsay Reishman Real Estate 1506 19th Street NW Suite 1 Washington DC, DC 20036
Phone: 202-491-1275 Fax: Jennifer Smira 1311 Floral St NW
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

LINDSAY REISHMAN
REAL ESTATE

REALTOR®

EQUAL HOUSING
OPPORTUNITY

**THIS NOTICE IS REQUIRED BY LAW AND IS NOT A CONTRACT.**

**THIS DISCLOSURE DOES NOT CREATE A BROKERAGE RELATIONSHIP.**

# Disclosure of Brokerage Relationship
# District of Columbia

Prior to providing specific real estate assistance, District of Columbia law requires that a licensee disclose to any party who the licensee does NOT represent the identity of the party to the proposed transaction which the licensee does represent. Even though a licensee may not represent you, that licensee must still treat you honestly in the transaction.

We, the undersigned ☐ Buyer(s)/Tenant(s) or ☒ Seller(s)/Landlord(s) acknowledge receipt of this Disclosure, and understand we are NOT represented by the licensee identified below.

____________________ and ____________________
(Licensee & License #) (Brokerage Firm)

The licensee and brokerage firm named above represent the following party in the real estate transaction:

☐ **Seller(s)/Landlord(s)** (The licensee has entered into a written listing agreement with the seller(s) or landlord(s) or is acting as a sub-agent of the listing broker.)

☒ **Buyer(s)/Tenant(s)** (The licensee has entered into a written agency agreement with the buyer/tenant.)

☐ **Designated Agent of the ☐ Buyer(s)/Tenant(s) or ☐ Seller(s)/Landlord(s)**
(Both the buyers and sellers have previously consented to "Designated Agency", and the licensee listed above is indicating the parties represented.

____________________
Acknowledged Date

____________________
Acknowledged Date

Name of Person(s): ____________________
I certify on this date that I, the real estate agent, have delivered a copy of this disclosure to the person(s) identified above.

____________________ ____________
Signed (Licensee) Date

©2005, The Greater Capital Area Association of REALTORS®, Inc.
This recommended form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this form should be destroyed.

GCAAR Form #1002- DC - Disclosure of Brokerage Relationship Page 1 of 1 07/2005
(formerly form #143)
Lindsay Reishman Real Estate 1506 19th Street NW Suite 1 Washington DC, DC 20036
Phone: 202-491-1275 Fax: Jennifer Smira 1311 Floral St NW
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

DocuSign Envelope ID: 4C9C0B45-EEBA-45AE-BEF3-2E58AFF8A453

REALTOR®

EQUAL HOUSING
OPPORTUNITY

**THIS NOTICE IS REQUIRED BY LAW AND IS NOT A CONTRACT.**

**THIS DISCLOSURE DOES NOT CREATE A BROKERAGE RELATIONSHIP.**

# Disclosure of Brokerage Relationship
# District of Columbia

Prior to providing specific real estate assistance, District of Columbia law requires that a licensee disclose to any party who the licensee does **NOT** represent the identity of the party to the proposed transaction which the licensee does represent. Even though a licensee may not represent you, that licensee must still treat you honestly in the transaction.

We, the undersigned ☒ Buyer(s)/Tenant(s) or ☐ Seller(s)/Landlord(s) acknowledge receipt of this Disclosure, and understand we are **NOT** represented by the licensee identified below.

Jenn Smira and Lindsay Reishman Real Estate, Inc.
(Licensee & License #) (Brokerage Firm)

The licensee and brokerage firm named above represent the following party in the real estate transaction:

☒ **Seller(s)/Landlord(s)** (The licensee has entered into a written listing agreement with the seller(s) or landlord(s) or is acting as a sub-agent of the listing broker.)

☐ **Buyer(s)/Tenant(s)** (The licensee has entered into a written agency agreement with the buyer/tenant.)

☐ **Designated Agent of the** ☐ **Buyer(s)/Tenant(s) or** ☐ **Seller(s)/Landlord(s)**
(Both the buyers and sellers have previously consented to "Designated Agency", and the licensee listed above is indicating the parties represented.

DocuSigned by: Dominic Ju 4/1/2013
Acknowledged Date

DocuSigned by: Dana Ju 4/2/2013
Acknowledged Date

Name of Person(s): ______________________
I certify on this date that I, the real estate agent, have delivered a copy of this disclosure to the person(s) identified above.

______________________ ______________________
Signed (Licensee) Date

©2005, The Greater Capital Area Association of REALTORS®, Inc.
This recommended form is the property of The Greater Capital Area Association of REALTORS®, Inc. and is for use by members only.
Previous editions of this form should be destroyed.

GCAAR Form #1002- DC - Disclosure of Brokerage Relationship Page 1 of 1 07/2005
(formerly form #143)
Urban Brokers LLC 2007 Vermont St NW Washington, DC 20001
Phone: 202-489-6150 Fax: 202-318-2268 Mark Meyerdirk 1311 Floral St
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026 www.zipLogix.com

# EXHIBIT 7



















# **EXHIBIT 8**

Gmail by Google

Dominic Y. Ju <[redacted]

## Fwd: Basement flooding

1 message

Dana Ju <[redacted]>
To: Dominic Ju [redacted]

Sat. Jul 13. 2013 at 11:03 AM

Begin forwarded message.

> **From:** Elizabeth Denevi <edenevi23@comcast.net>
> **Date:** July 13 2013 10:22:47 AM EDT
> **To:** Dana Ju [redacted]
> **Cc:** Randolph Carter <rcarter108@comcast.net>
> **Subject: Re: Basement flooding**

> Hi Dana -- I'm so sorry to hear that. No. once we fixed the drainage outside. we had no water in the basement
>
> When we bought the house. we had to fix the gutters and run the downspouts away from the house. When we first toured the house. there was a little bit of moisture on the side near the laundry room/office (not the guest bedroom side)
>
> That back "corner" just outside the guest bedroom window is the juncture point for two big gutters. I would suggest making sure they are clear. We had the upper level gutters cleaned before we put the house on the market. so I would check the lower level gutters first. right outside the kitchen sink window
>
> Then, Randolph said to make sure the rain barrel in that same area is drained so it's not overflowing into the same corner
>
> Hope it's an easy fix.
>
> Elizabeth Denevi
> edenevi23@comcast.net

# EXHIBIT 9

*10905 Fox Sparrow Court*
*Fairfax, VA 22032*

GELLER ENVIRONMENTAL LABS, INC.

*Phone: 703-978-4683*
*Facsimile: 703-250-4960*

# ASBESTOS BULK SAMPLE ANALYSIS REPORT

## 1311 Floral St., NW
## Washington, DC 20012

Inspection Date: August 13, 2013

Report Prepared: August 14, 2013

Prepared for: Mr. Dominic Ju
1311 Floral St., NW
Washington, DC 20012

Prepared By: Geller Environmental Labs, Inc.
10905 Fox Sparrow Court
Fairfax, VA 22032

*10905 Fox Sparrow Court*
*Fairfax, VA 22032*

GELLER ENVIRONMENTAL LABS, INC.

*Phone:* *703-978-4683*
*Facsimile:* *703-250-4960*

## Asbestos Bulk Sample Analysis Report

Mr. Dominic Ju
1311 Floral St., NW
Washington, DC 20012

August 14, 2013

Enclosed are the analytical results of the bulk samples collected from the home located at 1311 Floral St., NW, Washington, DC 20012, by Geller Environmental Labs, Inc. (GEL) on August 13, 2013.

A laboratory chain of custody form was completed with sample identification numbers as well as any site information. A licensed laboratory conducted analysis of bulk building materials for the presence of asbestos using the current EPA approved NIOSH method. The technique includes use of polarized light microscopy with confirmation technique using dispersion staining. This method is designed to identify asbestos minerals and determine their estimated concentrations as a percent by weight.

The results of the bulk sampling are as follows:

| Sample # | Material Type | Location of Sample | Result |
|---|---|---|---|
| **1311-01**<br>**1311-01A** | **Floor Tile (black w/yellow surface)**<br>**Mastic (black)** | Basement | **10% Chrysotile Asbestos**<br>**5% Chrysotile Asbestos** |
| 1311-02<br>**1311-02A**<br>**1311-02B** | Yellow Non-Fibrous Material<br>**Floor Tile (green)**<br>**Mastic (black)** | Basement | No Asbestos Detected<br>**15% Chrysotile Asbestos**<br>**5% Chrysotile Asbestos** |

When analyzed, both of the flooring tiles along with both of the black floor mastics were confirmed to contain regulated amounts (>1%) of Chrysotile asbestos.

If you have any questions or concerns about this report, the attached lab analysis report or these results, please do not hesitate to contact our office at 703-978-4683.

Sincerely,

Jack Geller, President

10905 Fox Sparrow Court
Fairfax, VA 22032

GELLER ENVIRONMENTAL LABS, INC.

Phone:      703-978-4683
Facsimile: 703-250-4960

# SECTION I

# LABORATORY ANALYSIS REPORT


EMLab P&K
A TestAmerica Company

Report for:

**Mr. Jack Geller**
**Geller Environmental Labs, Inc.**
10905 Fox Sparrow Ct.
Fairfax, VA 22032

---

Regarding: Project: 1311
EML ID: 1099464

Approved by:

Dates of Analysis:
Asbestos-EPA Method 600/R-93/116: 08-14-2013

Alana Valenzuela

Approved Signatory
Alana Valenzuela

Service SOPs: Asbestos-EPA Method 600/R-93/116 (EPA-600/M4-82-020 (SOP 01267))

---

All samples were received in acceptable condition unless noted in the Report Comments portion in the body of the report. The results relate only to the items tested. The results include an inherent uncertainty of measurement associated with estimating percentages by polarized light microscopy. Measurement uncertainty data for sample results with >1% asbestos concentration can be provided when requested.

EMLab P&K ("the Company") shall have no liability to the client or the client's customer with respect to decisions or recommendations made, actions taken or courses of conduct implemented by either the client or the client's customer as a result of or based upon the Test Results. In no event shall the Company be liable to the client with respect to the Test Results except for the Company's own willful misconduct or gross negligence nor shall the Company be liable for incidental or consequential damages or lost profits or revenues to the fullest extent such liability may be disclaimed by law, even if the Company has been advised of the possibility of such damages, lost profits or lost revenues. In no event shall the Company's liability with respect to the Test Results exceed the amount paid to the Company by the client therefor.

**EMLab P&K**
3000 Lincoln Drive East, Suite A, Marlton, NJ 08053
(866) 871-1984 Fax (856) 489-4085 www.emlab.com

Client: Geller Environmental Labs, Inc.
C/O: Mr. Jack Geller
Re: 1311

Date of Sampling: 08-13-2013
Date of Receipt: 08-13-2013
Date of Report: 08-14-2013

## ASBESTOS PLM REPORT: EPA-600/M4-82-020 & EPA METHOD 600/R-93-116

**Total Samples Submitted:** 2
**Total Samples Analysed:** 2
**Total Samples with Layer Asbestos Content > 1%:** 2

**Location: 1311-1, Floor tile/mastic** Lab ID-Version‡: 4958873-1

| Sample Layers | Asbestos Content |
|---|---|
| Black Floor Tile with Yellow Surface | 10% Chrysotile |
| Black Mastic | 5% Chrysotile |
| **Sample Composite Homogeneity:** | Moderate |

**Location: 1311-2, Floor tile/mastic** Lab ID-Version‡: 4958874-1

| Sample Layers | Asbestos Content |
|---|---|
| Yellow Non-Fibrous Material | ND |
| Green Floor Tile | 15% Chrysotile |
| Black Mastic | 5% Chrysotile |
| **Sample Composite Homogeneity:** | Moderate |

The test report shall not be reproduced except in full, without written approval of the laboratory. The report must not be used by the client to claim product certification, approval, or endorsement by NVLAP, NIST, or any agency of the federal government. EMLab P&K reserves the right to dispose of all samples after a period of thirty (30) days, according to all state and federal guidelines, unless otherwise specified.

Inhomogeneous samples are separated into homogeneous subsamples and analyzed individually. ND means no fibers were detected. When detected, the minimum detection and reporting limit is less than 1% unless point counting is performed. Floor tile samples may contain large amounts of interference material and it is recommended that the sample be analyzed by gravimetric point count analysis to lower the detection limit and to aid in asbestos identification.
‡ A "Version" indicated by -"x" after the Lab ID# with a value greater than 1 indicates a sample with amended data. The revision number is reflected by the value of "x".

# EXHIBIT 10



Dominic Y. Ju <dominic.ju@gmail.com>

**Fwd: 1311 Floral ST**
1 message

**Dana Ju** <dana.bykowski@gmail.com>
To: Dominic Ju <dominic.ju@gmail.com>

Thu, Oct 24, 2013 at 10:43 PM

Begin forwarded message:

> **From:** ruthjcommunications@verizon.net
> **Date:** October 24, 2013, 4:34:20 PM EDT
> **To:** dana.bykowski@gmail.com
> **Subject: Re: 1311 Floral ST**
>
> I don't know.... We are both out of town right now. We'll be back next week and I'll try to find our sales documents. I don't think there was a discussion about the tiles,, but these are traditional materials. I'll be in touch next week. There were no broken tiles when we moved
>
> On 10/23/13, Dana Ju<dana.bykowski@gmail.com> wrote:
>
> Hello Ruth--I hope you and Daniel are doing well!
>
> I'm sorry to bother you with this--but I just had one more question to ask regarding when you lived at 1311 Floral St.
>
> Do you happen to remember when you sold the house if you made the buyers aware that there was asbestos tile down in the basement or did you happen to mention the asbestos tiles in your seller disclosure forms when you sold the house?
>
> The reason I ask is we need to have the tiles taken out of the basement now because when they owned the home and renovated the basement, they placed walls on top of the tiles, breaking the tiles into small pieces in some places. As a result, we don't want to remove the tiles without using a special service that removes asbestos tiles. We have tried to contact the family that we bought the house from but they have not responded to our email or calls. Since they left the original tiles underneath the carpeting when they did renovations in the basement, it is hard to tell if they knew they placed carpet on top of broken asbestos tiles. We just want to make sure we remove them properly. Again, I apologize for bothering you with this.
>
> If you are able to answer that question, that would be extremely helpful. If you prefer to talk via phone, I'm happy to call you.
>
> Thank you so much!
>
> Kind Regards,
> Dana

# **EXHIBIT 11**



MR. WALKER

ROOF 1 ONE
332 16TH ST. S.E.
WASHINGTON, DC
20003
(202) 544-9430

SERVICE
CONTRACT

#

LICENSE# 5728

Name MR. CARTER
Address 1311 FLORAL ST N.W.
City WASHINGTON
Home Phone No. Office Phone No.
Contact Date 8/10/04
Salesman TILDEN ALSTON
State and Zip D.C.
Fax Phone No.

We propose to furnish and install the following:

INSTALL NEW GUTTER SYSTEM

1) REMOVAL OF EXISTING GUTTER SYSTEM (LOWER PART OF HOUSE)

2) INSTALL NEW GUTTAR SYSTEM (5 INCH WHITE)

3) CLEAN PROPERTY OF ALL TRASH AND GUTTER DEBRIS

(ONE YEAR WARRANTY ON LABOR AND WORKMANSHIP)

[Thursday, August 19 7:00 AM]

Approximate date when work will begin is ________ and approximate date when work will be substantially completed is ________.

TERMS

RETAIL CASH PAYMENT CONTRACT

Total Cash Price $ 1450.00
Down Payment at time of execution of contract (Not to exceed 33% of Contract Price) $
Balance to be paid as follows:
Discount $
Subtotal Due Amount $
Paid in Full Date $
Balance Due Amount $

...t Roof 1 One we take pride in ...r workmanship, experienced ...ew, and "on time" completion ...es.

Accepted: [signature]
Purchaser
Purchaser:
Date:

# EXHIBIT 12

***Price quote - Ju Residence***

11375 Lafayette Road, Mercersburg, PA 17236
Off: 717-328-5815 Cell: 717-729-1928

Dominic Y. Ju
1311 Floral St, NW
Washington, DC 20012
Email: Dominic Y. Ju <dominic.ju@gmail.com> Cell: 202-360-1817

Date: 11/4/2013 - updated
Job: Ju Residence
1311 Floral St, NW
Washington, DC 20012

**Pricing based on site walkthrough with Dominic on 8/7/13 and revised scope emails from Dominic**

**Storage**

1) Removal/Pod storage of all basement contents in climate controlled storage (for duration of renovations)

**Basement bedroom/bathroom**

1) Remove insulation, drywall, window trim items, and baseboard at rear elevation wall in basement bedroom and bathroom
2) Place fans in room to dry cavity behind walls
3) Install R-13 fiberglass batt insulation in wall to replace existing
4) Hang and finish new MR (moisture resistant) drywall on face of existing studs (level 4 finish)
5) Install new baseboard on walls to match existing
6) Install trims around two windows
7) Paint new drywall and trim to match existing

**Basement Asbestos Tile and Mastic Removal**

1) Remove approximately 460 sq.ft. of existing carpet and discard
2) Remove and encapsulate asbestos tile and mastic at basement bedroom/living area (approx. 460 sq.ft.)
3) Remove/demo drywall, framing, and misc. trim from all interior walls in basement
4) Temporary removal of existing electrical boxes/lines in walls that are being removed
5) Remove approx. 460 sq.ft. of existing slab (based on max slab thickness of 4" and w.m. reinforcement)
6) Remove approximately 8" of existing soils under existing slab (add for removal of embedded stone)
7) Install 3" of 3/4" stone base
8) Install new w.m. reinforcement and vapor barrier
9) install 3" of new concrete as a new slab
10) Coordinate transmission electron microscopy, IH reports and studies, PCM (phase contrast microscopy), and applicable permits related to asbestos removal
11) Installation of new laminate hardwood floors over existing concrete slab (approximately 460 sq..)
Price of laminate floor is based on $4.20/sq.ft (materials) and $4.75/sq.ft. (labor)
12) Frame new walls in place of removed walls as noted above
13) Install electrical items that were adjusted/removed during demolition phase
14) Extend electrical lines to accommodate new wall heights to meet code
15) Hang and finish new drywall and finish connection of new wall to ceilings
16) Install new trim as removed for demolition
17) Paint new trim and drywall and existing drywall that is in connection of any disturbed walls
18) Incorporate landing at bottom of existing stairs and basement exterior entry door
19) Supply dumpster for removal of debris associated with scope above
20) Work at basement office - includes removing and discarding existing carpet and installation of foam floors

***Price quote - Ju Residence***

**Exterior Grading**

Install 3" PVC underground drain for existing downspout from corner of house and exit at retaining wall
Demo/remove and haul section (approx. 20') of existing retaining wall between back yard and alley
Remove landscape timbers and misc. landscaping along back of house (approx. 18' area). 1 tree to remain
Move 1 HVAC heat pump approx. 5' around corner of house. Includes new 3" x 3' x 3' concrete pad for unit
Grade back yard, and remove soils starting from 8" below sill of existing basement windows and tapering down to 6" below existing pavement at alley. Width of grading to be established by a starting point of the inside corner of the rear elevation at the existing landscape timber box over to the corner of the house at the HVAC unit (approx. 18') then tapering out to the width of the removed area of the retaining wall at the alley (approx. 20'). Includes tapering of same over to existing rear sidewalk
Haul loose fill from premises
Install 4" deep of #57 stones over entire area of grading
Remove 1 flower bed, clay/soils as necessary to perform grading as noted above
Grading of rear yard towards alley to be completed and final grading, including stone base of 4", to be at 4" below exterior basement windows
Obtain required permits to perform work within this scope
Seal gap between house and concrete pad/walkway (under bay window), next to house with masonry sealant along length of left elevation at pad/walkway. Sealant to be Duralink/Durasil or equivalent.
Install 2 tier PT 4x4 landscape timbers around to trees in back yard. Approximate size of boxes to be 5' x 7'

**Additional scope:**

Remediation of mold in hidden cavities (allowance of $1425 - labor and materials)
Replacement of any rotted materials at in wall cavities (allowance of $985 - labor and materials)
Modify existing plumbing and HVAC due to increased depth of slab (allowance of $3670 - labor and materials)

**Total -- $ 99,560.00**

T & M work to be performed at $38/hour plus 15% coordination/admin fee. Materials will be charged at "cost plus 20%".
Any work outside of the "scope of work" above to be at an additional cost. Any additional work or cost will be discussed by Nick and Dominic prior to commencement of same.

**Thank you for the opportunity to bid this job. Feel free to call Nick Hodges with any questions - 717-729-1928**

# EXHIBIT 13



**We Create Your Thoughts**

LISCENCED – BONDED – INSURED
MD 126114 – DC 640044448 – VA 270511967

# Estimate

**Date: 11/11/13**
**Customer** : Dominic Ju **Address**: 1311 Floral St. NW Washington DC 2002
**Home**: 202-360-1817 **Cell** ?? Work: ?? **Email:dominic.ju@gmail.com**
**Project Name**: Dominic Ju **Project Location** : Same
**Projected Start Date:** Open
**Work Duration:** _______ days barring any additions, unforeseen recommended alterations, change orders, holidays, sickness, weather conditions, or delayed orders or ordered supplies, permits, inspections and/or additional planning.

| Description | Qty | Unit | Price |
|---|---|---|---|
| **Basement Floor Base Dimensions: 23' - 0" L x 23' - 0" W x** | | | |
| Plans, on-site survey, approval by owner | 1.00 | EA | 660.00 |
| Plus per $1000 of contract amount | 1.00 | $M | 2,837.26 |
| Building permit fee | 1.00 | EA | 55.00 |
| Plus per $1000 of contract amount | 1.00 | $M | 515.87 |
| **01 Plans and Permits Division Total** | | | **4,068.13** |
| Remove 2" basement slab w/pnuematic tool | 529.00 | SF | 1,788.02 |
| **02 Site Preparation Division Total** | | | **1,788.02** |
| 4" basement slab, no digging, chute pour | 529.00 | SF | 4,052.14 |
| 4" basement slab, no digging, chute pour | 529.00 | SF | 6,538.44 |
| **04 Concrete Division Total** | | | **10,590.58** |
| Concrete removal by hand | 3.50 | EA | 1,343.79 |
| **25 Clean-up Division Total** | | | **1,343.79** |
| **1 Basement Floor Phase Total** | | | **17,790.52** |

**Bedroom Base Dimensions: 11' - 5" L x 7' - 11" W x 78' - 0" H**

| Description | Qty Unit | Price |
|---|---|---|
| Remove interior non-bear wall, drywall | 50.00 LF | 517.50 |
| Remove door & window moulding, 1 piece | 30.00 LF | 28.80 |
| Remove moulding, 1 piece | 68.00 LF | 65.28 |
| Remove gypsum drywall ceiling | 90.38 SF | 91.28 |
| Remove small ceiling fixture | 1.00 EA | 32.89 |
| Remove carpet, tack strips, padding | 90.38 SF | 148.22 |
| Remove switch or duplex outlet | 7.00 EA | 88.69 |
| **02 Site Preparation Division Total** | | **972.66** |
| 2"x4" framed non-bearing wall | 50.00 SF | 93.00 |
| **07 Wall Framing Division Total** | | **93.00** |
| 2-6 x 6-8 Pine, 6 Panel door | 1.00 EA | 425.18 |
| **12 Doors and Trim Division Total** | | **425.18** |
| Duplex outlet | 1.00 EA | 73.23 |

| **Description** | **Qty Unit** | **Price** |
|---|---|---|
| Single-pole switch | 1.00 EA | 73.23 |
| **16 Electrical Division Total** | | **146.46** |
| 1/2" gypsum drywall, new work | 3016.0 SF 0 | 6,032.00 |
| **18 Interior Walls Division Total** | | **6,032.00** |
| Drywall ceiling, new, 1/2", over 300SF | 90.38 SF | 187.99 |
| **19 Ceiling Covering Division Total** | | **187.99** |
| 2-1/4" base trim, clam, ranch, colonial | 38.67 LF | 112.53 |
| **20 Millwork, Trim Division Total** | | **112.53** |
| Interior carpeting w/padding @ $15 yard | 90.38 SF | 354.29 |
| **23 Floor Covering Division Total** | | **354.29** |
| Paint smooth int wall spray/prime/2coat | 3016.0 SF 0 | 2,442.96 |
| Stain cased opening, 3-0, 2 coats | 1.00 EA | 13.72 |
| **24 Painting Division Total** | | **2,456.68** |
| Debris removal by hand or chute | 1.00 EA | 672.67 |
| Debris removal by hand, PLUS per SF | 90.38 SF | 159.07 |
| **25 Clean-up Division Total** | | **831.74** |
| **2 Bedroom Phase Total** | | **11,612.53** |

**Living Room Base Dimensions: 23' - 0" L x 9' - 6" W x 74' - 0" H**

| | | |
|---|---|---|
| Remove interior non-bear wall, drywall | 70.00 LF | 724.50 |
| Remove door & window moulding, 1 piece | 67.00 LF | 64.32 |
| Remove moulding, 1 piece | 90.00 LF | 86.40 |
| Remove gypsum drywall ceiling | 218.50 SF | 76.48 |
| Remove small ceiling fixture | 4.00 EA | 131.56 |
| Remove carpet, tack strips, padding | 218.50 SF | 358.34 |
| Remove switch or duplex outlet | 11.00 EA | 139.37 |
| **02 Site Preparation Division Total** | | **1,580.97** |
| 2"x4" framed non-bearing wall | 70.00 SF | 130.20 |
| **07 Wall Framing Division Total** | | **130.20** |
| 2-6 x 6-8 Pine, 6 Panel door | 1.00 EA | 425.18 |
| **12 Doors and Trim Division Total** | | **425.18** |
| Duplex outlet | 1.00 EA | 73.23 |
| Single-pole switch | 1.00 EA | 73.23 |
| Recessed 6" round fixture | 1.00 EA | 99.26 |
| **16 Electrical Division Total** | | **245.72** |
| 1/2" gypsum drywall, new work | 4810.0 SF 0 | 9,620.00 |
| **18 Interior Walls Division Total** | | **9,620.00** |
| Drywall ceiling, new, 1/2", over 300SF | 218.50 SF | 454.48 |
| **19 Ceiling Covering Division Total** | | **454.48** |
| 2-1/4" base trim, clam, ranch, colonial | 65.00 LF | 189.15 |
| **20 Millwork, Trim Division Total** | | **189.15** |
| Interior carpeting w/padding @ $15 yard | 218.50 SF | 856.52 |
| **23 Floor Covering Division Total** | | **856.52** |
| Paint smooth int wall spray/prime/2coat | 4810.0 SF 0 | 3,896.10 |
| Stain cased opening, 3-0, 2 coats | 1.00 EA | 13.72 |
| **24 Painting Division Total** | | **3,909.82** |
| Debris removal by hand or chute | 1.00 EA | 672.67 |
| Debris removal by hand, PLUS per SF | 218.50 SF | 144.21 |
| **25 Clean-up Division Total** | | **816.88** |
| **4 Living Room Phase Total** | | **18,228.92** |

**Bathroom Base Dimensions: 4' - 5" L x 6' - 11" W x 78' - 0" H**

| | | |
|---|---|---|
| Remove door & window moulding, 1 piece | 20.00 LF | 19.20 |
| Remove moulding, 1 piece | 40.00 LF | 38.40 |
| Remove gypsum drywall | 30.55 SF | 30.86 |

*13000 Strathaven Circle. Fort Washington, MD 20744 * 938 E. Swan Creek Road, Suite 311 Fort Washington, MD 20744*
***(888) 630.CITY * FAX (888) 630.2489 * Email: City@cityrenovations.net * Web site www.CityRenovations.net***

| Description | Quantity | Amount |
|---|---|---|
| ceiling | | |
| Remove small ceiling fixture | 1.00 EA | 32.89 |
| Remove toilet | 3.00 EA | 367.23 |
| Remove 19" vanity and top | 1.00 EA | 145.95 |
| Remove ceramic tile flooring in mastic | 30.55 SF | 197.35 |

| Description | Quantity | Amount |
|---|---|---|
| Remove switch or duplex outlet | 3.00 EA | 38.01 |
| **02 Site Preparation Division Total** | | **869.89** |
| 2"x4" framed non-bearing wall | 40.00 SF | 74.40 |
| **07 Wall Framing Division Total** | | **74.40** |
| Duplex outlet | 1.00 EA | 73.23 |
| Single-pole switch | 1.00 EA | 73.23 |
| Glass dome light, two 60 watt lamps | 1.00 EA | 93.60 |
| Bathroom fan, exhaust with switch | 1.00 EA | 296.34 |
| **16 Electrical Division Total** | | **536.40** |
| 1/2" gypsum drywall, new work | 1768.00 SF | 3,536.00 |
| **18 Interior Walls Division Total** | | **3,536.00** |
| Drywall ceiling, new, 1/2", over 300SF | 30.55 SF | 63.54 |
| **19 Ceiling Covering Division Total** | | **63.54** |
| 2-1/4" base trim, clam, ranch, colonial | 22.67 LF | 65.97 |
| 2-1/4" base trim, clam, ranch, colonial | 22.67 LF | 65.97 |
| **20 Millwork, Trim Division Total** | | **131.94** |
| Ceramic tile floor w/board @ $6.00SF | 31.00 SF | 642.94 |
| **23 Floor Covering Division Total** | | **642.94** |
| Paint smooth int wall spray/prime/2coat | 1768.00 SF | 1,432.08 |
| Stain cased opening, 3-0, 2 coats | 1.00 EA | 13.72 |
| **24 Painting Division Total** | | **1,445.80** |
| Debris removal by hand or chute | 1.00 EA | 672.67 |
| Debris removal by hand, PLUS per SF | 30.55 SF | 53.77 |
| **25 Clean-up Division Total** | | **726.44** |
| **5 Bathroom Phase Total** | | **8,027.35** |

## Exterior Slab Base Dimensions: 23' - 0" L x 1' - 0" W x

| Description | Quantity | Amount |
|---|---|---|
| Remove 4"slab w/pnuematic tool | 25.00 SF | 84.50 |
| **02 Site Preparation Division Total** | | **84.50** |
| Grading, place topsoil, 4" | 276.00 SF | 171.12 |

Dominic Ju

| | | | |
|---|---|---|---|
| **03 Excavation Division Total** | | **171.12** | |
| 4" slab, no digging, chute pour <2yrds | 1.00 PER | 1,349.00 | |
| **04 Concrete Division Total** | | **1,349.00** | |
| **6 Exterior Slab Phase Total** | | **1,604.62** | |
| **Grand Total** | | **57,263.94** | |
| Gen. and Admin. Overhead | | | 3,435.84 |
| Profit | | | 9,104.97 |
| Total with Overhead and Profit | | | 69,804.74 |

**Additional Services needed**

**Labor to remove & Restore furniture**

| | | |
|---|---|---|
| **Estimated**<br>**Cost does not include facility** | **840.00 per move** | **1,680.00** |

**Please call with any questions that you may have with reading or understanding this estimate.**

**Contractors Acceptance** ______________________________ **Date** ______________

**Owner(s) Acceptance** ______________________________ **Date** ______________

# **EXHIBIT 14**

**To:** Marty Stanton, Partner, KVS Title

**From:** Dominic & Dana Ju, Owners

**Date:**

**RE:** Improper Seller Disclosures of 1311 Floral Street, NW

---

**This document provides a detailed description and account of evidence regarding the items that SELLERS failed to disclose. We sincerely appreciate your attention to and review of this information and documentation.**

**On July 12, 2013, upon occupying the purchased home at 1311 Floral Street NW, Dana and Dominic Ju (referred to as BUYERS) discovered that Elizabeth Denavi and Randolph Carter referred to as SELLERS) failed to properly disclose several key latent material defects in the mandatory SELLER'S DISCLOSURE STATEMENT for the sale of 1311 Floral St, NW, Washington, D.C. 20012.**

**Specifically, the SELLERS did not act in good faith by providing correct and truthful answers to the following questions listed in the SELLER's DISCLOSURE STATEMENT:**

A. **D. Environmental/ Exterior Issues:**

QUESTION: Does the seller have actual knowledge of any substances, materials or environmental hazards (including but not limited to asbestos, radon gas, lead based paint, underground storage tanks, formaldehyde, contaminated soil, or other contamination on or affecting property? **SELLERS answered no.**

QUESTION: Exterior Drainage: Does the seller have actual knowledge of any problem with drainage on the property? **SELLERS answered no.**

QUESTION: Wood destroying insects or rodents? Does the seller have actual knowledge of any infestation or treatment for infestation? **SELLERS answered no.**

B. **Structural Conditions:**

QUESTION: Basement: Does the seller have actual knowledge of any current leaks or evidence of moisture in the basement? **SELLERS answered no.**

**1. Non-disclosure of latent material defects at 1311 Floral ST NW**

**Background**

a. BUYERS moved in on July 12, 2013 and noticed wet carpet in basement bedroom on or about 5 pm that evening.

b. BUYERS removed carpet in basement bedroom and witnessed extensive and prolonged water damage to basement bedroom and asbestos tile and mastic.

c. BUYERS removed additional carpet samples throughout the basement. BUYERS located additional water damage in basement bathroom and basement office/laundry.

d. Testing confirms presence of asbestos tile and asbestos mastic throughout the basement.

e. Professional contractors and landscaping/grading companies assessed improper drainage in the exterior spaces led to damaged mortar and windows and caused the water penetration into the basement. Professional contractors and landscaping/grading companies stated this drainage issue and interior water damage has been occurring for years and not months or weeks.

f. SELLERS acknowledge history of previous drainage issues and water in the basement but did not repair or abate these issues.

g. SELLERS did not disclose asbestos tiles or mastic although SELLERS renovated and finished the entire basement to include installing dry walls, stone tile flooring, and wall to wall carpet flooring. SELLERS removed some basement asbestos tiles except underneath the walls and closets they installed.

h. SELLER did not disclose previous treatment of infestation (rodents).

2. **Non-disclosure of environmental hazards: asbestos tiles and asbestos mastic in basement (Exhibits 1-39 (Ex1-Ex39)).**

   a. SELLERS renovated and converted basement into a finished space to include wall to wall carpeting and stone tile.

   b. August 14, 2013: Confirmed test results of asbestos tile and mastic (ExC).

   c. 9" square tiles and exposed mastic already a strong indicator of asbestos without testing.

      i. From Geller Environmental Services, a reputable environmental testing company, BUYERS were told even before test results that it was a 90% chance it would asbestos tile and mastic given the 9" square tiles and age of home.

      ii. Every contractor the BUYERS consulted assessed the high likelihood of asbestos tile and mastic and noted the damaged condition in basement bedroom before testing results on August 14, 2013.

   d. According to licensed and reputable contractors who surveyed the most recent occurrence of water damage in the home assessed that no previous contractors employed by SELLERS to renovate the basement would perform the work without advising sellers on the high likelihood of asbestos tile and asbestos mastic.

   e. Asbestos tile and asbestos mastic were not removed during SELLER renovations.

   f. Asbestos tile and asbestos mastic has not been abated to date, either through complete removal or encapsulation.

   g. Shattered and friable pieces of asbestos tile and fragments are present along the walls of entire basement and floor as new dry wall was nailed on top of asbestos tiles.

   h. Extensive water damage to asbestos tile in basement bedroom currently poses a significant health hazard.

   i. Dry wall, carpeting and/or stone tile installed on top of damaged tiles, especially near the walls, is not considered abatement.

   j. The awareness of these latent material defects was not disclosed, repaired or abated by previous owners.

3. **Non-disclosure of any problem with drainage on the property (Ex40-Ex54)**

   a. SELLERS acknowledge history of previous problems with drainage on the property in an email dated July 13, 2013 that "once we fixed the drainage outside, we had no water in the basement."

   b. SELLERS acknowledge history of previous problems with drainage on the property in an email dated July 13, 2013 that "there was a little bit of moisture on the side near the laundry room/office."

   c. SELLERS acknowledge history of previous problems with drainage on the property in an email dated July 13, 2013 that "back 'corner' just outside the guest bedroom window is the juncture point for two big gutters."

   d. SELLERS advise BUYERS of history of previous problems with drainage on the property in an email dated July 13, 2013 to "make sure the rain barrel in that same area is drained so it's not overflowing into the same corner."

   e. SELLERS did not repair or abate the problems with drainage on the property as evidenced by moisture in black mold on carpet tacking in basement bedroom.

      i. SELLERS did not repair or abate the problems with drainage on the property when SELLERS installed new rear gutters on August 10, 2004. The upper level gutters were 5" gutters with a 3"x4" downspout leading to lower level 4" gutters with 2"x3" gutters. Professional contractors and landscaping/grading companies stated this would cause an overflow of water very quickly to yard below.

      ii. SELLERS did not repair or abate the problems with drainage on the property when SELLERS installed helmet cover type gutter guards on a Mansard roof. The high pitch of the roof leads to rain quickly cascading down the roof, over the gutter guards, and to yard (Ex57, Ex58 shows how helmet cover gutter guards installed on Mansard roof).

      iii. SELLERS did not repair or abate the problems with drainage on the property when SELLERS pitched the gutters to drain towards the "'back corner' just outside the guest bedroom [which] is the juncture point for two big gutters.'" Professional contractors and landscaping/grading companies stated this caused water flowing towards the back corner problem area and not away from the house since gutters were installed.

      iv. SELLERS did not repair or abate the problems with drainage on the property when SELLERS graded the yard by adding soil and gravel and raising the grade to exterior window level. SELLERS graded the rear yard towards the 'back corner' of the house instead of away from the house.

      v. SELLERS did not fix the drainage outside when SELLERS installed two planter boxes which trapped water in the elevated grading between the planter boxes and exterior windows. Professional contractors and landscaping/grading companies stated this caused the water penetration through the window sill and mortar.

   f. SELLERS did not repair or abate the problems with drainage on the property as evidenced by moisture in black mold on carpet tacking in basement office/laundry room.

      i. SELLERS did not repair or abate the problems with drainage on the property when SELLERS installed landscaping mounds and other structures outside of basement office/laundry. Professional contractors and landscaping/grading companies stated this caused water to accumulate and penetrate basement office/laundry.

ii. SELLERS did not repair or abate the problems with drainage on the property when SELLERS ran a downspout with a short spout that would lead to water being channeled near the basement office/laundry room.

g. The awareness of these latent material defects was not disclosed, repaired or abated by previous owners.

**4. Non-disclosure of any current leaks OR evidence of moisture in the basement (Ex1-30)**

a. SELLERS acknowledge history of previous leaks and moisture in the basement in email dated July 13, 2013 that "once we fixed the drainage outside, we had no water in the basement."

b. BUYERS removed the wet basement bedroom carpet on July 14, 2013 revealing extensive and prolonged water damage (See Photo Exhibits B)

i. Damaged extended to the entire basement bedroom (11'x12') with dampness on the other side of basement bedroom dividing walls.

ii. Extensive black mold on carpet tacking and rusted nails reveals years of water damage.

iii. Contractor professionals and basement water damage experts stated to BUYERS consulted with has noted that this damage has been extensive for years.

iv. As depicted in the photos, black mold on carpet tacking covers at least 1/3 of room square footage.

v. Contractor professionals and basement water damage experts determined that faulty window installation by SELLERS and faulty water drainage has led to extensive and prolonged water damage in basement for years.

c. SELLERS acknowledge in email dated July 13, 2013 that previous moisture was "on the side near the laundry room/office."

i. Prolonged water damage in NE corner of basement ("basement office") is visible. Carpet tacking has been exposed to extensive and prolonged water damage resulting in black mold (see photos Aug 2013).

ii. Potential water damage to basement laundry could not be assessed due to stone tile flooring. However, Ex50, Ex51, and Ex52 shows faulty drainage of the air conditioning condensation pipe by SELLERS. BUYERS attached temporary black perforated pipe to extend drainage away from house. SELLERS had condensation flow to corner of house in area without proper drainage. Ex51 shows level of water drainage after a few hours of attaching black perforated pipe.

iii. Contractor professionals and basement water damage experts determined that faulty window installation by SELLERS and faulty water drainage has led to extensive and prolonged water damage in basement for years.

d. The awareness of these latent material defects was not disclosed, repaired or abated by previous owners.

e. As noted earlier, the undisclosed problem with drainage on the property was not repaired or abated and caused extensive and prolonged water damage in the basement.

f. SELLERS utilized the basement on a regular bases to include the basement bedroom. SELLERS maintained an active basement office workspace, active basement refrigerator, active treadmill in the main basement area, active basement children's play area, and active storage in the basement bedroom closet. The basement bedroom was also the sole dedicated guest bedroom maintained by the SELLERS. (Ex55, Ex56)

**5. Non-disclosure of any infestation OR treatment for infestation (rodents)**

a. 1311 Floral St NW as treated for infestation (rodents/rats) from November 15, 2007 to December 15, 2007 as directed and paid for by the SELLERS (Exhibit D).

b. The awareness of this treatment for infestation was not disclosed by previous owners.

**CONCLUSION**

The total cost of repairing latent material defects at 1311 Floral ST is $70,590.00 (Basement Repairs and Abatement: $69,590.00; New rear gutters: $1,000.00; Asbestos testing: $260.00)

The costs include complete asbestos tile and asbestos removal and water damage repairs. The estimate for "Optional pricing for lowering basement floor...etc" is for the complete removal of asbestos mastic. As the SELLERS did not abate or encapsulate the asbestos mastic, the mastic is inside the concrete slab floor. The existing concrete floor needs to be removed for complete asbestos mastic abatement.

Current cost estimate does not include hotel relocation costs during asbestos abatement, asbestos testing, mold remediation in hidden cavities, modifications to existing plumbing or structures in basement, paint, and potential assessment and repair materials for basement bathroom.

BUYERS are seeking a negotiated settlement of $47,430.00. This negotiated settlement compensation would be the total cost of repairing latent material defects minus $23,400.00, which is the cost of removing the concrete floor. The only method of complete removal of asbestos mastic is through removal of existing concrete floor and pouring a new concrete floor. BUYERS are willing to accept asbestos encapsulation of asbestos tiles and mastic underneath the finished walls installed by SELLERS to expedite necessary repairs to material defects.

If a negotiated settlement cannot be reached, BUYERS will seek compensation for all repairs to include compete removal of basement concrete floor and additional costs not included in the current cost estimate. Furthermore, BUYERS will seek damages and reimbursement for all legal fees.

# EXHIBIT 15



Dominic Y. Ju <dominic.ju@gmail.com>

# Asbestos Latent Material Defects

2 messages

**Dominic Y. Ju** <dominic.ju@gmail.com> Mon, Oct 14, 2013 at 4:12 PM
To: Elizabeth Denevi <edenevi23@comcast.net>, Randolph Carter <rcarter108@comcast.net>, dana ju <dana.bykowski@gmail.com>
Cc: Jenn Smira <jenn@reishmanrealestate.com>, Mark Meyerdirk <mark@urbanbrokers.com>

Dear Elizabeth and Randolph,

We hope everything is well with you. We are very saddened to be contacting you under these circumstances, but as you recently were made aware by Marty Stanton of KVS Title and your realtor, Jenn Smirna, there are latent material defects due asbestos in the basement of 1311 Floral Street that makes it unsafe for use or living. Consequently, at this time, we feel we have no other choice other than to contact you to make you aware of our findings and see how we can amicably resolve this unfortunate situation.

We have not been able to use the basement since July 12, 2013, the day we moved in. As you know, we had some minor flooding take place in the basement bedroom. As a result, we had to immediately rip out the carpeting because it was soaked beyond repair. When we tore out the carpeting, we first found black mold throughout the room, on the surface of the tile. This certainly seems to indicate this was not the first incident of water damage or moisture in that area. Upon ripping up the carpeting in the room, we immediately noticed damaged (fried) 9" square tile that are common with old asbestos tile measurements used in many older homes.

We proceeded to pull up several other areas of carpet and discovered more of the same tile and mastic. Upon noticing these tiles throughout the entire basement, we confirmed through laboratory testing that the tiles in the basement and the black mastic adhesive glue contain asbestos.

The seller disclosure forms that you completed for the sale of 1311 Floral Street did not state that there was knowledge of asbestos in this home. However, as we gathered some additional facts about the house and basement, we discovered that the 2004 sellers had installed the asbestos tile flooring for his basement workshop and freely shared this information with us. The 2004 sellers also stated that the asbestos floor was completely intact without damage to its structural integrity at the time of the 2004 transaction. Their basement was unfinished without any dry walls or basement dividing walls. Additionally, the 2004 sellers expressed surprise how the basement was finished due to the continuous leak and moisture issues. The 2004 sellers also stated that they had discussion with you about lowering the basement floor.

Since 2004, when you originally purchased this home, some but not all of the asbestos tiles were removed improperly. There are chunks of asbestos flooring that were removed which left friable tiles throughout the basement. In addition, the basement renovations that you originally did dropped dry walls and dividing walls and nailed studs through the asbestos tiles which damaged their structural integrity and created hazardous health conditions. The asbestos tiles that were removed were located within the basement walls but fragmented asbestos tiles were left in place along and under all the walls you had constructed.

Although we don't know who renovated the basement for you, every contractor we have brought in to look at the basement has brought to our attention that the tiles had the characteristics of asbestos tile. Furthermore, these contractors noted that the basement walls should not have been constructed on top of these tiles and no one could understand why some tiles were removed but most were left damaged and exposing persons to significant health risks.

We realize that you used your basement a great deal—specifically, as a space to watch TV, a spare bedroom, an

office, storage space and for your children to play. We certainly don't believe that you would put the health of your children or yourselves at such great risk but the carpet you installed on top of exposed and damaged asbestos tiles and mastic is not sufficient for abatement. At the least, the asbestos tiles and mastic should have been encapsulated. The exposed asbestos tile and mastic has posed and continues to pose serious health risks, especially for children.

An EPA certified environmental testing company and EPA certified asbestos removal company both told us only to use the basement as absolutely necessary. We were told not to spend time in the basement and to under no circumstances to bring our infant son to the basement. We are ONLY able to use the basement to do laundry. This leaves us with a house that was not supposed to contain any asbestos to one that has had hazardous health conditions since your basement renovations. I'm sure you can understand our disappointment at not being able to fully use a significant portion of our new home, not to mention, it containing materials that pose a danger to our physical health and environment.

In a recent email to our realtor, Mark Meyerdirk regarding the latent material defects, Jenn Smirna stated that you had no knowledge of any asbestos in the basement. We would like to understand how that is possible that you had absolutely no knowledge, given that you finished and fully renovated an unfinished basement. We assume you hired professional contractors to do this work, and if that is the case, it doesn't seem likely (based on the many contractors that have come to take a look at the basement now) that there would have been no recognition by your contractors of the fact that these were mastic tiles containing asbestos. If you are willing to share the disclosures from the 2004 sale of the house from the Jordan's to you and the statement of work from whichever company you used for the renovations (including necessary permits) that would be very helpful and useful in getting to the bottom of this matter.

To help resolve this issue and the great expense and undertaking we are now facing, we would like you to share the expense of making the house safe from asbestos with a settlement. As a neutral third party, Marty Stanton from KVS title has offered to broker a reasonable solution.  Please let us know if you would like to pursue a post-settlement solution by October 21, 2013.

We have attached photos of the basement floor that show the damaged and exposed asbestos tiles and mastic so you are fully able to see the extent of the damage and need for immediate repair. These are not all the photos and we can share more photos with you of additional asbestos along the walls and the black mold on the carpet tacking in the basement bedroom and office. We very much appreciate your attention to this matter.

Regards,
Dominic and Dana Ju

[electronically signed]


**9 attachments**

    **Ex11 BBD image_11.jpeg**
    137K

    **Ex17 BBD IMG_0088.JPG**
    1963K

    **Ex28 image_5.jpeg**
    117K

**Ex30 IMG_1207.jpg**
55K

**Ex39 image_9.jpeg**
128K

**Ex10 BBD image_10.jpeg**
112K

**Ex37 image_7.jpeg**
162K

**Latent Material Defects 1311 Floral ST NW.pdf**
80K

**Bulks 1311 Floral St., NW 8_13.pdf**
409K

# EXHIBIT 16

**ANTONOPLOS & ASSOCIATES**
**ATTORNEYS AT LAW**
805 15TH STREET, NW, SUITE 501
WASHINGTON, D.C. 20005
Phone: (202)-803-5676
Fax: (202)-803-5677
Email: Peter@AntonLegal.com
www.AntonLegal.com

January 10, 2014

VIA UPS 2nd Day Delivery and E-Mail
Mr. Randolph Carter
Ms. Elizabeth Denavi
1224 N. Wolcott Avenue
Chicago, IL 60613

Email:
Rcarter108@comcast.net
Edenevi23@comcast.net

**Re: 1311 Floral Street, NW, Washington, DC 20012**

Dear Mr. Carter and Ms. Denavi,

Our Firm has been retained by Mr. and Mrs. Dominic Ju (hereinafter, "my clients"), the purchasers of the residential real property located at 1311 Floral Street, NW, Washington, DC 20012 (the "Property") you sold to my clients pursuant to the sales contract dated April 1, 2013, (the "Sales Contract"). In the Sales Contract, you represented in the Seller's Disclosure Statement that there were no known environmental hazards, drainage problems, leaks or evidence of moisture in the basement. In reliance on your representations contained in the Seller's Disclosure Statement, my clients settled on the purchase of the Property on May 17, 2013, paying you over $800,000.00 (see attached HUD-1).

By way of background, on July 12, 2013, two months after settlement, my clients moved into the Property with their infant son. That evening, they discovered wet carpet in the basement bedroom. In an effort to locate the source of the dampness, my clients lifted a small section of the carpet. Lifting merely a small section of the carpet revealed extensive water damage and what appeared to be asbestos tiles and asbestos mastic. My clients then removed sections of the carpet throughout the basement to inspect the extent of the water damage and asbestos. As they continued to remove sections of the carpet, my clients, to their shock and dismay, observed what

appeared to be black mold, water damage, and fractured tiles throughout the basement flooring beneath the carpeting.

The next day, on July 13, 2013, my client, Mrs. Ju, emailed Ms. Denavi inquiring as to whether you were aware of prior instances of flooding in the Property's basement since you purchased it in 2004. That same day, Ms. Denavi responded in the 10:22 a.m. email, acknowledging that you had prior knowledge of the water damage, stating that "*[o]nce we fixed the drainage outside, we had no water in the basement.*" Ms. Denavi further advised in the same email that the source of the overflow is the "*back 'corner' just outside the guest bedroom window [which] is the juncture point for two big gutters.*"

My clients then obtained assessments of the damage from several water damage repair companies and general contractors. Each told my clients that improper drainage in the exterior spaces of the Property caused damage to the mortar and windows, thus allowing water penetration into the basement. Each also identified that this drainage issue and interior water damage had not only occurred in the past, but has been occurring for a prolonged period of several years.

In the course of assessing the water damage, the contractors additionally identified the likelihood of asbestos tile and asbestos mastic in the basement flooring. On August 13, 2013, my clients hired Geller Environmental Services to analyze the tiles and mastic, which confirmed through laboratory testing that the tiles are asbestos tiles and that the black mastic contains asbestos. A copy of the Geller report is enclosed for your review.

In an effort to learn the history of the water damage, on or about August 25, 2013, my clients met with the owners of the Property immediately preceding you, Daniel and Ruth Jordan. Daniel Jordan informed my clients that they had installed the asbestos tile in the then-unfinished basement when they occupied the Property. He affirmed that when they sold the Property to you in 2004, the asbestos tiles were exposed, fully intact, and undisturbed. Daniel Jordan also informed my clients that they had water leaks and moisture in the basement, and that they had disclosed this to you when you purchased the Property.

This presents a problem for you for two reasons. First, you had actual knowledge of the history of water damage and drainage problems in the Property, as you have admitted in your email correspondence with my clients, and you didn't disclose them to my clients, as you were obligated to by DC Code Ann. §§ 42-1301, *et. seq.*

In addition, you had actual knowledge of the asbestos tiles, which were physically exposed at the time you purchased the Property in 2004, and you did not disclose the presence of

asbestos in the Sales Contract, as you were statutorily required to do so. Rather, you attempted to conceal the hazardous asbestos tiles beneath carpeting and renovations, and then failed to disclose them to my clients to induce them to settlement.

On the Seller's Disclosure Statement that you signed on April 1, 2013, appended to and incorporated in the Sales Contract, you stated that during the years 2004 to 2013 during which you owned and occupied the Property, there were no known previous instances of flooding, leaking, or drainage problems with the Property, and no known environmental hazards of the Property. Specifically, the Disclosure Statement provides:

> **[A.] 3. Basement**
> Does the seller have actual knowledge of any current leaks or evidence of moisture in the basement?
>
> **[D.] 1. Exterior Drainage**
> Does the seller have actual knowledge of any problem with drainage on the property?
>
> **[D.] 2. Damage to Property**
> Does the seller have actual knowledge whether the property has previously been damaged by flooding?
>
> **[D.] 4. Does the seller have actual knowledge of any substances, materials or environmental hazards [including asbestos] on or affecting the property?**

**<u>To each of these questions, you answered "No."</u>**

As you know, the Seller's Disclosure Statement requires that any responses to specific questions be accurate and made in good faith. You seem to have disregarded your good faith obligation to my clients when you did not disclose these problems in the Property. Instead, you made material misrepresentations on your Seller's Disclosure Statement in order to mislead my clients into purchasing defective property for a significant sum. My clients relied to their detriment on your material misrepresentations in the Seller's Disclosure Statement, as they could not have discovered the friable asbestos tile by inspection or otherwise.

Further, each licensed contractor that observed the asbestos tiles in the course of assessing the water damage opined that no contractor would have performed the basement renovation work without advising you of the high likelihood of asbestos tile and mastic. As you purchased the Property and then retained a contractor to remodel the Property's basement, it is

On September 12, 2013, Marty Stanton of KVS Title notified you of all of the defects discovered in the Property's basement and offered on my clients' behalf a negotiated settlement in the amount of $47,430.00. You rejected this offer. On October 14, 2013, my clients offered amicable resolution of this matter and asked that you share in the expense of the necessary repairs to make the basement habitable. As of the date of this letter, you have not responded to Mr. Ju's email.

As you have rejected my clients' previous offers of settlement, my clients seek rescission of the Sale Agreement, or, alternatively, One Hundred Fifty-Thousand Dollars and No Cents ($150,000.00) as reimbursement for all sums to date already paid to mitigate and prevent further damage, as well as the cost of total repairs to put the Property in the condition that you represented it was in at the time of purchase, damages for diminution in property value, and other costs, including repairs and improvements already made to the Property, post-sale inspection costs, and alternative housing, in addition to attorney's fees. If resolution is not met by January 20, 2013, my clients intend to file the enclosed lawsuit against you. I would urge you to contact me as soon as possible at my Firm's address.

Kindest Regards,
Antonoplos & Associates, Attorneys at Law

BY: ______________________
Peter D. Antonoplos, Esq.

Enclosure: Draft Complaint

**IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | | |
|---|---|---|
| MR. DOMINIC Y. JU<br>1311 Floral Street, NW<br>Washington, DC 20012<br><br>And<br><br>MRS. DANA JU<br>1311 Floral Street, NW<br>Washington, DC 20012<br><br>*Plaintiffs*,<br>v.<br><br>MR. RANDOLPH CARTER<br>1224 N. Wolcott Avenue<br>Chicago, IL 60613<br><br>And<br><br>MS. ELIZABETH DENEVI<br>1224 N. Wolcott Avenue<br>Chicago, IL 60613<br><br>And<br><br>ROBERT L. LEE JR. & ASSOCIATES<br>8723 Silent Court<br>Odenton, MD 21113<br><br>And<br><br>ROBERT LOUISE LEE, JR.<br>8723 Silent Court<br>Odenton, MD 21113<br><br>*Defendants*. | ) | Civil Action No. ________<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED COMPLAINT**
**ACTION INVOLVING REAL PROPERTY**

COMES NOW DOMINIC Y. JU AND DANA JU, Plaintiffs herein (hereinafter, "Plaintiffs") by and through their undersigned counsel, pursuant to the District of Columbia

Rules of Civil Procedure, and for their Complaint ("Complaint") against Defendant Randolph Carter ("Defendant Carter"), Defendant Elizabeth Denevi ("Defendant Denevi"), Defendant Robert L. Lee Jr. & Associates, LLC, and Defendant Robert Louis Lee, Jr. ("Defendant Lee," and collectively with Defendant Carter, Defendant Denevi, and Defendant Robert L. Lee Jr. & Associates, LLC, the "Defendants"), state as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiffs are a married couple domiciled and residing in the District of Columbia. Plaintiffs are the purchasers and current owners of the residential real property located at 1311 Floral Street, NW, Washington, DC 20012 (hereinafter, the "Property").

2. Defendant Carter and Defendant Denevi are a married couple who, at the time of settlement on the Property with Plaintiffs herein, were domiciled in the District of Columbia. Defendants Carter and Denevi currently reside in Chicago, IL.

3. Defendant Carter and Defendant Denevi are the sellers of the Property to the Plaintiffs herein. See HUD-1 attached hereto and incorporated herein as **Exhibit 1.**

4. Defendant Robert L. Lee Jr. & Associates was a business organized under the laws of the State of Maryland with a principal place of business located at 8723 Silent Court, Odenton, MD 21113. The online public records for the Maryland State Department of Assessments and Taxation reflect that Defendant Robert L. Lee Jr. & Associates is "forfeited" as of 2009, for delinquency, and is therefore no longer considered to have a legal presence in the State of Maryland.

5. A public online records search for the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") shows no record that Defendant Robert L. Lee Jr. & Associates was registered to do business in the District of Columbia as a foreign entity or otherwise.

6. Defendant Robert L. Lee Jr. & Associates provided contractor services for home remodeling and renovation and was the contracting party with Defendant Carter for the Property that is the subject of this lawsuit.

7. Defendant Lee is a natural person domiciled in the State of Maryland. Defendant Lee is the sole proprietor of Robert L. Lee Jr. & Associates and the individual who executed the basement remodeling contract on behalf of Robert L. Lee Jr. & Associates with Defendant Carter to remodel the basement of the Property that is the subject of this lawsuit.

8. Because Defendant Robert L. Lee Jr. & Associates is no longer in existence, for the purposes of this Complaint, the allegations set forth against "Defendant Lee" shall be construed to include both the natural person (Defendant Robert Louis Lee, Jr.) and the business (Defendant Robert L. Lee Jr. & Associates).

9. The Property that is the subject of this suit is located in the District of Columbia; the contract that was breached was ratified in the District of Columbia; the Plaintiffs reside in the District of Columbia; and the Defendants conduct business is in the District of Columbia. All acts giving rise to this claim occurred in the District of Columbia.

10. This Court has jurisdiction over this matter under D.C. Code § 11-921 and Rule 56 SCR-Civ.

11. Venue is proper pursuant to D.C. Code § 13-422 and 13-423 on the basis that the Defendants transact business, contract to supply services, caused tortious injury in the District of Columbia by acts and omissions in the District of Columbia, and have an interest in real property located in the District of Columbia, out of which this lawsuit arises.

**STATEMENT OF FACTS**

12. On or about June 24, 2004, Defendant Carter and Defendant Denevi purchased and made full settlement upon the Property for the purchase price of Five Hundred Twenty-Seven Thousand Dollars and No Cents ($527,000.000). A copy of the deed recorded in the District of Columbia land records reflecting the conveyance to Defendants Carter and Denevi is attached hereto and incorporated herein as **Exhibit 2.**

13. At the time Defendants Carter and Denevi made settlement and took possession of the Property, the basement was unfinished.

14. On or about August 2004, Defendant Carter executed a contracted with Defendant Lee to perform remodeling work to fully finish the Property's basement (the "Renovation Agreement"). Specifically, the Renovation Agreement provided in the Description of Work that Defendant Lee was to perform the following work: "*Basement area, bathroom, laundry room, and office addition to be remodeled, designed, build-out.*" A copy of the Renovation Agreement is attached hereto and incorporated herein as **Exhibit 3.**

15. Defendant Lee performed or caused subcontractors to perform the work described in the Renovation Agreement. This work included adding a new bathroom, new laundry room, new plumbing fixtures, new electrical equipment, new structural support and framing, and new flooring.

16. Defendants Carter and Denevi resided in the Property at the time that Defendant Lee performed the renovations to the basement, and therefore saw the progress of the renovations.

17. The D.C. Construction Codes (2008) and the District of Columbia Construction Codes Supplement of 2008 (collectively, the "Construction Codes") require a Building Permit,

Demolition Permit and Supplement Plumbing, Mechanical and Electrical Permits, with corresponding inspections, for the scope of work described in the Renovation Agreement.

18. Pursuant to 12A DCMR 105.1.3, titled *Owner's Responsibility*, the owner, builder or authorized representative is responsible for securing all required permits and work performed without a required permit is deemed a violation of the Construction Codes.

19. A search of the D.C. Department of Consumer and Regulatory Affairs ("DCRA") records reflects that no permits, excepting supplemental mechanical and electrical permits, appear to have been issued for the renovations made to the basement. A list of the permit record from the DCRA website is attached hereto and incorporated herein as **Exhibit 4.**

20. Defendants did not obtain sufficient permits or inspections required by the Construction Codes for the scope of the basement renovations performed. These violations constitute illegal construction under 12A DCMR 113A.

21. In addition to finishing the basement, Defendants Carter and Denevi caused alterations to be made to the exterior drainage system of the Property, that included re-grading the yard and adding improperly sized gutters, both of which caused overflow that resulted in water leaking into the Property.

22. On or about March 27, 2013, Defendants Carter and Denavi caused the Property to be listed for sale and marketed in the Metropolitan Regional Information Systems, Inc. as MLS listing #DC8039415 ("MLS Listing"), that described the Property as a 5 bedroom home and the basement as "*fully finished w/ BR, Half BA, + space for office*," indicating that the basement is habitable for use as a bedroom. A copy of the MLS Listing is attached hereto and incorporated herein as **Exhibit 5.**

23. Plaintiffs viewed the MLS Listing and relied on the information therein in deciding to purchase the Property.

24. On or about April 1, 2013, Plaintiffs entered into a standard GCAAR Regional Sales Contract (the "Sales Contract") to purchase the Property from Defendants Carter and Denevi for Eight Hundred Thousand Dollars and No Cents ($800,000.00). A copy of the Sales Contract is attached hereto and incorporated herein as **Exhibit 6.**

25. As required by the District of Columbia Residential Real Property Seller Disclosure Act (D.C. Code § 42-1302), Defendants Carter and Denevi prepared and ratified a "Seller's Property Condition Statement" (hereinafter, the "Disclosure Statement"), on February 22, 2013. Defendants Carter and Denevi delivered the Disclosure Statement to Plaintiffs on April 1, 2013 as part of the Sales Contract. See Exhibit 6. In the Disclosure Statement, Defendants Carter and Denevi certified, as required by statute, that the disclosures of the Property's condition were true and correct to the best of their actual knowledge.

26. The Disclosure Statement requires disclosure of "any structural defects in the walls or floors" (Exhibit 6, Disclosure Statement, ¶ A.4); and/or "any current leaks or evidence of moisture in the basement" (Exhibit 6, Disclosure Statement, ¶ A.3); and/or "any problem with drainage on the property" (Exhibit 6, Disclosure Statement, ¶ D.1); and/or "whether the property has previously been damaged by flooding" (Exhibit 6, Disclosure Statement, ¶ D.2); and/or if there were "any substances, materials, or environmental hazards [including asbestos] on or affecting the property" (Exhibit 6, Disclosure Statement, ¶ D.4).

27. In response to each of these required disclosures, Defendants Carter and Denevi explicitly answered "NO."

28. In stating "NO" in response to the disclosure inquiries, Defendants Carter and Denevi declared to have no actual knowledge of the types of defects listed in the disclosure inquiries.

29. Defendants Carter and Denevi did not amend the Disclosure Statement at any time prior to the settlement date for the sale of the Property and transfer of possession to Plaintiffs.

30. On May 17, 2013, Plaintiffs and Defendants Carter and Denevi made full settlement on the Property and Plaintiffs took possession thereof.

31. On July 12, 2013, Plaintiffs moved into the Property with their infant son.

32. That evening, their first night living in the Property, Plaintiffs discovered wet carpet in the basement bedroom. In an effort to locate the source of the dampness, my clients lifted a small section of the carpet. Lifting merely a small section of the basement carpet revealed what appeared to be extensive water damage and disturbed asbestos tiles. Plaintiffs then removed sections of the carpet throughout the basement to inspect the extent of the water damage and asbestos. In doing so, Plaintiffs observed what appeared to be black mold, water damage, and fragments of fractured asbestos tiles throughout the basement beneath the carpeting.

33. On July 13, 2013, Plaintiff Dana Ju emailed Defendant Denevi inquiring as to whether she was aware of prior instances of flooding in the Property's basement during the years 2004 to 2013 that they owned and occupied the Property.

34. That same day, Defendant Denevi responded in the 10:22 a.m. email, stating that "*[o]nce we fixed the drainage outside, we had no water in the basement*," and further stating that the source of the overflow is the "*back 'corner' just outside the guest bedroom window [which] is the juncture point for two big gutters*." A copy of the email communication is attached hereto and incorporated herein as **Exhibit 7**.

35. Following discovery of the water damage, Plaintiffs obtained assessments of the water damage from several repair companies and general contractors. Each told the Plaintiffs that improper drainage in the exterior spaces of the Property caused damage to the mortar and windows, thus allowing water penetration into the basement. Each also observed that the drainage issue and interior water damage had not only occurred in the past, but has continued to occur for a prolonged period of several years.

36. In the course of assessing the water damage, the water damage repair companies and general contractors informed Plaintiffs that there appeared to be asbestos flooring in the Property's basement.

37. On August 13, 2013, Plaintiffs retained Geller Environmental Services ("Geller") to analyze and investigate the asbestos.

38. On August 14, 2013, Geller delivered a report of its testing that confirmed the presence of asbestos in the Property, and further advised Plaintiffs to avoid the basement and to never expose their infant son to the asbestos hazard in the basement. A copy of the Geller Environmental Services report is attached hereto and incorporated herein as **Exhibit 8.**

39. On August 25, 2013, in an effort to learn the history of the water damage, the Plaintiffs met with Daniel and Ruth Jordan, who are the former owners of the Property that sold the Property to Defendants Carter and Denevi in 2004.

40. During their meeting that day, Daniel Jordan informed the Plaintiffs that he had experienced water leaks and moisture in the basement while he owned the Property.

41. In the same meeting, Daniel Jordan told Plaintiffs that he had installed the asbestos tile flooring in the then-unfinished basement when he and Ruth Jordan occupied the Property.

Daniel Jordan also informed the Plaintiffs that when he and Ruth Jordan sold the Property to

Defendants Carter and Denevi in 2004, that the asbestos tiles were exposed and fully intact.

42.     After Defendants Carter and Denevi purchased and took possession of the Property in

2004 from Daniel and Ruth Jordan, they retained Defendant Lee to fully remodel and finish the

basement.  The remodeling work was performed while Defendants Carter and Denevi owned and

lived in the Property, and included installing new carpet, new windows, a new laundry room, a

finished bathroom, and new structural framing.

43.     During the basement remodeling, the Defendant Lee partially removed the asbestos tiles,

leaving fractured and friable tiles throughout the flooring, then installed carpeting on top of the

partially abated tiles.  In addition, Defendant Lee constructed new drywall framing built upon the

tiles and secured the framing with nails through the asbestos tiles.

44.     The asbestos was further disturbed by the ongoing damage caused by Defendants Carter

and Denevi's insufficient remedial repairs and defective alterations to the exterior drainage

system of the Property on or about August 10, 2004.  The purported repairs and alterations

involved installation of improperly sized gutters and improper grading that not only failed to

abate the water leaking, but also caused water overflow and accumulation that leaked into the

Property through the very corner of the Property Defendant Denevi discussed in her July 13,

2013 email as the source of the continuous leaking into the basement.

45.     Defendants Carter and Denevi's improper repairs and alterations directly and proximately

caused the extensive water damage and further disturbance of the asbestos tiles in the Property's

basement.  A copy of the contract for installation of the gutter system is attached hereto and

incorporated herein as **Exhibit 9.**

46. But for Defendants' negligent repairs and reckless disregard for proper asbestos abatement procedures, the asbestos tiles would not have become hazardous.

47. All Defendants had actual knowledge of the presence of asbestos, water damage, and structural defects in the Property.

48. No Defendant disclosed the existence of these hazards, damage, and/or defects to Plaintiffs.

49. These hazards, damage, and defects were not discoverable during an ordinary and reasonable home inspection.

50. On November 4, 2013, Plaintiffs obtained an expert assessment of the condition of Property's basement from BJC ("BJC"), and an estimate for asbestos abatement and repair to bring the basement to a habitable condition. BJC estimated the total cost of repairs to correct the identified defects to be approximately $100,000.00. A copy of the BJC Report is attached hereto and incorporated herein as **Exhibit 10.**

51. On November 11, 2013, Plaintiffs obtained a second expert assessment of the condition of Property's basement from City Renovations & Remodeling, LLC ("City"), and an estimate for repair to bring the basement to a habitable condition. City estimated the total cost of repairs to correct the identified defects to be approximately $70,000.00. The City Report does not account for asbestos abatement. A copy of the City Report is attached hereto and incorporated herein as **Exhibit 11.**

52. Due to the effects of the presence of asbestos, the water damage, and the defective renovations, Plaintiffs are required to demolish and fully renovate the entire basement.

53. To abate the exterior drainage problems to prevent further water damage, Plaintiffs must perform extensive repair work to the gutters, windows, and grading of the yard.

54. The asbestos tiles that Defendants disturbed and concealed continue to pose a significant health hazard to Plaintiffs and to their infant son. Plaintiffs have been deprived of the full use and enjoyment of their home.

55. Plaintiffs have spent significant sums to correct some of the defects and hazards, and anticipate spending extensive additional costs to make the Property safe, habitable, and in the promised condition.

56. On September 12, 2013, Marty Stanton of KVS Title sent, on behalf of Plaintiffs, to Defendants Carter and Denevi written notice of the asbestos hazards, water damage, and structural defects in the Property, and an offer to amicably settle the dispute. Defendants Carter and Denevi rejected this offer. A copy of the written offer is attached hereto and incorporated herein as **Exhibit 12.**

57. On October 14, 2013, Plaintiffs sent Defendants Carter and Denevi via the 4:12 p.m. email a second offer to amicably settle the dispute. Defendants Carter and Denevi rejected this offer. A copy of the written offer is attached hereto and incorporated herein as **Exhibit 13.**

58. On January 10, 2014, Plaintiffs sent Defendants Carter and Denevi a letter offering the amicable settlement of the dispute. A copy of the letter is attached hereto and incorporated herein fully referenced as Plaintiff's **Exhibit 14.**

59. Defendants Carter and Denevi have declined the Plaintiffs' offer to settle these claims.

**<u>COUNT I</u>**
**BREACH OF CONTRACT**
**As to Defendants Carter and Denevi**
**(Addendum and Seller Disclosure Statement)**

60. Plaintiff incorporates by reference the allegations contained in paragraphs 1 through 59 above.

61. On April 1, 2013, Plaintiffs and Defendants Carter and Denevi entered into the Sale Contract for the Property. On May 17, 2013, Plaintiffs and Defendants Carter and Denevi made full settlement on the Property.

62. Under the material terms of the Sales Contract, Defendants Carter and Denevi agreed to deliver the Property to Plaintiffs with the basement in a habitable condition free from environmental hazards and water damage problems.

63. Under the material terms of the Sales Contract, which incorporated the Disclosure Statement, Defendants Carter and Denevi agreed to disclose in good faith all information required under D.C. Code § 42-1301 *et seq.*

64. Plaintiffs fully performed their obligations under the Sales Contract.

65. On April 1, 2013, Defendants Carter and Denevi delivered to the Plaintiffs the Property with an uninhabitable basement with substantial structural defects, asbestos hazards, and water damage.

66. Defendants Carter and Denevi materially breached the Sales Contract by failing to deliver the Property with the basement in a habitable condition free from structural defects, asbestos hazards, and water damage.

67. Defendants Carter and Denevi materially breached the Sales Contract by failing to disclose actually known asbestos hazards, water damage, and structural defects in the Property to Plaintiffs.

68. The Sales Contract provides that "the provisions not satisfied at Settlement will survive the delivery of the deed and will not be merged therein." See Exhibit 6, para. 31. Accordingly, the breached covenants under the terms of the contract survived the delivery of the deed.

69. Despite several demands by the Plaintiffs to Defendants Carter and Denevi to pay for repairs to restore the Property to the promised condition, Defendants Carter and Denevi have refused to pay for any repairs to the Property to fix the asbestos hazard and defects throughout the Property.

70. Defendants Carter and Denevi's material breach has caused Plaintiffs to incur a substantial pecuniary loss, including diminution in value of the Property, and additional costs in the future to restore the Property to the promised condition.

WHEREFORE, the Plaintiffs request rescission of the Sales Contract and setting aside the deed for transfer of the Property from Defendants Carter and Denevi to Plaintiffs herein; or, alternatively, judgment against Defendants Carter and Denevi, jointly and severally, in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable costs and attorney's fees, and all other relief this Court deems just and proper.

**COUNT II**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**
**As to Defendant Carter and Defendant Denevi**

71. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 59 above.

72. On April 1, 2013, Plaintiffs and Defendants Carter and Denevi entered into the Sales Contract for the Property, which contains an implied duty of good faith and fair dealing.

73. Defendants Carter and Denevi materially breached this duty by failing to disclose the Property had been illegally renovated; falsely representating and failing to disclose known structural defects, environmental hazards, and water damage of the Property; and otherwise willfully rendering imperfect performance of the Sales Contract.

74. Defendants Carter and Denevi's material breach deceived Plaintiffs into believing that the Property was in a condition worth the value of the purchase price.

75. On May 17, 2013, believing Defendants Carter and Denevi was acting in good faith, Plaintiffs made full settlement on the Property and paid Defendants Carter and Denevi the purchase price of $800,000.00.

76. On May 17, 2013, Defendants Carter and Denevi delivered to Plaintiffs the Property with a basement rife with defects and environmental hazards, in a condition grossly deviating from the renovated and hazard-free condition in which Defendants Carter and Denevi represented it to be.

77. Defendants Carter and Denevi's material breach caused Plaintiffs to incur substantial expenses to date and must incur additional costs in the future to restore the Property's basement to the habitable condition it was represented to be by Defendants Carter and Denevi.

WHEREFORE, the Plaintiffs request rescission of the Sales Contract and setting aside the deed for transfer of the Property from Defendants Carter and Denevi to Plaintiffs herein; or, alternatively, judgment against Defendants Carter and Denevi, jointly and severally, in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable attorneys' fees and court costs and such further relief as relief this Court deems proper.

**COUNT III**
**BREACH OF WARRANTY**
**As to Defendant Carter and Defendant Denevi**

78. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 59 above.

79. On April 1, 2013, Plaintiffs and Defendants Carter and Denevi entered into the Sales Contract for the Property, which was a valid and enforceable contract.

80. Under the material terms of the contract, Defendants Carter and Denevi warranted that the existing basement was habitable and hazard-free as of the Possession Date.

81. On May 17, 2013, Defendants Carter and Denevi delivered to Plaintiffs the Property with a basement rife with defects and environmental hazards, in a condition grossly deviating from the renovated and hazard-free condition in which Defendants Carter and Denevi represented it to be.

82. Defendants Carter and Denevi materially breached this warranty by failing to delivery the Property with a habitable and hazard-free basement.

83. Defendants Carter and Denevi's material breach caused Plaintiffs to incur substantial expenses to date and must incur additional costs in the future to restore the Property's basement to the habitable and hazard-free condition it was warranted to be by Defendants Carter and Denevi.

WHEREFORE, the Plaintiffs request rescission of the Sales Contract and setting aside the deed for transfer of the Property from Defendants Carter and Denevi to Plaintiffs herein; or, alternatively, judgment against Defendants Carter and Denevi, jointly and severally, in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable attorneys' fees and court costs and such further relief as relief this Court deems proper.

**<u>COUNT IV</u>**
**NEGLIGENT MISREPRESENTATION**
**As to Defendant Carter and Defendant Denevi**

84. Plaintiffs incorporate herein by reference the allegations in Paragraphs 1 through 59 of the Complaint.

85. Defendants Carter and Denevi had a duty to exercise reasonable care in the marketing, selling, advertising and otherwise promoting of the Property to potential purchasers such as Plaintiffs, which included a duty to accurately describe the condition of the Property to Plaintiffs.

86. Defendants Carter and Denevi breached this duty and negligently misrepresented the property's suitability for occupancy and actual condition when they omitted material information from the Disclosure Statement contained in the Sales Contract in failing to disclose the previous instances of flooding, leaking, and/or drainage problems with the Property, and known asbestos hazard, that Defendants Carter and Denevi knew or should have known existed.

87. Defendants Carter and Denevi's statements as to the condition of the Property involved a material issue for the Plaintiffs, as their decision to purchase the Property was made on the belief that they were purchasing a fully renovated and ready to move-in Property with a habitable basement and no defects or environmental hazards.

88. Plaintiffs, to their detriment, entered into the Sale Contract with Defendants Carter and Denevi in reasonable reliance upon their statements and omissions, and, as a direct and proximate result of these negligent misrepresentations, purchased a Property that contained nor as valuable as believed to be at the time of purchase.

WHEREFORE, the Plaintiffs request judgment against Defendant Carter and Defendant Denevi, jointly and severally, in the amount of One Hundred Fifty Dollars and No Cents ($150,000.00), punitive damages in the amount of Three Hundred Thousand Dollars and No Cents ($300,000), reasonable attorneys' fees and costs and such further relief as relief this Court deems proper.

**COUNT V**
**FRAUDULENT MISREPRESENTATION**
**As to Defendant Carter and Defendant Denevi**

89. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 59 above.

90. To facilitate the sale of the Property to Plaintiffs, Defendants Carter and Denevi made representations to the Plaintiffs as to the condition of the Property and the quality of their renovations to the Property that were false and known to be false by them when made.

91. Defendants Carter and Denevi made a false representation of material fact when they declared on the Disclosure Statement that the Property had no known defects, when they had actual knowledge of previous instances of flooding, leaking, and/or drainage problems with the Property, and had actual knowledge of the asbestos hazard, as follows:

(a) Statement number A.3 of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge of any current leaks or evidence of moisture in the basement?" Defendants Carter and Denevi answered "No." However, Defendant Denevi's June 13, 2013, email response evidences actual knowledge of prior water damage.

(b) Statement number A.4. of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge of any structural defects in walls or floors?" Defendants Carter and Denevi answered "No". However, the renovations to the basement were made using slipshod methods resulting in significant defects to the walls and floors, including constructing drywall framing on top of and nailed to fragmented asbestos tiles.

(c) Statement number D.1. of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge of any problem with drainage on the property?" Defendants Carter and Denevi answered "No".

(d)    Statement number D.2. of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge whether the property has previously been damaged by flooding?"  Defendants Carter and Denevi answered "No." However, Defendant Denevi's June 13, 2013, email response evidences actual knowledge of prior water damage.

(e)    Statement number D.4. of the Disclosure Statement requires the seller to answer the following question, "[d]oes the seller have actual knowledge of any substances, materials or environmental hazards [including asbestos] on or affecting the property?" Defendants Carter and Denevi answered "No."  However, Defendants Carter and Denevi purchased the Property from Daniel and Ruth Jordan with the asbestos tiles intact and exposed, then proceeded to cause the asbestos to be disturbed in the course of renovating the basement, then concealed the hazardous condition by causing carpeting to be installed on top of the disturbed asbestos tiles.

92.    When answering the above questions in the Disclosure Statement, Defendants Carter and Denevi had actual knowledge that there were previous instances of flooding, leaking, and/or drainage problems with the Property; had actual knowledge of structural defects in the walls and flooring; and had actual knowledge of the asbestos hazard.  The statements in the Disclosure Statement are completely false.

93.    Defendants Carter and Denevi made these false representations of material fact with the intent to deceive the Plaintiffs into purchasing the Property at a price in excess of its actual value in view of the existing defects and hazards, and for financial gain divesting Defendants Carter and Denevi of the financial cost of remediation and repair.

94. Defendants Carter and Denevi caused the carpet to be installed on top of the hazardous asbestos tile, concealing the hazards and causing the asbestos to be undiscoverable by reasonable inspection.

95. The false representations affected the willingness of Plaintiffs to purchase the Property, as the Plaintiffs reasonably relied on the false representations in making their decision to purchase the Property, to their detriment.

96. Plaintiffs would not have purchased the Property if the defects, in particular, the asbestos hazard, had been disclosed to them.

97. Plaintiffs have suffered injury as a result of Defendant Carter and Defendant Denevi's false representation of material fact, including, but not limited to, remediation and abatement costs, professional fees and expenses, and diminution of Property value.

WHEREFORE, the Plaintiffs request judgment against Defendants Carter and Denevi, jointly and severally, in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), punitive damages in the amount of Three Hundred Thousand Dollars and No Cents ($300,000), reasonable attorneys' fees and costs and such further relief as relief this Court deems proper.

**COUNT VI**
**NEGLIGENCE PER SE**
**As to Defendant Carter and Defendant Denevi**
**(Violation of DC Code § 42-1305-06)**

98. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 59 above.

99. Sections 42-1305 and 42-1306 of the D.C. Code require sellers of real property to furnish a Disclosure Statement to prospective purchasers describing all known defects in the real

property, including previous instances of flooding, current leaking and/or drainage problems, and environmental hazards.

100. Defendants Carter and Denevi, who were identified as the "sellers" of the Property when Plaintiffs made their offer to buy the Property, violated DC Code § 42-1305-06 when they affirmatively represented to Plaintiffs in the Disclosure Statement that he had no actual knowledge of previous instances of flooding, current leaking and/or drainage problems, and/or environmental hazards, all as described above.

101. Defendants Carter and Denevi breached his statutory duty when they failed to disclose in writing on the Disclosure Statement the Property's known defects, and falsely stated there were no such known defects.

102. Plaintiffs are the purchasers of the Property, and therefore individuals intended to be protected by D.C. Code § 42-1305 and § 42-1306.

103. Plaintiffs reasonably relied on the statements made in the statutorily mandated Disclosure Statement to their detriment.

104. As a direct and proximate result of the misstatements and omissions contained in the Disclosure Statement, Defendants Carter and Denevi induced Plaintiffs to purchase the Property and caused Plaintiffs to suffer injury because of extensive defects to the Property. But for Defendants Carter and Denevi's misstatements and omissions regarding the condition of the Property, Plaintiffs would not have purchased the Property at the agreed-upon price.

105. The failure of Defendants Carter and Denevi to disclose, in good faith, known defects and environmental hazards caused and continues to cause Plaintiffs significant damage, including but not limited to, remediation costs, professional fees and expenses, and diminution of Property value.

106. WHEREFORE, the Plaintiffs request judgment against Defendant Carter and Defendant Denevi, jointly and severally, in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable attorneys' fees and court costs, and such further relief as this Court deems proper.

**COUNT VII**
**NEGLIGENCE PER SE**
**As to Defendant Carter and Defendant Denevi**
**(Violation of D.C. Code § 6-1401, *et seq.* and DCMR 12)**

107. Plaintiffs incorporate herein by reference the allegations in Paragraphs 1 through 59 of the Complaint.

108. District of Columbia Municipal Regulations ("DCMR") 12A § 105.1 requires Property owners performing renovation, repair, and home improvement work to obtain permits for the work from the District of Columbia Department of Regulatory and Consumer Affairs ("DCRA"). (DCMR 12A §§ 105.1.4 and 105.1.13).

109. Work started without a permit where a permit is determined to be required is a per se violation of the Construction Codes (DCMR 12A § 105.1.3).

110. The duty to obtain requisite permits prior to performing construction, repairs, and home improvements imposed by DCMR 12A § 105.1 is intended to protect the safety of residential property owners and occupants by ensuring that the renovation and repair work is performed in accordance with applicable Construction Code standards.

111. At the time the basement renovations were made to the Property, Defendants Carter and Denevi were the owners of the Property.

112. For all of the renovations, repairs, and home improvements Defendants Carter and Denevi made to the Property, they obtained a total of four (4) permits:

(a) Supplemental Permit # M83363 issued September 13, 2004 for mechanical work;

(b) Supplemental Permit # E88341 issued December 8, 2004 for electrical work;

(c) Permit # F107828 issued June 8, 2007 for fence construction; and

(d) Supplemental Permit # E151521 issued September 17, 2007 electrical work.  See Exhibit 4.

113. Defendants Carter and Denevi breached their duty of care by knowingly or negligently permitting the basement renovations, including installation of a new plumbing system and structural support, to be built, installed, and repaired without obtaining permits for the work as required by DCMR 12A § 105.1.

114. If Defendants Carter and Denevi had complied with the permit and inspection requirements of the Construction Codes, the defects in the Property would have been avoided or cured.

WHEREFORE, the Plaintiffs request judgment against Defendant Carter and Defendant Denevi, jointly and severally, in the amount of One Hundred Thousand Fifty Dollars and No Cents ($150,000.00), reasonable attorneys' fees and costs and such further relief as relief this Court deems proper.

## COUNT VIII
### NEGLIGENCE
### As to Defendant Lee

115. Plaintiffs incorporate herein by reference the allegations in Paragraphs 1 through 59 of the Complaint.

### Negligent Construction
### (Violation of D.C. Code § 6-1401, *et seq.* and DCMR 12)

116. Defendant Lee performed remodeling and renovation work to the Property's basement, and in conducting this activity, had a nondelegable duty to comply with the Construction Codes and in making the renovations, repairs, and home improvements to the Property.

117. The Construction Codes are intended to establish the minimum standards to safeguard the public health, safety, and general welfare.

118. Defendant Lee had a duty to use due care in the design, inspection, and construction that extends to persons foreseeably subjected to the risk of personal injury because of a latent and unreasonably dangerous condition resulting from that negligence.

119. Defendant Lee was negligent in failing to properly abate the asbestos from the Property that he discovered in the course of construction to the basement.

120. Defendant Lee was negligent in disturbing the tiles and concealing them beneath the carpeting he installed.

121. The post-settlement inspections identified dangerous latent conditions, the asbestos hazard in particular, that created risk of death or personal injury, particularly to the Plaintiff's infant son.

122. The asbestos hazards were a direct and proximate result of Defendant Lee's negligence in construction to the Property.

123. Defendant Lee exposed Plaintiffs to risks of personal injury through his negligence.

124. The threat to the safety and welfare of the Plaintiffs was significant to the degree that they were advised not to use the basement of the Property until it was repaired to a condition safe for habitability.

125. Defendant Lee, the party who performed the renovation work to the Property's basement, negligently created unsafe conditions that directly and proximately caused the Plaintiffs to suffer damages, including the cost of repair work necessary to correct the dangerous conditions to make the Property habitable.

**Negligence Arising Under the Renovation Agreement**

126. Defendant Lee contracted with Defendant Carter to perform remodeling work to the Property's basement.

127. At all relevant times, Defendant Lee was a licensed professional in DC.

128. Defendant Lee owed duty of care to Plaintiffs to remodel the Property's basement in a safe, skillful, careful, diligent, and worklike manner.

129. In performing the construction within the Renovation Agreement's scope of work, Defendant Lee should have known that protection of third parties either visiting Property or subsequent purchasers was important, and that his failure to exercise reasonable care in performing the work under the contract increases the risk of physical harm to third parties.

130. Defendant Lee breached his duty by recklessly and/or negligently creating, then concealing, hazardous asbestos conditions in the Property that created dangerous health hazards.

131. Defendant Lee's breach proximately caused Plaintiffs' injuries.

WHEREFORE, the Plaintiffs request judgment against Defendant Lee in the amount of One Hundred Fifty Thousand Dollars and No Cents ($150,000.00), reasonable attorneys' fees and costs and such further relief as relief this Court deems proper.

**COUNT IX (ALTERNATIVE)**
**UNLAWFUL TRADE PRACTICES**
**As to Defendant Lee**
**(Violation of DC Code § 28-3901, *et seq.*)**

132. Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 59 above.

133. In the alternative, Defendant Lee committed unlawful trade practices in violation of the District of Columbia Consumer Protection Procedures Act, § 28-3901, *et seq.*

134.   Defendant Lee is a "merchant" of "goods and services" as defined by the District of Columbia Consumer Protection Procedures Act, § 28-3901, *et seq.*

135.   Specifically, Defendant Lee committed unlawful trade practices in violation of D.C. Code §§ 28-3904 (d), when he represented that his construction and remodeling services performed were of the quality of a licensed professional, and that he had fully renovated the basement so that it was of a habitable condition free from defects and hazards, when in fact the basement as he renovated it was uninhabitable due to hazardous asbestos he had recklessly disturbed and concealed beneath carpeting.

136.   Specifically, Defendant Lee committed unlawful trade practices in violation of D.C. Code §§ 28-3904 (f), when he failed to disclose the Property's defects and asbestos hazards to Defendants Carter and Denevi that he discovered in the course of making the basement renovations, and proceeded to conceal the defects and asbestos hazards beneath carpeting.

137.   Plaintiffs have suffered injury as a result of Defendant Lee' unlawful trade practices, including, but not limited to, remediation costs, professional fees and expenses, diminution of Property value, and exposure to health hazards.

138.   Plaintiffs would not have been injured but for Defendant Lee' unlawful trade practices.

139.   Section 28-3905(k) of the D.C. Code permits a private right of action when an individual has been the victim of unlawful trade practices. This section also permits the victim of unlawful trade practices to recover treble damages, attorneys' fees and expenses, and punitive damages.

WHEREFORE, the Plaintiff demands judgment against Defendant Lee in the amount of treble damages of Four Hundred Fifty Thousand Dollars and No Cents ($450,000.00), reasonable attorneys' fees, costs and all other relief this Court deems proper.

**JURY DEMAND**

Plaintiffs Dominic Ju and Dana Ju demand a trial by jury for all issues so triable.

Dated: ____________

Respectfully submitted,

By ______________________________

Peter D. Antonoplos, Esq.
DC Bar # 485119
Antonoplos & Associates, Attorneys at Law
805 15th Street, NW
Suite 501
Washington, DC 20005
Telephone: (202) 803-5676
Fax: (202) 803-5677
Email: Peter@antonlegal.com

*Attorney for the Plaintiffs*

DRAFT

PLAINTIFF'S VERIFICATION

I, Dana Ju, Plaintiff herein, under penalty of perjury, state that I have read the foregoing Verified Compliant, and that the information stated therein as factual is true and correct, and those factual matters which are stated upon information and belief are believed to be true and correct. Executed on this ___th day of __________, 2014.

______________________________
Dana Ju

STATE OF ____________________________ )
) ss.
CITY OF THE DISTRICT OF COLUMBIA )

I, the undersigned, a Notary Public in and for the DISTRICT OF COLUMBIA, do hereby certify that DANA JU, party to the foregoing instrument bearing date on the _day of ________, 2014, and hereto annexed, personally appeared before me, and the said DANA JU being personally well known to me as (or proved by the oath of credible witnesses to be) the person who executed the foregoing instrument, and acknowledged the same to be their act and deed.

Given under my hand and official seal, this ________day of ________, 2014.

______________________________
NOTARY PUBLIC

My commission expires: ________________

PLAINTIFF'S VERIFICATION

I, Dominic Y. Ju, Plaintiff herein, under penalty of perjury, state that I have read the foregoing Verified Compliant, and that the information stated therein as factual is true and correct, and those factual matters which are stated upon information and belief are believed to be true and correct. Executed on this __th day of __________, 2014.

______________________________
Dominic Y. Ju

STATE OF ______________________________ )
) ss.
CITY OF THE DISTRICT OF COLUMBIA )

I, the undersigned, a Notary Public in and for the DISTRICT OF COLUMBIA, do hereby certify that DOMINIC Y. JU, party to the foregoing instrument bearing date on the ____day of ________, 2014, and hereto annexed, personally appeared before me, and the said DOMINIC Y. JU being personally well known to me as (or proved by the oath of credible witnesses to be) the person who executed the foregoing instrument, and acknowledged the same to be their act and deed.

Given under my hand and official seal, this ________day of ________, 2014.

______________________________
NOTARY PUBLIC

My commission expires: ________________